# Exhibit D



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

MAR 2 9 2016

Food and Drug Administration
10903 New Hampshire Avenue
Building #51
Silver Spring, MD 20993

Donna Harrison, M.D.
Executive Director
American Association of Pro Life Obstetricians and Gynecologists
P.O. Box 395
Eau Claire, MI 49111

Gene Rudd, M.D.
Senior Vice President
Christian Medical and Dental Associations
P.O. Box 7500
Bristol, TN 37621

Penny Young Nance
CEO and President
Concerned Women for America
1015 Fifteenth St., NW
Suite 1100
Washington, DC 20005

Re: Docket No. FDA-2002-P-0364

Dear Drs. Harrison and Rudd and Ms. Nance:

This letter responds to your citizen petition submitted on August 20, 2002, to the Food and Drug Administration (FDA or Agency) on behalf of the American Association of Pro Life Obstetricians and Gynecologists (AAPLOG), the Christian Medical Association (CMA) (n/k/a the Christian Medical and Dental Associations), and Concerned Women for America (CWA) (Petition).[1] Your Petition requests that the Agency stay FDA's approval of Mifeprex (mifepristone, also known as RU-486), thereby halting the distribution and marketing of the drug pending final action on the Petition. The Petition also requests that the Agency revoke FDA's approval of Mifeprex and requests a full audit of the French and U.S. clinical trials submitted in support of the new drug application (NDA) for Mifeprex.

We have carefully considered the information submitted in your Petition, comments on your Petition submitted to the docket, other submissions to the docket, and other relevant data available to the Agency. Based on our review of these materials and for the reasons described below, your Petition is denied.

---

[1] The citizen petition was originally assigned docket number 2002P-0377/CP1. The number was changed to FDA-2002-P-0364 as a result of FDA's transition to its new docketing system (Regulations.gov) in January 2008. This citizen petition was submitted by AAPLOG, CMA, and Sandy Rios, the then-President of CWA. We have addressed this response to CWA's current CEO and President, Penny Young Nance.

Docket No. FDA-2002-P-0364

## I.    BACKGROUND

On September 28, 2000, FDA approved Mifeprex for the medical termination of intrauterine pregnancy through 49 days' pregnancy (NDA 20-687).  The application was approved under 21 CFR part 314, subpart H, "Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses" (subpart H).  This subpart applies to certain new drug products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments.  Specifically, § 314.520 of subpart H provides for approval with restrictions that are needed to assure the safe use of the drug product.  In accordance with § 314.520, FDA restricted the distribution of Mifeprex as specified in the approval letter, including a requirement that Mifeprex be provided by or under the supervision of a physician who meets eight qualifications specified in the letter.

The September 28, 2000, approval letter also listed two Phase 4 commitments[2] that the then-applicant of the Mifeprex NDA (i.e., the Population Council)[3] agreed to meet.  In addition, the letter stated that FDA was waiving the pediatric study requirement in 21 CFR 314.55.

## II.    DISCUSSION OF ISSUES RAISED

You maintain that good cause exists for granting an immediate stay of the Mifeprex approval and for the subsequent revocation of that approval under 21 CFR 314.530 (Petition at 3).  You contend that:

- The approval of Mifeprex in 2000 violated the Administrative Procedure Act's (APA's) prohibition against agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law (5 U.S.C. 706(2)(A));

- The 2000 approval violated section 505 of the Federal Food, Drug, and Cosmetic Act (the FD&C Act) (21 U.S.C. 355) because Mifeprex does not satisfy the safety and labeling requirements of that section; and

- FDA approved Mifeprex in 2000 despite the presence of substantial risks to women's health, including fatal hemorrhage and serious bacterial infections.

You make eight arguments for the stay and revocation of the 2000 Mifeprex approval, as follows (Petition at 4-7):

---

[2] For purposes of this petition response, the term 'Phase 4 commitments' refers to the postmarketing studies that the Mifeprex sponsor agreed to perform as a condition of approval.

[3] Effective October 31, 2002, the Population Council transferred ownership of the Mifeprex NDA to Danco Laboratories, LLC (Danco), which had been licensed to manufacture and market Mifeprex.

Docket No. FDA-2002-P-0364

- That the approval of Mifeprex in 2000 violated the legal requirements of the accelerated approval regulations under 21 CFR Subpart H.

- That Mifeprex was not proven safe and effective in 2000 as required by law.

- That the Mifeprex regimen requires that Mifeprex be used in conjunction with another drug, misoprostol, which has not been separately approved as an abortifacient.

- That the Mifeprex regimen was approved in 2000 without adequate safety restrictions.

- That the drug's sponsor, following the approval in 2000, neglected to require Mifeprex providers to adhere to the restrictions contained in the regimen approved at that time.

- That the safeguards employed in one of the clinical trials that supported the 2000 approval were not mirrored in the regimen that FDA approved.

- That FDA improperly waived a requirement for pediatric studies in connection with the 2000 Mifeprex approval.

- That FDA did not require the sponsor of Mifeprex to honor its commitments for Phase 4 studies.

We respond to each of these arguments below.

We note your petition challenges the original approval of Mifeprex in 2000, and therefore this response is addressed to the 2000 approval and to the labeling that was approved at that time. Today, the Agency is approving a supplemental NDA submitted by Danco Laboratories, LLC (Danco), the holder of the Mifeprex NDA. This supplemental NDA proposed modified labeling for Mifeprex, including an updated dosing regimen, and included data to support the new labeling. After reviewing Danco's supplemental NDA, FDA determined that it met the statutory standard for approval. The fact that the previously approved regimen is no longer included in the labeling does not reflect a decision that there were safety or effectiveness concerns with the previously approved regimen.

A.    **Approval of Mifeprex Was Consistent With Subpart H**

You maintain that FDA's 2000 approval of Mifeprex under the subpart H regulations was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and thus violated the APA (Petition at 18-23). You state that pregnancy, without major complications, is not a serious or life-threatening illness; instead, you claim it is a normal physiological state experienced by most females one or more times and is rarely accompanied by life-threatening complications (Petition at 19). You contend that Mifeprex does not provide meaningful therapeutic benefit to patients over existing treatments because surgical abortion is a less dangerous, more effective alternative for the termination of pregnancy, and that Mifeprex does not treat any subset of the female population that is unresponsive to or intolerant of surgical abortion

Docket No. FDA-2002-P-0364

(Petition at 21-23). Thus, you assert that the approval of Mifeprex did not meet the requirements for product approval under subpart H (Petition at 23).

We disagree with your conclusion that we inappropriately approved Mifeprex under subpart H. As stated in section I above, the accelerated approval regulations apply to new drug products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments (§ 314.500). As FDA made clear in the preamble to the final rule for subpart H, the subpart H regulations are intended to apply to serious or life-threatening conditions, as well as to illnesses or diseases.[4] The Agency also made clear that a condition need not be serious or life-threatening in all populations or in all phases to fall within the scope of these regulations.[5] Unwanted pregnancy falls within the scope of subpart H under § 314.500 because unwanted pregnancy, like a number of illnesses or conditions, can be serious for certain populations or under certain circumstances.

Pregnancy can be a serious medical condition in some women.[6] Pregnancy is the only condition associated with preeclampsia and eclampsia and causes an increased risk of thromboembolic complications, including deep vein thrombophlebitis and pulmonary embolus. Additionally, there is a significant risk of a major surgical procedure and anesthesia if a pregnancy is continued; for 2013 (the most recent data available), the Centers for Disease Control and Prevention reported an overall 32.7 percent rate of cesarean sections in the United States.[7] Other medical concerns associated with pregnancy include the following: disseminated intravascular coagulopathy (a rare but serious complication); amniotic fluid embolism; life-threatening hemorrhage associated with placenta previa, placenta accreta, placental abruption, labor and delivery, or surgical delivery; postpartum depression; and exacerbation or more difficult management of preexisting medical conditions (e.g., diabetes, lupus, cardiac disease, hypertension). In addition, approximately 50 percent of all pregnancies in the United States each year are unintended.[8] According to the

---

[4] See, e.g., 57 FR 58942, 58946 (Dec. 11, 1992).

[5] Id.

[6] According to data from the Centers for Disease Control and Prevention (CDC), for 2012 (the most recent year for which data are available), the pregnancy-related mortality ratio in the United States was 15.9 maternal pregnancy-related deaths per 100,000 live births. See CDC, Pregnancy Mortality Surveillance System, available on the CDC Web page at
http://www.cdc.gov/reproductivehealth/maternalinfanthealth/pmss.html. A 2012 study by Raymond and Grimes provides a comparison for the mortality rate associated with legal abortion to live birth in the United States for the earlier period from 1998 through 2005. Investigators reported that over the study period, the pregnancy related mortality rate among women who delivered live neonates was 8.8 deaths per 100,000 live births. This lower rate excludes deaths from ectopic pregnancies, stillbirths, gestational trophoblastic disease, etc. During the same period, the rate of abortion related mortality was 0.6 per 100,000 abortions. The risk of childbirth related death was therefore approximately 14 times higher than the rate associated with legal abortion. Raymond, EG and DA Grimes, Feb. 2012, The Comparative Safety of Legal Induced Abortion and Childbirth in the United States, Obstet Gynecol, 119 (2, Part 1):215-219.

[7] See CDC, Nov. 5, 2014, Trends in Low-risk Cesarean Delivery in the United States, 1990-2013, National Vital Statistics Report, 63(6), available at http://www.cdc.gov/nchs/data/nvsr/nvsr63/nvsr63_06.pdf .

[8] Guttmacher Institute, Feb. 2015, Unintended Pregnancy in the United States, at 1, available at http://www.guttmacher.org/pubs/FB-Unintended-Pregnancy-US.pdf. See also Institute of Medicine, 2011,

Docket No. FDA-2002-P-0364

Institute of Medicine, women experiencing an unintended pregnancy may experience depression, anxiety, or other conditions.[9]

Furthermore, consistent with § 314.500, medical abortion through the use of Mifeprex provides a meaningful therapeutic benefit to some patients over surgical abortion.[10]   Although FDA provided several examples in the preamble to the final rule to illustrate how the term "meaningful therapeutic benefit" might be interpreted, the Agency did not suggest that the meaning of the term was limited to the examples provided.[11]   In the Phase 3 clinical trial of Mifeprex conducted in the United States, medical termination of pregnancy avoided an invasive surgical procedure and anesthesia in 92 percent of the 827 women with an estimated gestational age (EGA) of 49 days or less.[12]   Complications of general or local anesthesia, or of intravenous sedation ("twilight" anesthesia), can include a severe allergic reaction, a sudden drop in blood pressure with cardiorespiratory arrest, death, and a longer recovery time following the procedure.  Medical (non-surgical) termination of pregnancy provides an alternative to surgical abortion; it is up to the patient and her provider to decide whether a medical or surgical abortion is preferable and safer in her particular situation.[13]

---

Clinical Preventive Services for Women:  Closing the Gaps (Closing the Gaps), at 102-110, available at http://books.nap.edu/openbook.php?record_id=13181 (stating that "[u]nintended pregnancy is highly prevalent in the United States").

[9] See Closing the Gaps, supra note 8, at 103.

[10] For a discussion of how FDA interprets the phrase "meaningful therapeutic benefit to patients over existing treatments" in 21 CFR 314.500, see FDA guidance for industry, *Expedited Programs for Serious Conditions—Drugs and Biologics*, at 3-4, 16-17, available on the FDA Drugs guidance Web page at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.

[11] 57 FR 58942, 58947 (Dec. 11, 1992).

[12] FDA, 1999, Medical Officer's Review of Amendments 024 and 033: Final Reports for the U.S. Clinical Trials Inducing Abortion Up to 63 Day Gestational Age and Complete Responses Regarding Distribution System and Phase 4 Commitments (Medical Officer's Review), at 11 (Table 1) and 16, available at http://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_medr_P1.pdf and http://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_medr_P2.pdf. Spitz, IM, et al., 1998, Early Pregnancy Termination With Mifepristone and Misoprostol in the US, NEJM, 338:1241-1243.

[13] CDC data indicate that for the 730,322 abortions reported in 2011, there were 2 deaths.  The CDC's calculated case fatality rate over the period from 2008 to 2011 (the most recent year for which data are available), the case fatality rate was 0.73  legal induced abortion-related deaths per 100,000 reported legal abortions.  http://www.cdc.gov/mmwr/preview/mmwrhtml/ss6410a1.htm?s_cid=ss6410a1_e.  Mortality rates identified by type of abortion (medical or surgical) were not available.  However, the evidence suggests that the risk of mortality associated with medical abortion is quite low.  Confirmation of the low risk of medical abortion is provided in a study by Trussell, et al., which recorded no deaths for 711,556 medical abortions performed by Planned Parenthood clinics under the buccal misoprostol administration protocol (Trussell J, D Nucatola, et al., Mar. 2014, Reduction in Infection-Related Mortality Since Modifications in the Regimen of Medical Abortion, Contraception, 89(3):193-6).  We note that one study reported a comparatively high occurance of fatality (1 death in a study of 11,155  early medical abortions); however, this apparent high occurance of fatality is likely due to instability in the estimate as a result of the small sample size (Goldstone P, J Michelson, et al., Sept. 3, 2012, Early Medical Abortion Using Low-Dose Mifepristone Followed by

Docket No. FDA-2002-P-0364

You cite a study by Jensen, et al., as support for your claim that surgical abortion is less dangerous and more effective than Mifeprex (Petition at 21-22 (citing Jensen, JT, et al., 1999, Outcomes of Suction Curettage and Mifepristone Abortion in the United States: A Prospective Comparison Study, Contraception, 59:153-159 (Jensen study)). This study was a prospective, nonconcurrent cohort analysis comparing the patients from one site in the U.S. phase 3 trial and a separate group of patients (who were not part of the U.S. phase 3 trial) who underwent surgical abortion at the same facility. The populations that were compared were not randomized to treatment (i.e., medical or surgical abortion) and the treatment periods did not overlap.[14]   In addition, the data on medical abortion cited in the Jensen study are based on the 178 subjects at a single site in the phase 3 U.S. Mifeprex trial that enrolled 2,121 women. This small subset of the U.S. trial included patients with pregnancies of up to 63 days' gestation. Although you cite a surgical intervention rate of 18.3 percent in the Mifeprex patients, the surgical intervention rate for Mifeprex patients with an EGA ≤ 49 days was 12.7 percent (9 of 71), which, because of the small number of patients in the two groups, is not statistically significantly different from the 3.9 percent rate for re-intervention in the comparative surgical group (3 of 77).[15] Furthermore, the 3.9 percent who first had a surgical abortion and then required surgical re-intervention ultimately required *two* surgical interventions, not one, thereby exposing them twice to the risks inherent in invasive surgical procedures and anesthesia. Finally, although you state that the medical abortion patients in the Jensen study reported significantly longer bleeding than did surgical patients, there was not a greater amount of bleeding in the medical abortion group, nor was there a significant difference between the two treatment groups in the incidence of anemia as determined by the overall change in hemoglobin concentrations.

You state that FDA "viewed [s]ubpart H as the only available regulatory vehicle that had the potential to make Mifeprex safe" (Petition at 23 (footnote omitted)). The question of whether subpart H was "the only available regulatory vehicle" is not relevant here. As described above, Mifeprex met the criteria for approval under subpart H. Additionally, as stated in the September 28, 2000, memorandum to NDA 20-687 (Mifeprex Approval Memorandum), "the Population Council proposed and FDA agreed that this drug will be directly distributed via an approved plan that ensures the physical security of the drug to physicians who meet specific qualifications" that were set out in the approval letter and the Prescriber's Agreement.[16]

---

Buccal Misoprostol: A Large Australian Observational Study. Med J Aust. 197(5):282-6). Much more accurate and meaningful data are provided by Trussell's study covering >700,000 medical abortions.

[14] We are not suggesting that in order to be adequate and well-controlled a trial must be concurrently controlled. As discussed below in section II.B.1, FDA's regulations in § 314.126 recognize a number of different types of controls.

[15] In addition, the mean surgical intervention rate for all Mifeprex patients with gestational ages ≤ 49 days in the Phase 3 U.S. trial was 7.9 percent (65 of 827 evaluable patients).

[16] FDA. Sept. 28, 2000, Memorandum to NDA 20-687 MIFEPREX (mifepristone) Population Council (Mifeprex Approval Memorandum), available at
http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111366.pdf

Docket No. FDA-2002-P-0364

Furthermore, we approved a risk evaluation and mitigation strategy (REMS) for Mifeprex in June 2011, consisting of a Medication Guide, elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS. Mifeprex was identified as one of the products that was deemed to have in effect an approved REMS under the Food and Drug Administration Amendments Act of 2007 (FDAAA) because on the effective date of Title IX, subtitle A of FDAAA (March 28, 2008), Mifeprex had in effect elements to assure safe use.[17] The 2011 REMS for Mifeprex incorporated the restrictions under which the drug was approved. Indeed, there is substantial overlap between the requirements of subpart H and the statutory criteria for REMS set out in Title IX.

Given all of the above, the Mifeprex NDA was appropriately approved in 2000.

**B.    The French and U.S. Clinical Trials of Mifeprex Provided Substantial Evidence to Support Approval**

You contend that the studies on which the Population Council relied in support of its NDA for Mifeprex do not meet the statutory and regulatory requirements for the quality and quantity of scientific evidence needed to support a finding that a new drug is safe and effective (Petition at 24).

Our review of Mifeprex was thorough and consistent with the FD&C Act and FDA regulations, including the requirements under section 505(d) of the FD&C Act that: (1) there be adequate tests to show that the drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling (section 505(d)(1)) and (2) there be substantial evidence that the drug will have the effect it purports or is recommended to have under the conditions of uses prescribed, recommended, or suggested in the labeling (section 505(d)(5)). The Mifeprex NDA was thoroughly reviewed, and the drug product was found to be safe and effective for its approved indication. In addition, as noted in the Mifeprex Approval Memorandum (at 1), FDA's Reproductive Health Drugs Advisory Committee (Advisory Committee) voted 6 to 0 (with 2 abstentions) on July 19, 1996, that the benefits of Mifeprex exceeded the risks. As set forth below, we disagree with your claims concerning the clinical trials that form the basis for the approval of Mifeprex.

1.    The Clinical Trials Used to Support the Mifeprex NDA Were in Accordance With the FD&C Act and Applicable Regulations

You argue that because neither the French clinical trials nor the U.S. clinical trial of mifepristone were blinded, randomized, or concurrently controlled, these trials were inadequate to establish the safety and effectiveness of Mifeprex (Petition at 24-25 and 32-34). In addition, you assert in the response you submitted on October 10, 2003, to the comments in opposition to the Petition submitted by the Population Council and Danco (Response to Opposition) that the clinical trials of Mifeprex were not historically controlled but instead were uncontrolled.[18] You state that the

---

[17] 73 FR 16313 (Mar. 27, 2008).

[18] Response to Opposition at 5. You also state that because the Mifeprex regimen was the first drug regimen that FDA approved to induce abortions, the applicant should have compared the new drug regimen to surgical abortions performed during the first 49 days after a woman's last menstrual period (Response to Opposition at

Docket No. FDA-2002-P-0364

applicant did not describe any historical control group in the French clinical trials, and did not indicate that any of the scientific guidelines for selecting a proper control group before beginning a historically controlled study were used for these trials (id. at 5-6). You also reject the applicant's claim that the available information on surgical abortion constitutes historically controlled data (id. at 6).

We disagree with your conclusion that the French and U.S. clinical trials of mifepristone were not clinically and legally adequate to support the approval of Mifeprex. The data from these three clinical trials (a large U.S. trial and two French trials) constitute substantial evidence that Mifeprex is safe and effective for its approved indication in accordance with section 505(d) of the FD&C Act. The labeling approved in 2000 for Mifeprex was based on data from these three clinical trials and from safety data from a postmarketing database of over 620,000 women in Europe who had had a medical termination of pregnancy (approximately 415,000 of whom had received mifepristone together with misoprostol).[19]

The U.S. trial of Mifeprex involved 2,121 subjects enrolled at 17 sites. Of these, 827 had an EGA of ≤ 49 days and were included in the efficacy evaluation.[20] Medical termination of pregnancy was complete (without the need for surgical intervention) in 762 of these subjects (92 percent).[21] Sixty-five of the subjects in the U.S. trial who were evaluable for efficacy were classified as having had a "treatment failure." The reasons for treatment failure (and number of subjects experiencing each) were: incomplete pregnancy termination (n = 39), still pregnant (n = 8), subject request for surgical intervention (n = 5), and medical indication (bleeding, n = 13).[22] The two French trials enrolled a total of 1,681 subjects providing effectiveness outcomes. Among the French subjects, the success rate for medical termination of pregnancy was 95.5 percent.[23]

In the U.S. trial, 859 subjects with an EGA of ≤ 49 days were evaluated for safety. Among these subjects, there were no deaths, one transfusion, and nine instances in which subjects received intravenous fluids.[24] The safety profile of the patient group in the French trials with an EGA of ≤ 49 days did not differ significantly from the safety profile of the same patient group in the U.S.

---

5, note 20). The fact that a drug might be the first one approved for a particular indication is not a factor in determining what type of control is adequate for a clinical trial of that drug for that indication. As discussed above, FDA's regulations provide for a variety of different types of controls (see 21 CFR 314.126(b)), and do not require comparison of a proposed drug product to an active control group to establish the safety and effectiveness of the drug. Therefore, the clinical trials to support the approval of Mifeprex were not required to have a surgical comparator arm.

[19] Mifeprex labeling, Sept. 28, 2000, PRECAUTIONS, Teratogenic Effects: Human Data, *Pregnancy,* available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.pdf.

[20] Mifeprex Approval Memorandum, supra note 16, at 1; Medical Officer's Review, supra note 12, at 10.

[21] Medical Officer's Review, supra note 12, at 11 (Table 1) and 16.

[22] Id. at 11 (Table 1).

[23] Mifeprex Approval Memorandum, supra note 16, at 1.

[24] Medical Officer's Review, supra note 12, at 12-13.

Docket No. FDA-2002-P-0364

trial, and the percentage of patients in the French and U.S. trials requiring hospitalization and blood transfusion and experiencing heavy bleeding was comparable.[25] There were no deaths in the French trials.[26]

Section 505(d) of the FD&C Act states, in part, that FDA must refuse to approve an application if the Agency finds that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the drug's proposed labeling. Section 505(d) defines "substantial evidence" as "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved."

As stated in 21 CFR 314.126(a), the purpose of conducting clinical investigations of a drug is to distinguish the effect of the drug from other influences, such as a spontaneous change in the course of the disease or condition, placebo effects, or biased observation. Reports of adequate and well-controlled investigations serve as the main basis for determining whether there is substantial evidence to support the claims of effectiveness for a drug.

We agree that randomization and the use of concurrent controls are two principal means of ensuring that clinical trial data are reliable and robust. However, that does not mean that in order to be adequate and well-controlled, a clinical trial must use a randomized concurrent control design. Section 314.126(b) lists the characteristics of an adequate and well-controlled study. Contrary to your assertion (Petition at 24), FDA regulations do not require that a study be blinded, randomized, and/or concurrently controlled. Among the characteristics of an adequate and well-controlled study is that it uses a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect (§ 314.126(b)(2)). A historical control is one of the recognized types of control (§ 314.126(b)(2)(v)), and one in which the results of treatment with the test drug are compared with experience historically derived from the adequately documented natural history of the disease or condition, or from the results of active treatment in comparable patients or populations (id.). Unlike some other types of control (e.g., placebo concurrent control (§ 314.126(b)(2)(i)) or dose-comparison concurrent control (§ 314.126(b)(2)(ii))), use of a historical control does not include randomization or blinding. Because historical control populations usually cannot be as well assessed with respect to pertinent variables as can concurrent control populations, historical control designs are usually reserved for special circumstances, including studies in which the effect of the drug is self-evident.[27] Thus, in the proper setting,

---

[25] Id. at 18.

[26] FDA, May 21, 1996, Statistical Review and Evaluation (May 21, 1996, Statistical Review), at 4 and 7, available at http://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_statr.pdf.

[27] 21 CFR 314.126(b)(2)(v). We note your contention that the effects of the regimen approved in 2000 are not self-evident because "[t]he Sponsor's focus on this dyadic set of possibilities (failure (0) or success (1)) obscures a whole range of less easily measurable, but critically important, outcomes," including "tissue retention, life-threatening hemorrhaging, persistent bleeding, infection, teratogenicity, pain, continued fertility, and psychological effects" (Response to Opposition at 8). We disagree with your argument. From a clinical perspective, there are two outcomes associated with the use of Mifeprex for medical abortion: either there is a complete abortion (without the need for surgical intervention) or there is not. The "outcomes" you

Docket No. FDA-2002-P-0364

historically controlled trials can be considered adequate and well-controlled, and there is no need for the other types of control listed in § 314.126(b)(2).[28]

The use of historical controls in the Mifeprex clinical trials was appropriate for two reasons. First, the natural history of a viable pregnancy is adequately documented (a pregnancy continues on average for 40 weeks' gestation).[29] Second, the effect of Mifeprex is dramatic, occurs rapidly following treatment, and has a low probability of having occurred spontaneously.[30] Furthermore, contrary to your assertion (Petition at 32-34), the use of a historical control in these circumstances is consistent with ICH's guidance for industry, *E10 Choice of Control Group and Related Issues in Clinical Trials* (E10 Guidance).[31] The E10 Guidance addresses external controls (including historical controls) that are used in externally controlled trials to compare a group of subjects receiving the test treatment with a group of patients external to the study, rather than with an internal control group consisting of patients from the same population assigned to a different treatment.[32] The guidance states that the "external control may be defined (a specific group of patients) or non-defined (a comparator group based on general medical knowledge of outcome)."[33]

---

cite are complications that can be associated with all abortions (including surgical abortion, missed abortion (non-viable pregnancy that has not been expelled from the uterus), and spontaneous abortion).

[28] You cite to a statement in the May 21, 1996, Statistical Review regarding the two French trials that "[i]n the absence of a concurrent control group in each of these studies, it is a matter of clinical judgement whether or not the sponsor's proposed therapeutic regimen is a viable alternative to uterine aspiration for the termination of pregnancy" (Petition at 27). FDA's finding that Mifeprex was safe and effective for its labeled indication was based on data from three trials, one in the U.S. and two in France, as well as from safety data from a database of over 620,000 women in Europe who had had a medical termination of pregnancy (and approximately 415,000 of whom had received the combination of mifepristone and misoprostol). The Medical Officer's Review, supra note 12, also states that the "U.S. clinical trials confirm the safety and efficacy of mifepristone and misoprostol found in the pivotal French studies for women seeking medical abortions with gestations of 49 days duration or less" (Id. at 18-19). As stated previously, it is up to the physician and his/her patient to decide whether a medical or surgical abortion is preferable and safer in the patient's particular situation.

[29] MacDonald, PC, NF Gant, et al., 1996, Williams Obstetrics (20th ed.), Appleton and Lange, at 151.

[30] Although sources and studies differ somewhat, the 92% success rate following mifepristone/misoprostol use far exceeds the rate of spontaneous abortion (spontaneous miscarriage). One source states: "No less than 30% and as much as 60% of all conceptions abort within the first 12 weeks of gestation, and at least half of all losses go unnoticed. Most recognized pregnancy losses occur before 8 weeks' gestation, and relatively few occur after 12 weeks" (Fritz, M and L Speroff, 2011, Clinical Gynecologic Endocrinology and Infertility (8th ed.), Lippincott Williams & Wilkins, Philadelphia, at 1193). Other sources indicate that 15% of all pregnancies between 4-20 weeks of gestation spontaneously abort (See Speroff, L, et al., 1989, Clinical Gynecologic Endocrinology and Infertility (4th ed.), Williams and Wilkins, Baltimore, at 535; see also Stenchever, MA, 2001, Comprehensive Gynecology (4th ed.), Mosby, at 414). According to the National Library of Medicine, "[a]mong women who know they are pregnant, the miscarriage rate is about 15-20%. Most miscarriages occur during the first 7 weeks of pregnancy." (Miscarriage, available on the MedlinePlus Web site at http://www.nlm.nih.gov/medlineplus/ency/article/001488.htm.

[31] E10 Guidance, available on the FDA Drugs Web page at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm, at 6.

[32] Id.

[33] Id.

Docket No. FDA-2002-P-0364

Moreover, the E10 Guidance clearly states that, notwithstanding certain limitations of external controls, including the possibility of bias, external controls can be appropriate under circumstances where the effect of the treatment is dramatic and the usual course of the disease or condition is highly predictable.[34] In other words, historical controls can be appropriate in circumstances such as medical termination of early pregnancy. The use of the expected rate of spontaneous abortion during early pregnancy as the control in the Mifeprex clinical trials was appropriate and fully consistent with FDA regulations and guidance. The applicant could rely on the data from the three trials to support approval because they were adequate and well-controlled, using a historical control.[35]

It is not uncommon for the drug product review divisions in FDA's Center for Drug Evaluation and Research (CDER) to accept for filing and approve applications that rely on clinical trials employing historical controls to support approval for drug products in which the outcome of the condition is well known and the effect of the drug is anticipated to be markedly different from that of a placebo. Examples include FDA's approval of numerous oncology drug products, including, for example, Xalkori (crizotinib) for the treatment of patients with locally advanced or metastatic non-small cell lung cancer (NSCLC) that is anaplastic lymphoma kinase (ALK)-positive as detected by an FDA-approved test, and Adcetris (brentuximab vedotin) for the treatment of patients with Hodgkin lymphoma and a rare lymphoma known as systemic anaplastic large cell lymphoma. Other examples include iPlex (mecasermin rinfabate [rDNA origin] injection) for treatment of growth failure in children with severe primary IGF-1 deficiency (Primary IGFD) or with growth hormone (GH) gene deletion who have developed neutralizing antibodies to GH; Myozyme (alglucosidase ALFA) for use in patients with Pompe disease (GAA deficiency); Ferriprox (deferiprone) for the treatment of patients with transfusional iron overload due to thalassemia syndromes when current chelation therapy is inadequate; Voraxaze (glucarpidase) for treatment of toxic (>1 micromole per liter) plasma methotrexate concentrations in patients with delayed methotrexate clearance due to impaired renal function; and Elelyso (taliglucerase alfa) for injection for use as a long-term enzyme replacement therapy in patients with Type 1 Gaucher disease. Similarly, it is not unusual for the CDER review divisions to accept for filing applications relying on historically controlled clinical trials. Examples of reproductive drug products for which a historical control is often relied on in the drug approval process include contraceptive drug products (e.g., most birth control pills, Mirena intrauterine device, NuvaRing (an intravaginal hormonal contraceptive), and Implanon (an implanted hormonal contraceptive)) and menopausal hormonal therapy products with the addition of a progestin to prevent endometrial cancer secondary to unopposed estrogen stimulation.

---

[34] Id. at 27.

[35] We disagree with your statement that the sponsor's failure to identify precisely a historical control group is fatal to its claim that the trials supporting the approval of Mifeprex were historically controlled (Response to Opposition at 5-6). In situations where an investigational product is anticipated to have an effect that is readily discernible and greatly exceeds that which would be expected otherwise, the historical control may be relied upon without explicitly describing it as such. Examples of situations where this arises include, as here, the use of a drug for early medical abortion, given that the majority of pregnancies continue to term, and the use of a drug as a contraceptive, given that the pregnancy rate in sexually active women between 18 and 35 years old in the absence of contraception for one year is well documented at approximately 85% ( Hatcher, RA, et al., 2012, Contraception Technology (20th ed.), Ardent Media, Inc., at 780.

Docket No. FDA-2002-P-0364

You state that FDA did not conduct a statistical review of the results of the U.S. clinical trial (Petition at 29). The Agency, however, concluded that the clinical results of the supporting U.S. clinical trial were "similar enough to the results of the European studies" (the studies used to support the original approval of Mifeprex in Europe) that a statistical evaluation of the results of the U.S. trial was not required.[36]

You maintain that the Mifeprex approval is not in accordance with Agency guidance[37] on when only one effectiveness trial may be necessary for approval because: (1) mifepristone had not been approved for any use in any population in the United States and (2) no one had ever presented to FDA any evidence from adequate and well-controlled trials regarding any use for mifepristone.[38] As stated above, our approval of Mifeprex was based on not one but three studies that met the requirements of § 314.126. Therefore, Agency guidance concerning reliance on only one effectiveness trial is not relevant to the approval of Mifeprex.

You argue that FDA's acceptance of the French and U.S. clinical trial data violated § 314.126(e), which states that uncontrolled studies or partially controlled studies are not acceptable as the sole basis for approval of claims of effectiveness (Petition at 34-36). As explained above, the Mifeprex clinical trials were neither uncontrolled nor partially controlled. They were historically controlled, and the use of an historical control was appropriate under § 314.126(b)(2)(v). Consequently, § 314.126(e) is inapplicable.

Citing § 314.500, you contend that the approval of Mifeprex under subpart H was improper because FDA did not require the concurrent testing of mifepristone with surgical abortion to test the proposition that mifepristone provides a meaningful therapeutic benefit over the standard method for terminating pregnancies (Petition at 37-40). You maintain that Mifeprex is the only drug that we have approved under § 314.520 (approval with restrictions to assure safe use) without requiring "that safety and efficacy be scientifically demonstrated through blinded, comparator-controlled, and randomized clinical trials" (Petition at 37).

Nothing in subpart H requires that an applicant conduct comparative clinical trials in order to demonstrate that a drug product provides meaningful therapeutic benefit to patients over existing treatments. Furthermore, nothing in the concept of "meaningful therapeutic benefit" requires concurrent testing of a proposed drug with an existing treatment.[39] We have approved other drugs

---

[36] FDA Memorandum to NDA 20-687 re: Statistical comments on Amendment 024, Feb. 14, 2000, available at http://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_statr.pdf.

[37] FDA guidance for industry, *Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (Effectiveness Guidance), available on the FDA Drugs Web page at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.

[38] Petition at 31-32 (citing Effectiveness Guidance at 5-17).

[39] You state that "[c]onducting a concurrently-controlled randomized trial comparing surgical abortion with the mifepristone-misoprostol regimen is readily achievable" (Petition at 32, note 145). You add that "[t]here are study designs that would have also allowed for blinding" (Id.). Assuming, arguendo, that it may have been feasible to design a randomized, concurrently-controlled study, such study was not required under our regulations; as described previously in this response, the clinical trials supporting the approval of Mifeprex

Docket No. FDA-2002-P-0364

under subpart H based on clinical trials that do not directly compare the drug to an existing therapy, including Gleevec (imatinib mesylate), Tracleer (bosentan), and Xyrem (sodium oxybate). We also note that the latter two referenced drug products, Tracleer (bosentan) and Xyrem (sodium oxybate), were approved under the restricted distribution provisions at 21 CFR 314.520. As previously explained in this response, Mifeprex was deemed to have in effect an approved REMS under Title IX of FDAAA. The Mifeprex REMS, which was approved in June 2011 and is still in effect, incorporated the subpart H restrictions under which the drug was approved.

As evidenced by the foregoing, the studies supporting the 2000 approval of Mifeprex were consistent with the FD&C Act and FDA regulations, including § 314.126 and subpart H.

2. There Is No Need for an Audit of the French Clinical Data

You assert that FDA allowed "tainted data" to support the Mifeprex NDA by failing to require a comprehensive audit of the French clinical trial data after discovering violations of good clinical practices (Petition at 40-41). You maintain that we should therefore conduct a complete audit of all of the French clinical trial data to determine whether other trials must be conducted (Petition at 41 and 89).

We disagree with your characterization of both the French data and FDA's reliance on that data. You reference the Form FDA 483 issued on June 28, 2006, to Dr. Elisabeth Aubeny, as well as the Summary of Findings related to that Form FDA 483. It is not uncommon to have trial sites receive a Form FDA 483, listing the FDA investigator's observations regarding non-compliance with good clinical practice, at the conclusion of an inspection. The investigator will draft an Establishment Inspection Report (EIR) that reviews the violations noted and will recommend an action, taking into consideration the nature of the inspectional findings, any actions that occurred following the findings, and Agency policy. For products regulated by CDER, compliance reviewers in the Division of Clinical Compliance Evaluation in the Office of Scientific Investigations (previously, the Division of Scientific Investigations) review the EIR, the Form FDA 483, and the evidence collected during the inspection, as well as any written response submitted timely by the inspected party, to determine whether the recommended action is appropriate and is supported by adequate evidence. This review evaluates each violation's effect on the timeliness, accuracy, and/or completeness of the data collected from the site to ascertain if the data are reliable. In this particular case, although there were violations cited on the Form FDA 483 and discussed in the EIR, the violations were determined not to affect the reliability of the data provided by that site. The statement you quote from the Summary of Findings reflects this conclusion. We note that, although the French studies were not performed under a U.S. investigational new drug application (IND), this is typical of many approved drugs that originally were developed or studied outside the United States, and is fully permissible under 21 CFR 312.120 (Foreign clinical studies not conducted under an IND) (including the version of the provision in effect at the time of the 2000

were historically controlled, which was appropriate under § 314.126(b)(2)(v). Furthermore, your suggestion that there are study designs that would have allowed for blinding raises ethical issues that go beyond the scope of your Petition and this response.

Docket No. FDA-2002-P-0364

approval of Mifeprex). FDA concluded that the French trials were conducted in accordance with good clinical practice,[40] and the Agency was able to validate the data from those studies.

It is worth noting that in 1996, when the Advisory Committee reviewed the French data without considering the U.S. data, the committee voted 6 to 2 that the French data alone demonstrated efficacy and 7 to 0 (with one abstention) that the French data supported safety.[41] The subsequent approval of Mifeprex was based not only on the data from the two French trials but also on the data from the large Phase 3 U.S. trial. The Advisory Committee received a report on the U.S. trial (the article by Spitz, et al., referenced in note 12 above) and had no comments.

For the foregoing reasons, there is no scientific or regulatory need for us to further review the French clinical data on Mifeprex.

> 3.    Your Request for an Audit of the U.S. Clinical Data

In addition to your request that FDA conduct a full audit of the data from the French trials, you request that FDA conduct a full audit of all data from the U.S. trial (Petition at 1-2 and 89). Other than one footnote referring to a letter from the NDA sponsor to FDA (Petition at 89, note 384), you have provided no information supporting this request. Accordingly, we do not address this request further, other than to note that we do not believe there is any scientific or regulatory need to further review the U.S. clinical trial data relied on for approval of the Mifeprex NDA.

## C.    FDA Lawfully Approved Labeling for Mifeprex for Use with Misoprostol

You contend that FDA's "de facto" approval of misoprostol for use with Mifeprex as part of a medical abortion regimen was unlawful because the holder of the only approved NDA for misoprostol[42] did not submit a supplemental NDA for this new use (Petition at 41-45). You further

---

[40] The regulations in effect at the time of the Mifeprex approval in 2000 refer to FDA accepting such studies when they are "well designed, well conducted, performed by qualified investigators, and conducted in accordance with ethical principles acceptable to the world community" FDA has generally interpreted that language as incorporating the principles of "good clinical practice" (see, e.g., ICH guidance for industry. *ICH E6 Good Clinical Practice: Consolidated Guidance* (E6 Guidance), available on the FDA Drugs Web page at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm), which is the term used in the current regulations. The E6 Guidance states that GCP:

> is an international ethical and scientific quality standard for designing, conducting, recording, and reporting trials that involve the participation of human subjects. Compliance with this standard provides public assurance that the rights, safety, and well-being of trial subjects are protected, consistent with the principles that have their origin in the Declaration of Helsinki, and that clinical trial data are credible

(E6 Guidance at 1).

[41] Mifeprex Approval Memorandum, supra note 16, at 1.

[42] Two abbreviated new drug applications (ANDAs) for misoprostol have been approved since Mifeprex was approved: ANDA 076095 (IVAX Pharmaceuticals, Inc., approved July 10, 2002) and ANDA 091667 (Novel Laboratories Inc., approved July 25, 2012).

Docket No. FDA-2002-P-0364

argue that FDA not only sanctioned, but participated in, the promotion of an off-label use of misoprostol by overseeing the creation of Mifeprex promotional materials that discuss the off-label use of misoprostol and by disseminating information about the off-label use in documents such as the press release announcing Mifeprex's approval (Petition at 46-47).

The approval of Mifeprex was based on evidence from three adequate and well-controlled clinical trials using the treatment regimen of administration of mifepristone on day one, followed approximately 48 hours later (i.e., on day three) by the administration of misoprostol (unless a complete abortion has already been confirmed before that time). Neither the FD&C Act nor FDA regulations require the submission of a supplemental NDA by the sponsor of the misoprostol NDA for the use of misoprostol as part of the approved treatment regimen for Mifeprex. In this situation, the "drug product" subject to section 505(b) of the FD&C Act (21 U.S.C. 355(d)) was Mifeprex.[43] The NDA for Mifeprex appropriately contained the full reports of investigations which have been conducted to show whether or not "such drug" is effective in use (§ 505(b)(1) of the FD&C Act), and FDA appropriately found that the Mifeprex NDA met the approval requirements in § 505(d) of the FD&C Act.

There are a number of drug products that FDA has approved as safe and effective in combination with another drug for a use that was not sought by the applicant of the second drug product, and for which the Agency did not require any change in the labeling of the second product (i.e., that the second product's labeling include the indication for use with the newly approved drug product). Examples of approved drug labeling that refer to the concomitant use of another drug without there being a specific reference to the combined therapy in the previously approved labeling for the referenced drug include the following:

- Xeloda (capecitabine) for treatment of metastatic breast cancer in combination with Taxotere (docetaxel) after failure of prior anthracycline-containing therapy[44]

---

[43] In the Response to Opposition, you reference a July 2, 2002, letter submitted by the Population Council to Docket 01E-0363 re: Determination of Regulatory Review Period for Purposes of Patent Extension; Mifeprex (Response to Opposition at 12-13). In its July 2, 2002, letter, the Population Council made several statements regarding what it believed should be considered "the approved human drug product" for purposes of 21 CFR 60.22(a)(1), for purposes of patent term restoration. In the Agency's October 24, 2002, notice amending FDA's previous determination of the regulatory review period for Mifeprex (67 FR 65358), we addressed — and rejected — the Population Council's assertions. We stated that "[t]he applicant tries to characterize Mifeprex as mifepristone 'in combination with another active ingredient' in an attempt to take advantage of portions of the definition of 'human drug product' in 35 U.S.C 156(f), that is, a human drug product means 'the active ingredient of a new drug * * * as a single entity or in combination with another active ingredient.' The applicant points to the definition of 'combination product' at 21 CFR 3.2(e) in this effort. A more useful description of a drug 'in combination with another active ingredient' is found at 21 CFR 300.50 (two or more drugs combined in a single dosage form). Mifeprex is not mifepristone 'in combination with another active ingredient.' Mifeprex is single entity mifepristone" (67 FR 65358, note 2).

[44] We note your assertion that when Xeloda and Taxotere are used together, each is being used for an FDA-approved use (Response to Opposition at 11). Taxotere (docetaxel) was approved on May 14, 1996; its current labeling states that it is indicated as a single agent for treatment of locally advanced or metastatic breast cancer after failure of prior chemotherapy, and in combination with doxorubicin and cyclophosphamide as adjuvant treatment of patients with operable node-positive breast cancer. Xeloda (capecitabine), which

Docket No. FDA-2002-P-0364

- Nexium (esomeprazole magnesium) in combination with clarithromycin and amoxicillin for *H. pylori* eradication

- Persantine (dipyridamole) as an adjunct to coumarin anticoagulants for prevention of postoperative thromboembolic complications of cardiac valve replacement

- Herceptin (trastuzumab) in combination with paclitaxel for treatment of metastatic breast cancer

- Vistide (cidofovir) administered with probenecid for treatment of CMV retinitis in patients with AIDS

- Daraprim (pyrimethamine) for treatment of toxoplasmosis when used conjointly with a sulfonamide

You maintain that the labeling for Mifeprex is misleading because it directs physicians to use misoprostol for a purpose that FDA never approved and because it creates the false expectation that misoprostol is approved for medical abortion (Petition at 47). We disagree that the labeling for Mifeprex is misleading by virtue of the fact that it includes instructions for the use of misoprostol as part of the approved treatment regimen for Mifeprex. The Mifeprex labeling appropriately describes the clinical trial treatment regimen in which Mifeprex was shown to be safe and effective. The labeling for Mifeprex makes clear that Mifeprex tablets contain mifepristone, not misoprostol, and although the Indication and Usage section in the 2000 labeling does address the use of misoprostol in a regimen with Mifeprex, the labeling is clearly addressed to Mifeprex.

You claim that Mifeprex is misbranded because, per 21 CFR 201.6(a), the references to misoprostol in the Mifeprex labeling constitute a false or misleading representation that misoprostol itself is approved for medical termination of pregnancy (Petition at 48). In addition, you contend that Mifeprex is misbranded under section 502(j) of the FD&C Act (21 U.S.C. 352(j)) because it is unsafe when used as directed in the 2000 approved labeling (id.).

The references to misoprostol in the Mifeprex labeling do not render Mifeprex misbranded as described in § 201.6(a) because the labeling does not make any false or misleading representations with regard to misoprostol. We determined, and the labeling reflects, that Mifeprex is safe and effective for the termination of early pregnancy when used in combination with misoprostol. The approval was based on evidence from adequate and well controlled clinical trials in which misoprostol was administered two days after mifepristone to help stimulate uterine contractions; accordingly, the approved labeling describes the use of Mifeprex in combination with misoprostol.

---

originally was approved on April 30, 1998, for the treatment of metastatic breast cancer that is resistant to both paclitaxel and an anthracycline-containing chemotherapy regimen or resistant to paclitaxel and for whom further anthracycline therapy may be contraindicated, is currently approved (in addition to other indications) for use in combination with docetaxel for treatment of patients with metastatic breast cancer after failure of prior anthracycline-containing chemotherapy. The indication to which this response refers is the concomitant use (i.e., use in combination) of the two drugs, a use that is not referenced in the labeling for Taxotere. Your arguments with respect to Actos (pioglitazone) in combination with a sulfonylurea, metformin, or insulin; Viread (tenofovir disproxil fumarate) in combination with other antiretroviral agents; and Nexium (esomeprazole magnesium) in combination with clarithromycin and amoxicillin (id.) are similarly inapposite.

Docket No. FDA-2002-P-0364

Additionally, the approved labeling in no way implies that misoprostol alone would be safe and effective for the termination of pregnancy. Thus, the statements in the labeling are neither false nor misleading with regard to the use of misoprostol.

With regard to section 502(j) of the FD&C Act, Mifeprex is not misbranded under that provision because, as discussed in the following section, the approved regimen for Mifeprex is not "dangerous to health when used in the dosage or manner; or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."

**D.     Mifeprex Is Safe for Its Approved Use and the Conditions of Approval Do Not Lack Essential Safeguards**

You contend that FDA "approved mifepristone for use in a deregulated regimen that lacks key safeguards" (Petition at 5). You claim that in 2000, the Population Council repudiated distribution restrictions that it had proposed in 1996, and that FDA subsequently approved a regimen that does not embody restrictions sufficient to address legitimate safety concerns (Petition at 49). You note that the February 18, 2000, Mifeprex approvable letter stated that restrictions (per § 314.520) on the distribution and use of Mifeprex were needed to ensure safe use of the drug but that in March 2000, the Population Council said such restrictions were unwarranted (Petition at 51-52). You claim that we later yielded to the applicant on several important issues (Petition at 54-55).

FDA has found that Mifeprex is safe and effective for its intended use. It is true that, before the 2000 approval of Mifeprex, FDA and the applicant were not always in full agreement about the distribution restrictions. It is not unusual for such differences to emerge during the course of the review process for a proposed drug product. We ultimately determined that the distribution restrictions stated in the approval letter were appropriate to ensure the safety of Mifeprex for its intended use.[45] Three adequate and well-controlled clinical trials supported the safety of Mifeprex for its intended use, and over 15 years of postmarketing data and many comparative clinical trials in the United States and elsewhere continue to support the safety of this drug product.[46] Further, we approved a risk evaluation and mitigation strategy (REMS) for Mifeprex in June 2011, consisting of a Medication Guide, elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS.

Following is our response to the specific safety issues you raise in the Petition.

1.     Ultrasound Dating

---

[45] We note your reference in your Response to Opposition to the statement by the Reproductive Health Drugs Advisory Committee that it had concerns about the distribution proposal discussed at the July 19, 1996, meeting (Response to Opposition at 4 (referencing the minutes from the 1996 Reproductive Health Drugs Advisory Committee meeting)). In light of FDA's determination in 2000 that the distribution restrictions stated in the approval were appropriate to ensure that Mifeprex was safe for its intended use, as well as the 2011 approval of the Mifeprex REMS, the Committee's reservations in 1996 are not applicable.

[46] See, e.g., Raymond, EG, et al., 2013, First-Trimester Medical Abortion With Mifepristone 200 mg and Misoprostol: A Systematic review, Contraception, 87:26-37   In this article, 87 trials were reviewed and 91 references were cited.

Docket No. FDA-2002-P-0364

You maintain that the Mifeprex regimen is unsafe because it does not require ultrasound examination. Specifically, you maintain that the use of transvaginal ultrasound is necessary to accurately date pregnancies and to identify ectopic pregnancies, and you note both that Mifeprex was approved in 2000 only for women through 49 days' gestation and that it is contraindicated for women with a confirmed or suspected ectopic pregnancy (Petition at 57-61).

Although the protocol for the U.S. clinical trial required a transvaginal sonogram (TVS) for each patient at Visit 1 and stated that the test should be used "as indicated" at Visits 2 and 3, this does not mean that a TVS is essential to ensure the safe use of Mifeprex.[47] As stated in the Mifeprex Approval Memorandum, during the review process, the Agency carefully considered the role of ultrasound.[48] In the clinical trials, ultrasound was performed to ensure proper data collection on gestational age, but in clinical practice, pregnancies can also be (and frequently are) dated using other clinical methods. (As discussed in section II.F below, safeguards employed during clinical trials are not always essential for safe use of the approved drug product.) As part of the restricted distribution of Mifeprex put in place in 2000, each provider must have the ability to accurately assess the duration of pregnancy and to diagnose ectopic pregnancy. We determined that it was inappropriate for us to mandate how providers clinically assess women for duration of pregnancy and for ectopic pregnancy. These decisions should be left to the professional judgment of each provider, as no method (including TVS) provides complete accuracy. The approved labeling for Mifeprex recommended ultrasound evaluation as needed, leaving this decision to the judgment of the provider.

You claim that the only way to date a pregnancy accurately enough to exclude EGA > 49 days is by using TVS (Petition at 58). That is incorrect. As noted above, using TVS (or any other method) does not ensure complete accuracy in dating a pregnancy. In most cases, a provider can accurately make such a determination by performing a pelvic examination and obtaining a careful history, which would include the following: date of last menstrual period, regularity of menses, intercourse history, contraceptive history, and (if available) home pregnancy test results.[49] If in doubt, the provider can order an ultrasound and/or a blood test measuring the quantitative beta-human chorionic gonadotropin (hCG) to further assist in dating the gestational age.

Furthermore, use of a TVS does not guarantee that an existing ectopic pregnancy will be identified. As of April 30, 2015, there were 89 unduplicated reports in FDA's Adverse Event Reporting System (FAERS) database of ectopic pregnancy in women in the United States who had received mifepristone for termination of pregnancy since the approval of Mifeprex in the United States. In

---

[47] We note that the French clinical trials did not require an ultrasound examination: rather, the decision as to whether an ultrasound was needed was left to the discretion of the investigator.

[48] Mifeprex Approval Memorandum, supra note 16, at 5.

[49] See, e.g., Fielding, SL, et al., 2002, Clinicians' Perception of Sonogram Indication for Mifepristone Abortion up to 63 Days, Contraception, 66:27-31 (discussing the results of a prospective study of 1,016 women in a medical abortion trial at 15 sites that concluded that "clinicians correctly assessed gestational age as no more than 63 days in 87% of women. In only 1% (14/1013) of their assessments did clinicians underestimate gestational age. We conclude that the clinicians felt confident in not using ultrasound in most cases").

Docket No. FDA-2002-P-0364

42.7% (38 of 89) of the reported cases, an ultrasound was completed. Of the 38 cases that had an ultrasound completed, 55.3% (21 of 38) showed no changes indicative of ectopic pregnancy.[50] In light of the fact that Mifeprex is contraindicated for women with a confirmed or suspected ectopic pregnancy, we believe it is reasonable to expect that the women's providers would not have prescribed Mifeprex if a pelvic ultrasound examination had clearly indicated an ectopic pregnancy; this strongly suggests, therefore, that ultrasound examinations were falsely negative for ectopic pregnancy in these women. The currently approved labeling for Mifeprex reflects this, stating that the "presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography prior to being prescribed Mifeprex."[51]

2.      Physician Training and Admitting Privileges

You contend that the administration of Mifeprex should have been restricted to physicians who have formal training in both pharmaceutical and surgical abortion and who have admitting privileges to emergency facilities (Petition at 62-65).

Although we did not restrict the administration of Mifeprex to physicians with the specific requirements you list in your Petition, we did conclude in 2000 that Mifeprex had to be provided by a physician who, among other qualifications, either (1) has the ability to provide surgical intervention in cases of incomplete abortion or severe bleeding or (2) has made plans to provide such care through other qualified providers and facilities.

During the clinical trials for Mifeprex, the principal investigators were trained in surgical abortions and were able to conduct any necessary surgical interventions.[52] The protocol for the U.S. trial was designed such that the studies were conducted at 17 centers where the principal investigators could perform abortions by either vacuum aspiration or dilatation and curettage and had access to facilities that provided blood transfusions and performed routine emergency resuscitation procedures.

During the NDA review process, the issue of physician qualifications and certification was thoroughly discussed within the Agency, with the applicant, and with an outside consultant with expertise in early pregnancy termination. Although the distribution of Mifeprex was not restricted to any particular medical specialist, the Agency did determine in 2000 that certain restrictions were

---

[50] Seventeen cases were identified as having an ultrasound with a possible ectopic pregnancy. Fourteen of these 17 (82.3%) cases noted appropriate follow-up procedures, such as additional hCG monitoring, ultrasounds, appointments, or emergency room referral, while two cases did not include any additional follow-up information. In the remaining case, a diagnosis of a heterotopic gestation (simultaneous ectopic pregnancy and intrauterine pregnancy) was noted.

[51] Mifeprex labeling (Mar. 29, 2016) available at
http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apphist. .

[52] Additionally, it is common in drug development that the clinical investigators who conduct pivotal Phase 3 clinical trials have more specialized training than may be necessary to ensure the safe use of a drug post-approval. Examples are trials for male erectile dysfunction (typically conducted by urologists), hypertension (internists), depression (psychiatrists), and endometriosis (gynecologists).

Docket No. FDA-2002-P-0364

necessary under § 314.520.  In accordance with this determination, the Prescriber's Agreement for Mifeprex stated the following:[53]

> Under Federal law, Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications:
>
> - Ability to assess the duration of pregnancy accurately.
> - Ability to diagnose ectopic pregnancies.
> - Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have [sic] made plans to provide such care through others, and are [sic] able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.
> - Has read and understood the prescribing information of Mifeprex….

As noted in the Mifeprex Approval Memorandum, the requirement that a physician certify, by signing the Prescriber Agreement, that he or she has the qualifications described in that Agreement limited the physicians who would be eligible to receive Mifeprex from the sponsor to those who are familiar with managing early pregnancies.[54]  Because only such qualified physicians would be using or would oversee the use of Mifeprex, we concluded that there was no need for special certification programs or additional restrictions.  Additionally, as noted in the Mifeprex Approval Memorandum, in the U.S. clinical trial of Mifeprex, 11 out of roughly 850 patients needed surgical intervention to treat bleeding, and three of these patients were treated by non-principal investigators such as emergency room physicians and a non-study gynecologist.[55]  These data suggested that patients would receive any needed surgical intervention from either their physician or another physician with the needed skills.[56]  The Mifeprex Approval Memorandum also pointed out that the Mifeprex labeling and the Medication Guide approved at that time highlight that surgery may be needed and that patients must understand whether the provider will furnish any necessary medical intervention or whether they will be referred to another provider and/or facility.[57]

In addition, one of the Phase 4 commitments accompanying the approval of Mifeprex was a cohort-based study of safety outcomes when Mifeprex is prescribed by physicians with the skills for surgical intervention compared to physicians who refer patients for surgical intervention.  In a February 2008 submission, the applicant stated that so few medical abortions are prescribed by physicians who do not have surgical intervention skills that it was not feasible to do a meaningful

---

[53] Mifeprex labeling (June 8, 2011). Mifeprex (mifepristone) tablets, 200 mg. Prescriber's Agreement. available at
http://www.accessdata.fda.gov/drugsatfda_docs/label/2011/020687s014lbl.pdf.

[54] Mifeprex Approval Memorandum, supra note 16, at 5.

[55] Id.

[56] Id.

[57] Id.

Docket No. FDA-2002-P-0364

study to assess this specific issue. After review of this submission, the Agency: (1) concurred with the applicant regarding the non-feasibility of conducting a meaningful study and (2) concluded that no differences between non-referrers or referrers in terms of clinical outcomes could be identified based on the data that had been submitted. Accordingly, on September 26, 2008, the Agency released the applicant from this commitment.

The provisions of the currently approved labeling (including the REMS) that relate to provider training and admitting privileges are substantially similar to the labeling provisions approved in 2000. Under current labeling, healthcare providers who administer Mifeprex must be licensed to prescribe, and must have the ability to date pregnancies accurately and to diagnose ectopic pregnancies. These healthcare providers must also (1) be able to provide any necessary surgical intervention, or (2) have made arrangements for others to provide for such care. Healthcare providers must be able to ensure that women have access to medical facilities for emergency care, and must agree to other responsibilities, including reviewing and signing the Patient Agreement Form with the patient and providing each patient with a copy of the signed Patient Agreement Form and the Medication Guide.[58]

      3.      "Dear Health Care Provider" Letter and FDA "Mifepristone Questions and Answers"; Adverse Events Discussed in Response to Opposition

You maintain that your concerns about the safety of Mifeprex are validated by the April 19, 2002, "Dear Health Care Provider" letter issued by Danco and by statements in the "Mifepristone Questions and Answers" (Mifepristone Q&A) document (placed on FDA's Web site on April 17, 2002) about reports of serious adverse events, including ruptured ectopic pregnancies and serious systemic bacterial infections (Petition at 65-71). You argue that FDA understated the possibility that the Mifeprex regimen caused the serious adverse events referred to in the letter and inappropriately attempted to link those events to the unapproved vaginal administration of misoprostol (Petition at 67-68).

The fact that Danco and FDA agreed that there was a need to issue a Dear Health Care Provider letter in April 2002 (or that a subsequent Dear Health Care Provider letter and a Dear Emergency Room Director letter were issued on September 30, 2004) does not imply that the approved Mifeprex regimen is unsafe. It is not uncommon for drug sponsors to issue "Dear Health Care Provider" letters, and, as noted in the Mifepristone Q&A document posted on our Web site in April 2002, "[w]hen FDA receives and reviews new information, the agency provides appropriate updates to doctors and their patients so that they have essential information on how to use a drug safely."[59] The intent of the two "Dear Health Care Provider" letters and the "Dear Emergency Room Director" letter was to provide health care personnel with new safety information regarding the use of Mifeprex. Similarly, when these letters were issued, we posted Mifepristone Q&A documents to

---

[58] Mifeprex REMS, available at
http://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=35
[59] See Historical Information on Mifepristone (Marketed as Mifeprex), available at
http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111334.htm.

Docket No. FDA-2002-P-0364

address questions that might arise as a result of the issuance of the letters. We disagree that we have in any way "inappropriately attempted to link" the adverse events to the intravaginal use of misoprostol. Rather, the April 2002 Mifepristone Q&A document accurately stated that in all of the adverse event cases at that time,[60] the misoprostol was given vaginally not orally; that we did not know what role, if any, the use of Mifeprex and vaginal misoprostol may have in the development of serious infections; and that FDA had not reviewed data on the safety and effectiveness of vaginal administration of misoprostol.

You maintain that it is particularly important for FDA to respond to these adverse events because the clinical trials in support of Mifeprex allegedly did not adhere to the Agency's scientific methodology for such trials (Petition at 70). As explained above, however, the clinical trials supporting the approval of Mifeprex were adequate and well-controlled, and they provided substantial evidence of the safety and effectiveness of the drug product in accordance with the FD&C Act and FDA regulations.

In your Response to Opposition, you state that the serious adverse events reported to date are consistent with concerns expressed before approval (Response to Opposition at 16). You refer to the death of Holly Patterson on September 17, 2003, after she had taken Mifeprex and misoprostol to terminate her pregnancy. You state that Ms. Patterson's apparent death from a serious systemic bacterial infection after taking Mifeprex is "not the first such death since FDA approved Mifeprex," referring to a fatality due to serious systemic bacterial infection mentioned in the April 2002 "Dear Health Care Provider Letter" (Response to Opposition at 16-17). You also question whether adverse events for Mifeprex will be adequately reported to FDA (Response to Opposition at 18).

As with all approved drug products, we continue to monitor the safety of Mifeprex. Since the approval of Mifeprex, the Agency has issued two public health advisories (one in July 2005[61] and one in March 2006[62]) and posted multiple MedWatch safety alerts (in November 2004[63] and July 2005, the latter with updates in November 2005 and March 2006[64]). As referenced above, Danco has issued two Dear Health Care Provider letters and one Dear Emergency Room Director letter. Furthermore, since you submitted your Response to Opposition, Danco has revised the labeling for

---

[60] The April 2002 Mifepristone Q&A document refers to cases of ectopic pregnancy, sepsis, and heart attack.

[61] Available at,
http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm051734.htm.
[62] Available at
http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm051196.htm.

[63] Available at
http://www.fda.gov/Safety/MedWatch/SafetyInformation/SafetyAlertsforHumanMedicalProducts/ucm166463.htm.

[64] Available at
http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111339.htm.

Docket No. FDA-2002-P-0364

Mifeprex (including the prescribing information, the Medication Guide, and the Patient Agreement), in November 2004, December 2004, July 2005, and April 2009[65] to provide prescribers and women with additional information about infection, vaginal bleeding, and ectopic pregnancy.

The boxed warning for Mifeprex currently states the following:

> Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use. No causal relationship between the use of MIFEPREX and misoprostol and these events has been established.
>
> •    Atypical Presentation of Infection. Patients with serious bacterial infections (e.g., *Clostridium sordellii*) and sepsis can present without fever, bacteremia, or significant findings on pelvic examination following an abortion. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. A high index of suspicion is needed to rule out serious infection and sepsis.
>
> •    Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. Advise patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding.
>
> Because of the risks of serious complications described above, MIFEPREX is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the MIFEPREX REMS Program.
>
> Before prescribing MIFEPREX, inform the patient about the risk of these serious events. Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, if she experiences sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if she experiences abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting or diarrhea) for more than 24 hours after taking misoprostol.
>
> Advise the patient to take the Medication Guide with her if she visits an emergency room or a healthcare provider who did not prescribe MIFEPREX, so that the provider knows that she is undergoing a medical abortion.

---

[65] The Mifeprex labeling also was revised in June 2011 when the REMS was approved. In addition, as described above, FDA is today approving a supplemental NDA submitted by Danco that proposed modified labeling for Mifeprex. See Mifeprex labeling (Mar. 29, 2016) available at http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apphist.

Docket No. FDA-2002-P-0364

The WARNINGS section of the Mifeprex labeling states, in part, the following:

*[With respect to infection and sepsis:]*

>As with other types of abortion, cases of serious bacterial infection, including very rare cases of fatal septic shock, have been reported following the use of MIFEPREX. Healthcare providers evaluating a patient who is undergoing a medical abortion should be alert to the possibility of this rare event. A sustained (> 4 hours) fever of 100.4°F or higher, severe abdominal pain, or pelvic tenderness in the days after a medical abortion may be an indication of infection.

>A high index of suspicion is needed to rule out sepsis (e.g., from *Clostridium sordellii*) if a patient reports abdominal pain or discomfort or general malaise (including weakness, nausea, vomiting or diarrhea) more than 24 hours after taking misoprostol. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise.  No causal relationship between MIFEPREX and misoprostol use and an increased risk of infection or death has been established. *Clostridium sordellii* infections have also been reported very rarely following childbirth (vaginal delivery and caesarian section), and in other gynecologic and non-gynecologic conditions.

*[With respect to uterine bleeding:]*

>Uterine bleeding occurs in almost all patients during a medical abortion. Prolonged heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours) may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed to prevent the development of hypovolemic shock. Counsel patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding following a medical abortion.

>Women should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days.  Women report experiencing heavy bleeding for a median duration of 2 days.  Up to 8% of all subjects may experience some type of bleeding for 30 days or more. In general, the duration of bleeding and spotting increased as the duration of the pregnancy increased.

>Decreases in hemoglobin concentration, hematocrit, and red blood cell count may occur in women who bleed heavily.

>Excessive uterine bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, surgical uterine evacuation, administration of saline infusions, and/or blood transfu¬sions. Based on data from several large clinical trials, vasoconstrictor drugs were used in 4.3% of all subjects, there was a decrease in hemoglobin of more than 2 g/dL in 5.5% of subjects, and blood transfusions were administered to ≤ 0.1% of subjects.  Because heavy bleeding requiring surgical uterine evacuation occurs in about 1% of patients, special care should be given to patients with hemostatic disorders, hypocoagulability, or severe anemia.

Docket No. FDA-2002-P-0364

*[With respect to ectopic pregnancy:]*

> MIFEPREX is contraindicated in patients with a confirmed or suspected ectopic pregnancy because MIFEPREX is not effective for terminating ectopic pregnancies. Healthcare providers should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy because some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. The presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography prior to being prescribed MIFEPREX.

> Women who became pregnant with an IUD in place should be assessed for ectopic pregnancy.

The Agency has regularly completed a cumulative summary of U.S. postmarketing adverse events reported for the use of mifepristone for medical termination of pregnancy. From the approval date of Mifeprex (September 28, 2000) through October 31, 2012, we received 2,740 reports of adverse events associated with the use of mifepristone in the United States to terminate pregnancy,[66] including 57 reports of severe infections[67] and 416 incidences of blood loss requiring transfusion. From November 1, 2012, through April 30, 2015, we received 984 reports of adverse events associated with the use of mifepristone in the United States to terminate pregnancy, including 9 reports of severe bacterial infections and 134 incidences of blood loss requiring transfusion.[68] As of April 30, 2015, 89 ectopic pregnancies associated with the use of mifepristone in the United States had been reported since the approval of Mifeprex. As of July 24, 2015, 17 U.S. deaths had been reported since the approval of Mifeprex. Deaths were associated with sepsis in 8 of the 17 reported fatalities (7 cases tested positive for *Clostridium sordellii*, and 1 case tested positive for *Clostridium perfringens*).[69] Seven of the eight fatal sepsis case reported vaginal misoprostol use;

---

[66] This represents data from the FDA's previous adverse event reporting system, which was known as AERS.

[67] Severe infections generally involve death or hospitalization for at least 2-3 days, intravenous antibiotics for at least 24 hours and total antibiotic usage for at least 3 days, and any other physical or clinical findings, laboratory data or surgery that suggest a severe infection.

[68] This represents data from the current FDA Adverse Event Reporting System (FAERS), which was implemented in September 2012 and replaced AERS. FDA migrated all of the data from the previous reporting system (AERS) to FAERS. FDA validated and recoded product information as the reports from the AERS database were migrated to the FAERS database. In addition, the FAERS database features a new search functionality that is based on the date FDA initially received for the case; this facilitates more accurate follow-up for cases that have multiple reports and multiple receipt dates. For these reasons, there may be differences in the case counts between AERS and FAERS.

[69] We note your statements in your October 10, 2003, Response to Opposition Comments that the presence of retained products of conception can lead to the development of intrauterine or systemic infection and that Mifeprex might potentiate this possibility through negative effects on immune system function or normal protective mechanisms (Response to Opposition at 17). Regarding retained products of conception and the emergence of infections, based on autopsy and/or ultrasound reports, there were no retained products of conception in any of the eight deaths associated with infections (sepsis). With respect to your claim that Mifeprex might increase the likelihood of infection by adversely affecting immune system function, although

25

Docket No. FDA-2002-P-0364

one case reported buccal misoprostol use. Seven of the nine remaining U.S. deaths involved two cases of ruptured ectopic pregnancy and one case each of the following: substance abuse/drug overdose; methadone overdose; suspected homicide; suicide; and a delayed onset of toxic shock-like syndrome. In the eighth case, the cause of death could not be established despite performance of an autopsy; tissue samples were negative for *C. sordellii*. In the ninth case, infection was ruled out and the final autopsy report listed pulmonary emphysema as the cause of death. [70]

We disagree with your assertion that adverse event reporting for Mifeprex is "spotty" and that, as a result, the database for post-approval adverse events for Mifeprex is incomplete (Response to Opposition at 18). You are correct that reporting to the Agency's MedWatch program is voluntary, and we acknowledge that there is always a possibility with any drug that some adverse events are not being reported. We believe, however, that the potential for underreporting of serious adverse events associated with the use of Mifeprex for medical abortion has been very low because of the restricted distribution of the product and because healthcare providers have agreed in writing to report any hospitalizations, transfusions, or other serious adverse events associated with the drug to the sponsor, which is required under FDA's regulations to report all adverse events, including serious adverse events, to the Agency (see 21 CFR 314.80, 314.81). As with all drugs, we will continue to closely monitor the postmarketing safety data on Mifeprex.

---

published experimental data from animal models suggest that this is a theoretical possibility, the overall event rate of serious infections does not support this. If Mifeprex were adversely affecting immune system function, we would expect to see a much higher rate of serious infections from more common organisms, as well as a higher number of deaths in Europe (where mifepristone has been approved for over 24 years) and in the United States. Contrary to your statements, data from the medical literature and findings by the CDC suggest that the critical risk factor in the reported cases of sepsis is pregnancy itself (see Miech, RP, 2005, Pathophysiology of Mifepristone-Induced Septic Shock Due to *Clostridium sordellii*, Ann Pharmacother, 39:1483-1488). In May 2006, FDA, along with the CDC and the National Institute of Allergy and Infectious Diseases at the National Institutes of Health held a workshop on emerging clostridial disease. The issue of immunosuppression also was discussed at length during this public workshop. It was clear from the presentations at the workshop that *C. sordellii* causes rapid and serious clinical illness in settings other than medical abortion, including among pregnant women who have recently undergone spontaneous abortion or term delivery. The fact that cases of *C. sordellii* have been identified both in pregnant women who have undergone medical abortion and those who have not supports the idea that the physiology of pregnancy may be a more plausible risk factor for *C. sordellii* illness than having undergone a medical abortion with Mifeprex.

[70] FDA is aware of 11 additional deaths of women in foreign countries who used mifepristone for the termination of pregnancy. This included one death associated with sepsis (*Clostridium sordellii* identified in tissue samples) in a foreign clinical trial, and 10 deaths identified from post-marketing data. These 10 fatal cases were associated with the following: sepsis (Group A *Streptococcus pyogenes*); a ruptured gastric ulcer; severe hemorrhage; severe hemorrhage and possible sepsis; "multivisceral failure"; thrombotic thrombocytopenic purpura leading to intracranial hemorrhage; toxic shock syndrome (*Clostridium sordellii* was identified through uterine biopsy cultures); asthma attack with cardiac arrest; respiratory decompensation with secondary pulmonary infection 30 days after mifepristone in a patient on the lung transplant list with diabetes a jejunostomy feeding tube, and severe cystic fibrosis; *Clostridium septicum* sepsis (from a published literature report).

Docket No. FDA-2002-P-0364

**E.     Withdrawal of the Approval for Mifeprex Based on Current Use Is Not Appropriate**

You claim that Mifeprex abortion providers have disregarded the restrictions in the approved regimen "without any reaction from FDA, the Population Council, or Danco" (Petition at 71).  You also claim that "common departures from the approved regimen" have included (1) offering the regimen to women with pregnancies beyond 7 weeks and (2) eliminating the second of the three prescribed visits to the health care provider (Petition at 72-74).  You argue that we should withdraw approval of Mifeprex under § 314.530(a)(4) due to the failure of the Population Council and Danco to adhere to the postmarketing restrictions in the approval letter (Petition at 71).

In the Response to Opposition, you suggest that some providers have not met their obligations because many prescriber Web sites (1) advertise the Mifeprex regimen as being available for patients whose pregnancies have progressed beyond 49 days and (2) indicate that patients take misoprostol at home rather than at the provider's office (Response to Opposition at 19-20).  Thus, you maintain that many prescribers have allowed patients to make false statements and that the applicant is obligated to stop sales to these prescribers (id. at 20).  You claim that prescribers have disregarded the requirements imposed with the 2000 approval of Mifeprex to provide patients with the Medication Guide, obtain their signatures on the Patient Agreement, and give them the opportunity to read and discuss these documents (id. at 20-21).  You state that because some prescribers, with the applicant's tacit approval, have permitted patients to sign the Patient Agreement while effectively directing them not to adhere to its requirements, the applicant cannot be described as meeting its obligations (id. at 21).

FDA is aware that medical practitioners may use modified regimens for administering Mifeprex and misoprostol.  However, FDA does not believe that it is appropriate to initiate proceedings under 21 CFR 314.530 or section 505(e) of the FD&C Act to withdraw the approval of Mifeprex based on available information regarding the distribution of Mifeprex.

The Mifeprex approval letter included nine items that the applicant and/or prescriber were obligated to follow.  As stated earlier in this response, Mifeprex has been subject to a REMS which incorporated these restrictions, including by appending a Prescriber's Agreement outlining required qualifications and guidelines prescribers must agree to follow.  Specifically, the Prescriber's Agreement required each physician to attest to possessing certain necessary skills and abilities related to managing early pregnancy to ensure safe use of the drug.[71]  The Prescriber's Agreement also contained responsibilities that prescribers must carry out.[72]  The Prescriber's Agreement stated that prescribers must have read and understood the prescribing materials.[73]

---

[71] Prescriber's Agreement, supra note 53, at 1.

[72] Id. at 1-2.

[73] Id. at 1.

Docket No. FDA-2002-P-0364

The 2000 Prescriber's Agreement also required that the prescriber (1) provide each patient with a copy of the Medication Guide and the Patient Agreement, (2) fully explain the procedure to the patient, and (3) give the patient the opportunity to read and discuss the Medication Guide and Patient Agreement.[74]  The Medication Guide and the Patient Agreement stated the approved dosage and administration of Mifeprex.  FDA has no evidence, nor have you provided any evidence, that prescribers have not signed the Prescriber's Agreement, or that women either have not been given the opportunity to read and discuss the Patient Agreement or have not signed the Patient Agreement.

As noted above, restrictions on the distribution and use of Mifeprex substantially similar to those approved in 2000 remain in place today.

## F.    Safeguards Employed in Clinical Trials Are Not Necessarily Essential Conditions for Approval

You maintain that we effectively approved a drug regimen that we had not tested because the Mifeprex regimen approved in 2000 does not include important safeguards employed in the U.S. clinical trial (e.g., governing physician training, use of ultrasound, 4-hour post-misoprostol monitoring, physician privileges at facilities that provide emergency care) (Petition at 75-76).  You argue that we should not have extrapolated conclusions about the safety and effectiveness of the Mifeprex regimen from data generated under trial conditions that do not mirror the approved regimen (id.).

We disagree with your assertions.  Furthermore, your implication that the approved conditions of use for a drug product must mirror those used in the clinical trials supporting its approval is incorrect.  As discussed above with respect to ultrasound dating and physician qualifications, safeguards employed in clinical trials are often not reflected in approved drug product labeling nor are they necessarily needed for the safe and effective use of the drug product after approval.  Many clinical trial designs are more restrictive (e.g., additional laboratory and clinical monitoring, stricter inclusion and exclusion criteria, more visits) than will be necessary or recommended in postapproval clinical use; this additional level of caution is exercised until the safety and efficacy of the product is demonstrated.  For example, in menopause hormonal therapy trials, specialists perform periodic endometrial biopsies to establish the safety of long-term hormone use.  Once the safety of the product has been established, these biopsies are not recommended in the approved product labeling, nor are they routinely performed in actual use with the approved product.  During our review of the clinical data submitted in support of an NDA, we make an assessment of the procedures employed during the clinical trials and the conditions under which the drug was studied.  This assessment is reflected in the approved labeling for the drug product.

Upon reviewing the data submitted in support of the Mifeprex NDA, we concluded in 2000 that restrictions requiring ultrasound dating of gestational age of the pregnancy and limiting access to Mifeprex to physicians trained in surgical abortions and capable of performing surgical intervention if complications arise subsequent to use of Mifeprex were not necessary to ensure its safe use (see discussion in section II.D above).

---

[74] Id.

Docket No. FDA-2002-P-0364

**G.     FDA Appropriately Concluded That Studies of Mifeprex in Pediatric Patients Were Unnecessary**

You maintain that our 2000 approval of Mifeprex violated regulations requiring that new drugs be tested for safety and effectiveness in the pediatric population (Petition at 76). You state that although we stated in the September 28, 2000, approval letter that the application was subject to the Pediatric Rule (21 CFR 314.55), we waived the requirement without explanation (Petition at 78). You contend that the Mifeprex application was not in accordance with any of the three provisions under which an applicant may obtain a waiver under 21 CFR 314.55(c)(2) of the pediatric study requirement, for the following reasons:

- 21 CFR 314.55(c)(2)(i) does not apply because FDA maintained that Mifeprex represented a meaningful therapeutic benefit over existing treatments and because Mifeprex can be expected to be used in a substantial number of pediatric patients.

- 21 CFR 314.55(c)(2)(ii) does not apply because pediatric studies of Mifeprex would not have been either impossible or highly impractical because a large population of pediatric females becomes pregnant each year and the female population is evenly distributed throughout the country.

- 21 CFR 314.55(c)(2)(iii) does not apply because FDA stated that there was no reason to expect menstruating females under age 18 to have a different physiological outcome with the regimen than older females (Petition at 79-82).

As an initial matter, we reject your contention that the Population Council did not provide evidence from any adequate and well-controlled adult studies of Mifeprex, and that therefore it was inappropriate to rely on the submitted adult studies under § 314.55(a) with respect to the use of Mifeprex in the pediatric population (Petition at 82). As discussed above, the Mifeprex approval was based on three adequate and well-controlled clinical trials.

Our conclusion that studies of Mifeprex in pediatric patients were not needed for approval was consistent with FDA's implementation of the regulations in effect at that time.[75] We determined that there were sufficient data from studies of mifepristone. Therefore, the Mifeprex approval letter should have stated our conclusion that the pediatric study requirements were waived for pre-menarchal patients and that the pediatric study requirements were met for post-menarchal pediatric patients, rather than stating that we were waiving the requirements for all pediatric age groups.[76]

---

[75] FDA was enjoined from enforcing 21 CFR § 314.55 under *Ass'n of Am. Physicians & Surgeons v. FDA*, 226 F. Supp. 204 (D.D.C. 2002). However, on December 3, 2003, the President signed into law the Pediatric Research Equity Act of 2003 (PREA 2003), Public Law 108-155, which gave FDA the statutory authority to require pediatric studies of drugs when such studies are needed to ensure the safe and effective use of drugs in children. PREA 2003 stated that any waivers or deferrals that were granted under the Pediatric Rule were considered to be granted under PREA 2003 (see Section 4 of Public Law 108-155).

[76] FDA's implementation of the Pediatric Rule was still at a relatively early stage in September 2000 and the Agency was not always precise regarding the language used in approval letters to distinguish between situations where studies were waived and where studies were not needed because the requirements were met.

Docket No. FDA-2002-P-0364

It is still our scientific opinion, based on the medical literature and over 15 years of use in the United States, that there is no biological reason to expect menstruating females under age 18 — compared to women age 18 and older — to have a different physiological outcome with the Mifeprex regimen.[77]

### H.   The Mifeprex Approval Letter Included Appropriate Phase 4 Commitments

You state that although the Population Council agreed in 1996 to perform Phase 4 studies with six different objectives, the Mifeprex approval letter included only two Phase 4 study obligations (Petition at 85-86).  You allege that the changes in its Phase 4 commitments were largely in response to the Population Council's unwillingness to explore the "ramifications" of the Mifeprex regimen (Petition at 87).  You maintain that this alleged "curtailment" of Phase 4 study commitments was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law (Petition at 88).[78]

We disagree with your assertions.  Our process for determining the appropriate Phase 4 studies for Mifeprex adequately addressed our concerns and reflected typical Agency-applicant interactions to reach consensus on appropriate postmarketing studies.[79]  It is common for proposed Phase 4 commitments to evolve during the application review process.  As you note (Petition at 85), in 1996, the Population Council committed to six postmarketing studies with the following objectives:

---

[77] In the Mifeprex Approval Memorandum, the Office Director stated, "FDA agrees there is no biological reason to expect menstruating females under age 18 to have a different physiological outcome with the regimen.  The Spitz data actually suggests a trend towards increased success of medical abortion with younger patients" (Mifeprex Approval Memorandum, supra note 16, at 7).

[78] We note that post-marketing studies are not required for approvals under 21 CFR 314.520.

[79] You also state that, "[a]s a general rule, the clinical trials required by FDA to support an NDA are adequate to establish short-term drug safety and effectiveness.  The standard pre-approval clinical trials, however, are typically incapable of providing either the amount or type of data necessary to assess a drug's long-term effects" (Petition at 84).  This argument is not relevant to Mifeprex, which is approved for medical termination of pregnancy.  Mifeprex is not approved for long-term or chronic use, which is an important factor in assessing the need to study long-term effects of a drug.  Long-term safety for a single-dose medication is generally not a concern.  However, FDA routinely monitors postmarketing safety data for all approved drugs.  Mifeprex is no exception.  FDA's Office of Surveillance and Epidemiology continuously monitors available safety data from use of mifepristone for termination of pregnancy both within and outside of the United States and has not identified any long-term safety signals.  The Mifeprex adverse events reported are consistent with product labeling and with what can be expected with spontaneous and surgical abortions.  Furthermore, as explained in this response, since Mifeprex's approval, safety concerns and adverse events have been monitored through enhanced surveillance and reporting by certified prescribers, and we have required a REMS for Mifeprex including a Medication Guide, elements to assure safe use, an implementation system that requires the sponsor to assess the performance of certified distributors, and a timetable for submission of assessments of the REMS.  We also continue to closely monitor the post-marketing safety of mifepristone for termination of pregnancy for any new or long-term signals.

Docket No. FDA-2002-P-0364

(1)  Monitor the adequacy of the distribution and credentialing system.

(2)  Follow-up on the outcome of a representative sample of Mifeprex-treated women who have surgical abortion because of method failure.

(3)  Assess the long-term effects of multiple use of the regimen.

(4)  Ascertain the frequency with which women follow the complete treatment regimen and the outcome of those who do not.

(5)  Study the safety and efficacy of the regimen in women under age 18, women over age 35, and women who smoke.

(6)  Ascertain the effect of the regimen on children born after treatment failure.

As stated in the Mifeprex Approval Memorandum (at 7), during the final review of the Mifeprex NDA in 2000, items 1, 2, 4, and 5 above were revised and integrated into a single Phase 4 study to assess whether, for providers who did not have surgical intervention skills and referred patients for surgery, clinical outcomes were similar to those of patients under the care of physicians (such as those in the clinical trials) who possessed surgical skills. Based on a revised protocol, this Phase 4 study would monitor the adequacy of provider qualifications (item 1) and collect data on safety outcomes and method failures (item 2) and return of patients for their follow-up visits (item 4). Because patients would not be restricted to a specific age range or smoking status, information to address item 5 also would be obtained. In a second Phase 4 study, the applicant would examine the outcomes of ongoing pregnancies (i.e., method failures) through a surveillance, reporting, and tracking system (item 6). Thus, although the approval letter listed only two Phase 4 studies, those two studies incorporated all but one element of the six studies listed in the September 18, 1996, approvable letter concerning the Mifeprex NDA. (As discussed below, the remaining study was not included for logistical and practical reasons.)

As mentioned in section II.D.2 above, for the first Phase 4 study, which addressed items 1, 2, 4, and 5 above, the applicant reported in a submission in February 2008 that so few medical abortions are prescribed by physicians who do not have surgical intervention skills that it was not feasible to do a meaningful study to assess this specific issue. We agreed with the applicant regarding the non-feasibility of conducting a meaningful study and concluded that no differences between non-referrers or referrers in terms of clinical outcomes could be identified based on the data that had been submitted. In September 2008, we released the applicant from this postmarketing commitment.

For the second Phase 4 study, which addressed item 6 above, based on the reporting of ongoing pregnancies during the first 5 years of Mifeprex distribution, the applicant provided updates in January 2006 and November 2007. Danco reported that only one to two pregnancies per year were followed for final outcomes, and explained that the small number was due, in part, to the requirement that the patients consent to participation after seeking a pregnancy termination. In January 2008, because of the lack of an adequate number of enrolled women, and based on subsequent reports, we released the applicant from this postmarketing commitment.

Docket No. FDA-2002-P-0364

In addition, as noted in the Mifeprex Approval Memorandum (at 7), we agreed with the Population Council both that it would not be feasible to identify and enroll sufficient numbers of repeat users of the drug and that the pharmacology of mifepristone does not suggest any carryover effect after one-time administration.  Accordingly, we did not include item 3 as a Phase 4 commitment in the September 28, 2000, approval letter.  However, we note that data from many other studies reported in the medical literature using mifepristone for, e.g., fibroids, uterine myoma, meningioma, psychiatric illnesses, and Cushing's disease, in much higher daily and lower daily doses for chronic use (months) have not raised any major safety issues.[80]

## III.   REQUEST FOR STAY AND REVOCATION OF APPROVAL

You request that we immediately stay the approval of Mifeprex, thereby halting all distribution and marketing of the drug pending final action on your Petition (Petition at 2).  You cite 21 CFR 10.35 as the basis for your request for a stay (Petition at 1).  In addition, you urge us to revoke the approval of Mifeprex because of the purported legal violations and safety concerns set forth in your Petition (Petition at 2).

As described above, we are denying your Petition.  Therefore, your request for a stay pending final action on your Petition is moot.

For the reasons set forth in section II of this response, we conclude that you have not presented any evidence that the applicable grounds in 21 CFR 314.530 have been met with respect to Mifeprex. Furthermore, you have not provided any evidence that any of the applicable grounds in section 505(e) of the FD&C Act have been met for Mifeprex.[81]  Therefore, you have not provided any evidence that would serve as a basis for seeking to withdraw the approval of Mifeprex.

---

[80]  See, e.g., Tristan, M, et al., 2012, Mifepristone for Uterine Fibroids (Review), Cochrane Library, 8:1-47; Esteve, JL, et al, 2013, Mifepristone Versus Placebo To Treat Uterine Myoma:  A Double-Blind, Randomized Clinical Trial, Int J Womens Health, 5:361; Spitz, IM, et al., 2005, Management of Patients Receiving Long-Term Treatment With Mifepristone, Fertil Steril, 84:1719; Blasey, CM, TS Block, JK Belanoff, and RL Roe, 2011, Efficacy and Safety of Mifepristone for the Treatment of Psychotic Depression, J Clin Psychopharmacol, 31:436; Fleseriu, M, et al., 2012, Mifepristone, a Glucocorticoid Receptor Antagonist, Produces Clinical and Metabolic Benefits in Patients with Cushing's Syndrome, J Clin Endocrinol Metab, 97:2039.

[81]  You have not presented any clinical data or other information demonstrating that Mifeprex is unsafe for use under its approved conditions for use, either on the basis of evidence available to the Agency at the time of approval or when also considering evidence obtained subsequent to approval.  In addition, you have not provided any new evidence that, when evaluated with the evidence available at the time of Mifeprex's approval, shows that there is a lack of substantial evidence that the drug will have its intended effect.

Docket No. FDA-2002-P-0364

## IV.   CONCLUSION

We appreciate and share your concerns about the need to appropriately manage the risks associated with the use of Mifeprex. Our concerns about the potential complications associated with Mifeprex led to its approval in accordance with 21 CFR 314.520. It was deemed to have in effect a REMS in 2007, and it has had an approved REMS since 2011.[82]

For the reasons set forth above, your request that we immediately stay the approval of Mifeprex is moot, and we deny your request that we revoke approval of the Mifeprex NDA. In addition, we deny your request that we conduct an audit of all records of the French and U.S. clinical trials supporting the Mifeprex approval. As with all approved new drug products, we will continue to monitor the safety of Mifeprex and take any appropriate actions.

Sincerely,

Janet Woodcock, M.D.
Director
Center for Drug Evaluation and Research

---

[82] As of today's approval of Danco's supplemental NDA, the Medication Guide is no longer part of the REMS. However, the Medication Guide will remain as part of approved patient labeling and will be required to be provided to the patient under current Medication Guide regulations.