**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| WHOLE WOMAN'S HEALTH ALLIANCE, on behalf of itself, its staff, and its patients; WHOLE WOMAN'S HEALTH, on behalf of itself, its staff, and its patients; WHOLE WOMAN'S HEALTH OF THE TWIN CITIES, LLC, on behalf of itself, its staff, and its patients; BLUE MOUNTAIN CLINIC, on behalf of itself, its staff, and its patients; HELEN WEEMS, APRN-FNP on behalf of herself and her patients; ALL FAMILIES HEALTHCARE, on behalf of itself, its staff, and its patients; and TRUST WOMEN FOUNDATION, on behalf of itself, its staff, and its patients, | Case No. 3:23-cv-00019-NKM |
| Plaintiffs, | |
| v. | |
| UNITED STATES FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D., in his official capacity as Commissioner of Food and Drugs; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and XAVIER BECERRA, in his official capacity as Secretary of the Department of Health and Human Services, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## PRELIMINARY STATEMENT

Plaintiffs Whole Woman's Health Alliance, Whole Woman's Health, Whole Woman's Health of the Twin Cities, LLC, Blue Mountain Clinic, Helen Weems, All Families Healthcare, and Trust Women Foundation ("Plaintiffs") are abortion providers respectively operating in Virginia, Montana, and Kansas, where abortion remains legal notwithstanding the reversal of *Roe v. Wade*. In this case, Plaintiffs ask the Court to lift the unjustified cloud of fear and apprehension over mifepristone—one of two drugs used in the most common protocol for medication abortion in the United States—created and perpetuated by the U.S. Food and Drug Administration ("FDA") and exploited by anti-abortion politicians and activists. FDA's imposition of a "Risk Evaluation and Mitigation Strategy" in January 2023 (the "2023 REMS") for mifepristone exceeds FDA's statutory authority, is arbitrary and capricious, and contrary to the Constitution. Compl. ¶¶ 144–58. The medically baseless REMS harms patients and providers by imposing unnecessary restrictions on mifepristone. At the same time, anti-abortion activists have weaponized both the 2023 REMS and prior REMS against abortion providers around the country.

This motion for a preliminary injunction seeks to protect Plaintiffs' continued ability to prescribe and dispense mifepristone to their patients during the pendency of this litigation. Such relief is needed because a host of threats have encircled the provision of medication abortion, including pending federal litigations to which Plaintiffs are not party, *Alliance for Hippocratic Medicine v. FDA*, No. 2:22-CV-00223-Z (N.D. Tex.) (the "*Alliance* Case"), and *State of Washington v. FDA*, No. 1:23-cv-03026-TOR (E.D. Wash.) (the "*Washington* Case"), along with a new citizen petition to FDA seeking to have mifepristone's approval revoked.[1]

---

[1] Alice Miranda Ollstein, *Anti-Abortion Group Launches New Pill Challenge as SCOTUS Mulls Sweeping Restrictions*, Politico (Apr. 20, 2023, 9:48 A.M.), https://www.politico.com/news/2023/04/19/students-for-life-abortion-scotus-00092771.

On April 7, 2023, a federal district court judge in Amarillo, Texas (a state that has already banned abortion)[2] effectively ordered mifepristone off the market by purporting to stay FDA's regulatory actions approving the drug on the spurious ground that FDA had not adequately considered mifepristone's safety and efficacy. *All. for Hippocratic Med. v. FDA*, No. 2:22-CV-00223-Z, 2023 WL 2825871, at *32 (N.D. Tex. Apr. 7, 2023). Five days later, on applications for an emergency stay pending appeal, the United States Court of Appeals for the Fifth Circuit stayed the *Alliance* Case injunction with respect to FDA's initial approval of mifepristone in 2000, but not with respect to its actions regarding mifepristone from 2016 through 2023, purporting to reinstate the REMS in effect prior to 2016. *All. for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 2913725, at *1, *17, *21 (5th Cir. Apr. 12, 2023) (per curiam). Although the Supreme Court entered a preliminary stay that averts some of the devastating harms that were about to occur due to the trial court decision in the *Alliance* Case, *see Danco Lab'ys, LLC v. All. for Hippocratic Med.*, No. 22A901, 2023 WL 3033177 (U.S. Apr. 21, 2023) (mem.), threats to mifepristone continue to proliferate—prompting a growing number of states to stockpile large amounts of mifepristone even after the Supreme Court's stay.[3]

---

[2] Caroline Kitchener & Ann E. Marimow, *The Texas Judge Who Could Take Down The Abortion Pill*, Wash. Post (Feb. 25, 2023, 6:00 A.M.), https://www.washingtonpost.com/politics/2023/02/25/texas-judge-abortion-pill-decision ("The lead plaintiff in the . . . case, the Alliance for Hippocratic Medicine, incorporated in Texas—with a 'registered agent' in Amarillo—several months before the lawsuit was filed. While the group's website does not include any location or contact information, records filed with the Texas secretary of state's office show that the group's mailing address is in Tennessee.").

[3] *See, e.g.*, Reis Thebault et al., *Democratic States Stockpile Abortion Pills as Access Rests in Courts*, Wash. Post (Apr. 21, 2023), https://www.washingtonpost.com/nation/2023/04/21/blue-state-abortion-pill-access (describing six states, representing a quarter of the U.S. population, that "have publicly pledged to stockpile abortion drugs"); Jen Christensen, *Concerned About the Courts, Some States and Universities are Stockpiling Abortion Drugs*, CNN (Apr. 12, 2023, 5:49 P.M.), https://www.cnn.com/2023/04/12/health/abortion-drugs-stockpile/index.html (University of Massachusetts and University of Washington stockpiling mifepristone; New York and California stockpiling misoprostol).

Plaintiffs—independent abortion providers doing all they can to care for an ever-increasing number of patients in the post-*Roe* world—are caught in the middle. The preliminary injunction and ensuing orders in the *Alliance* Case unleashed chaos and confusion at Plaintiffs' clinics. Plaintiffs expended significant resources preparing their practices for the possibility that they would be unable to offer mifepristone entirely. Declaration of Rebecca Tong, attached as Exhibit 1 ("Tong Decl.") ¶ 24; Declaration of Nicole Smith, PhD, MPH, attached as Exhibit 2 ("Smith Decl.") ¶ 23; Declaration of Helen Weems, MSP, APRN-FNP, attached as Exhibit 3 ("Weems Decl.") ¶ 19; Declaration of Amy Hagstrom-Miller, attached as Exhibit 4 ("Hagstrom-Miller Decl.") ¶¶ 28, 30. Then, days later, they had to pivot to determining how to provide medication abortion as if it were 2015 and the outdated restrictions imposed under a prior REMS were still in place. Tong Decl. ¶ 27; Smith Decl. ¶ 24; Weems Decl. ¶ 19; Hagstrom-Miller Decl. ¶ 29. Further, they were unsure about whether they could use the generic mifepristone approved in 2019. Tong Decl. ¶¶ 27–28; Smith Decl. ¶ 24; Weems Decl. ¶ 19.

Although the Supreme Court's stay maintains the status quo for the time being, Plaintiffs remain vulnerable to repetition of the same chaotic scenario. The pending appeal in the Fifth Circuit will be argued on May 17, 2023, and the stay remains through the Fifth Circuit decision and a petition for certiorari that may or may not be filed—neither of which Plaintiffs can control. Further, as the case proceeds, new orders could arise not subject to the stay, and, taking past as prologue, any appeals of those orders would once again thrust abortion providers and their patients into the same chaos and uncertainty.[4]

---

[4] *See, e.g.*, Christine Fernando & Jeanine Santucci, *Dueling Federal Rulings Plunge Future of Abortion Pill into Legal Uncertainty*, USA Today (Apr. 8, 2023, 2:32 P.M.), https://www.usatoday.com/story/news/nation/2023/04/07/judge-revokes-fda-approval-key-abortion-drug-nationwide/11203402002 (describing providers' rush to shift to misoprostol-only protocols due to legal uncertainty); C.A. Bridges, *What is Mifepristone? Are Abortion Pills Legal in Florida?*, Gainesville Sun (Apr. 17, 2023, 2:22 P.M.), https://www.gainesville.com/story/news/healthcare/2023/04/14/abortion-pills-florida-mifepristone-misoprostol-what-they-are-how-get-them/7766021001 (describing confusion as "patients

Not all abortion providers in the states where abortion remains legal are exposed to the same risks and uncertainty that Plaintiffs face. In the *Washington* Case, the district court issued an order that maintains the status quo for abortion providers in 17 states and the District of Columbia, all of which protect access to abortion as an essential part of reproductive healthcare.[5] That lawsuit challenges the same 2023 REMS at issue here. There, the district court held that the plaintiff states had raised "serious issues going to the merits of" their challenge to the 2023 REMS. *Washington v. FDA*, No. 1:23-CV-03026-TOR, 2023 WL 2825861, at *8 (E.D. Wash. Apr. 7, 2023). The district court enjoined FDA from altering the status quo on mifepristone's availability in the plaintiff states "irrespective of" the rulings in the *Alliance* Case. *Washington v. FDA*, No. 1:23-CV-03026-TOR, 2023 WL 2941567, at *2 (E.D. Wash. Apr. 13, 2023). The injunction in the *Washington* Case, however, does not protect Plaintiffs here from the devastating consequences of any rulings in the *Alliance* Case or others because the states of Virginia, Montana, and Kansas are not parties to it— indeed, the Attorney General of Montana unsuccessfully sought to intervene to *oppose* the relief sought, *see Washington v. FDA*, No. 1:23-CV-03026-TOR, 2023 WL 3035380, at *3 (E.D. Wash. Apr. 21, 2023)—and the district court declined to issue a nationwide injunction, *Washington*, 2023 WL 2825861, at *10.

Plaintiffs ask this Court to halt this uncertainty by enjoining FDA from deviating from the status quo in the states in which they provide care. Plaintiffs ask for the same relief as was granted to Washington State and its co-plaintiff States: maintenance of the status quo so their continued

---

and providers try to understand the new and shifting laws, lawsuits and court rulings"); Jan Johnson & Michael Martin, *Supreme Court Ruling on Mifepristone Causes Uncertainty for Advocates*, NPR (Apr. 21, 2023, 11:30 A.M.), https://www.npr.org/2023/04/21/1171202676/abortion-pill-supreme-court (citing Michigan provider saying that "conflicting legal rulings and the wait for answers is complicating care and making it difficult to help patients").

[5] Plaintiffs in the *Washington* Case are the states of Washington, Arizona, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, and the District of Columbia.

provision of mifepristone is not repeatedly under threat while their challenge to the REMS proceeds.

Plaintiffs' application satisfies all of the required elements for preliminary relief: they are likely to prevail on the merits (as the district court held in the *Washington* Case); they and their patients would be irreparably injured if their ability to prescribe and dispense mifepristone were proscribed or constrained during the pendency of this litigation; and the public interest favors equal treatment under federal law for providers and patients who work and live in states where abortion, including medication abortion, is legal. Indeed, equity requires this result; otherwise, Plaintiffs and their patients will be gravely prejudiced merely because they happen to work or reside in states where medication abortion is legal, but whose state officials nonetheless opted not to protect their interests by joining the *Washington* Case as plaintiffs.

## STATEMENT OF FACTS

### A.    The Plaintiff Providers

Plaintiffs are independent abortion providers who provide care in Virginia, Montana, and Kansas. Each brings this case on behalf of themselves, their providers, and their patients. All Plaintiffs provide medication abortion using the FDA-approved regimen of mifepristone followed by misoprostol. They use both Danco's Mifeprex and Genbiopro's generic mifepristone, which was approved in 2019. Compl. ¶ 60; Smith Decl. ¶ 23; Weems Decl. ¶ 19; Tong Decl. ¶¶ 27–28. Plaintiffs' continued prescription of medication abortion under the status quo is essential to their patients. If Plaintiffs and their clinicians are unable to prescribe mifepristone, or if they must prescribe mifepristone with outdated restrictions, their patients will be delayed in obtaining or outright denied access to medication abortion with mifepristone or abortion generally.

**Whole Woman's Health.** Whole Woman's Health Alliance is a nonprofit organization committed to providing holistic reproductive care for its patients that operates Whole Woman's

Health of Charlottesville ("WWH of Charlottesville"), which has provided medication abortion since 2017. Whole Woman's Health also operates Whole Woman's Health of Alexandria ("WWH of Alexandria"), a licensed healthcare facility in Alexandria, Virginia, which currently has a nurse practitioner on staff who provides medication abortion to patients in-clinic. And, since August 2021, Plaintiff Whole Woman's Health of the Twin Cities, LLC ("WWH of the Twin Cities") has operated a virtual healthcare program that provides telehealth services for medication abortion in Virginia and other states. As part of its telehealth abortion services, WWH of the Twin Cities provides medication abortion by mail ("direct to patient telehealth").

**Blue Mountain Clinic.** Plaintiff Blue Mountain Clinic ("Blue Mountain") is a family practice in Missoula, Montana. When it opened in 1977, Blue Mountain was the first and only abortion clinic in the state of Montana; its services now include comprehensive family medical care to better serve its community. Blue Mountain's primary physician and two physician assistants provide medication abortion both in person and via direct to patient telehealth to patients with Montana addresses.

**All Families Healthcare and Helen Weems.** Plaintiff Helen Weems is a nurse practitioner licensed to practice in Montana with over 20 years of clinical experience. She owns and is the only clinician at All Families Healthcare, a sexual and reproductive health clinic located in Whitefish, Montana. All Families provides medication abortion, both in-person and by direct to patient telehealth. Ms. Weems is the clinic's only certified mifepristone prescriber, and the only provider of abortion care in the Flathead Valley.

**Trust Women.** Trust Women operates clinics in Wichita, Kansas, and Oklahoma City, Oklahoma. In Wichita, Trust Women provides reproductive healthcare, including both procedural and medication abortion. Trust Women has provided medication abortion since it opened its

Wichita clinic in 2013. Trust Women was in the process of organizing a telehealth program that would include direct to patient telehealth when mifepristone's approval came under fire.

### B.    FDA's Repeated Acknowledgments of Mifepristone's Safety

To date, mifepristone has been used by over 5 million patients in the United States. Under the branded name "Mifeprex," the drug was first approved by FDA in September 2000 for use in a two-drug regimen: administration of mifepristone, which interrupts early pregnancy by blocking the effect of progesterone, a hormone necessary to maintain a pregnancy, followed by misoprostol, which causes uterine contractions that expel the pregnancy from the uterus.[6] Shortly after taking the two drugs, a patient experiences bleeding akin to a heavy period or a miscarriage.[7]

FDA's initial approval of mifepristone was the result of a thorough, nearly five-year scientific review that determined mifepristone was safe for use in the United States. Compl. ¶ 43. After over 15 years of widespread use, a multidisciplinary FDA review team conducted a medical review based on the 2.5 million uses of Mifeprex for medication abortion in the U.S. that had occurred since the drug's 2000 approval. Its 2016 report concluded that "[Mifeprex] has been increasingly used as its efficacy and safety have become well established by both research and experience, and serious complications have proven to be extremely rare," and "that no new safety concerns have arisen in recent years, and that the known serious risks occur rarely."[8] FDA has

---

[6] U.S. Food & Drug Admin., NDA 20-687 Mifeprex Approval Memo, Sept. 28, 2000, Compl. Ex. A.

[7] *See* U.S. Gov't Accountability Office, GAO-08-751, Food and Drug Administration Approval and Oversight of the Drug Mifeprex (2008), https://www.gao.gov/assets/gao-08-751.pdf (hereinafter FDA Approval and Oversight of Mifeprex), Compl. Ex. B.

[8] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., No. 020687Orig1s020, Mifeprex Medical Review(s) 8, 12 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf (hereinafter FDA 2016 Medical Review), Compl. Ex. E; *see also* U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., Full Prescribing Information for Mifeprex 7–8, tbls.1 & 2 (Mar. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf ("Mifeprex Labeling"), Compl. Ex. F.

further stated: "[t]he safety profile of Mifeprex is well-characterized and its risks well-understood after more than 15 years of marketing. Serious adverse events are rare and the safety profile of Mifeprex has not substantially changed."[9] Still further, "[g]iven that the numbers of . . . adverse events appear to be stable or decreased over time, it is likely that . . . serious adverse events will remain acceptably low."[10]

The FDA's 2016 review also concluded that the risk of death from mifepristone is near zero. The FDA review reflected that there are only 13 recorded deaths even possibly related to medication abortion—roughly 0.00000232%. The other deaths were included in the adverse events summary "regardless of causal attribution to mifepristone" and included cases of homicide and drug overdose.[11] FDA further noted that, as to rare, serious infections following use, "the critical risk factor" is not mifepristone but "pregnancy itself," as the very same complications can arise during a miscarriage or procedural abortion.[12] FDA found that mifepristone was just as safe when administered by an advanced practice clinician ("APC") as it was when administered by a physician, pointing to five studies demonstrating that "efficacy is the same with non-physician providers compared to physicians."[13]

---

[9] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., No. 020687Orig1s020, Mifeprex Risk Assessment and Risk Mitigation Review(s): REMS Modification Memorandum 3 (Mar. 29, 2016) (hereinafter 2016 REMS Modification Memorandum), Compl. Ex. G.

[10] Compl. Ex. E (FDA 2016 Medical Review) at 47.

[11] U.S. Food & Drug Admin., Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2022, at 1, https://www.fda.gov/media/164331/download (hereinafter Mifepristone U.S. Post-Marketing Adverse Events Summary), Compl. Ex. I.

[12] U.S. Food & Drug Admin., FDA-2002-P-0364-0002, Letter from Janet Woodcock, Dir., Ctr. for Drug Evaluation & Rsch., U.S. Food & Drug Admin., to Donna Harrison, Exec. Dir., Am. Assoc. of Pro Life Obstetricians & Gynecologists, Gene Rudd, Senior Vice President, Christian Med. & Dental Ass'n, and Penny Young Nance, CEO and President, Concerned Women for Am., denying Citizen Petition, Docket No. FDA-2002-P0364, at 25 n.69 (Mar. 29, 2016) (hereinafter Citizen Petition Denial), Compl. Ex. D.

[13] Compl. Ex. E (FDA 2016 Medical Review) at 43.

Leading scientific and medical organizations also recognize mifepristone's safety. In 2018, the National Academies of Sciences, Engineering, and Medicine ("National Academies"), a universally respected non-partisan advisory institution, reviewed all available scientific research and concluded that the risks of medication abortion are "similar in magnitude to the reported risks of serious adverse effects of commonly used prescription and over-the-counter medications," such as "antibiotics and NSAIDS"[14] (non-steroidal anti-inflammatory drugs, such as ibuprofen and aspirin)—medications that millions of people take daily.[15]

In 2019, relying on the data supporting Mifeprex, FDA approved an abbreviated new drug application for a generic version of mifepristone produced by GenBioPro.

## C.    FDA's Promulgation of the Medically Unnecessary and Harmful REMS

Notwithstanding the mountains of evidence demonstrating mifepristone's safety, and its own repeated conclusions about mifepristone, FDA has mystifyingly persisted in subjecting the drug to uniquely burdensome restrictions.

FDA may impose a "Risk Evaluation and Mitigation Strategy" ("REMS") as a condition to approval, but only when "necessary to ensure that the benefits of the drug outweigh the risks of the drug." 21 U.S.C. § 355-1(a)(1). The most burdensome form of REMS is "Elements to Assure Safe Use" ("ETASU"), which FDA may impose if medically necessary due to a drug's "inherent toxicity or potential harmfulness." *Id.* § 355-1(f)(1). By statute, REMS with ETASU is only appropriate for drugs with serious side effects such as death, incapacity, or birth defects, and even then, only where that risk is so severe that approval could not be granted without the restriction.

---

[14] Nat'l Acads. of Sci., Eng'g. & Med., *The Safety and Quality of Abortion Care in the United States* 56, 79 (2018) (hereinafter National Academies Report), http://nap.edu/24950.

[15] Pamela Gorczyca et al., *NSAIDs: Balancing the Risks and Benefits*, 41 U.S. Pharmacist 24 (Mar. 2016), http://bit.ly/3YLbw3x.

*Id.* §§ 355-1(b)(4), (f)(1)(A). Among the 20,000 prescription drug products approved by FDA, there are only 60 REMS programs, 56 of which include ETASU. Compl. ¶ 82.

Currently, FDA continues to impose the REMS with the following ETASU on mifepristone, none of which accord with FDA's determinations about mifepristone's safety and efficacy:

- **A Prescriber Certification requirement,** requiring clinicians who prescribe mifepristone to attest to their clinical abilities in a signed form kept on file by the manufacturer, and to agree to comply with reporting and other REMS requirements. Under the prior REMS, only physicians could be certified as mifepristone prescribers, although APCs (nurse practitioners, nurse midwives, and physician assistants) could dispense mifepristone under the supervision of a physician. Compl. ¶ 83.

- **A Patient Agreement requirement,** mandating that the prescriber and patient review and sign a special form with information about the mifepristone regimen and risks, and requiring the prescriber to provide the patient with a copy and place a copy in the patient's medical record. *Id.*

- **A Pharmacy Certification requirement,** mandating that pharmacies wishing to dispense mifepristone be "specially certified" by the manufacturer. This requirement took effect in January 2023, when FDA ended the in-person dispensing requirement and first allowed retail pharmacies to dispense mifepristone. *Id.*

FDA's continued adherence to these restrictions has no justification. In 2016, preeminent reproductive health, rights, and justice organizations, including the Society of Family Planning ("SFP"), urged FDA to lift the REMS in their entirety, arguing that "[t]he overall legal and social climate around abortion care intensifies all of the burdens that the mifepristone REMS places on patients and makes it even more critical that the FDA lift medically unnecessary restrictions on the

drug."[16] The organizations emphasized that: "[e]xtensive scientific and clinical evidence of mifepristone's safety and efficacy, and the ever-increasing burden on patient access to abortion care, clearly demonstrate that mifepristone's REMS program is not needed to protect patients.[17]

Specifically as to the ETASU that remain in place today, the organizations pressed FDA to "[e]liminate the Prescriber Agreement certification requirement," because it was not necessary for the safe distribution of mifepristone—especially considering the "many laws, policies, and ordinary standards of care" to which health professionals and drugs are already subject.[18] With respect to the "confusing and unnecessary" Patient Agreement Form, the organizations urged that it was "medically unnecessary and interferes with the clinician-patient relationship."[19] An internal FDA review concurred with this assessment, and unanimously recommended eliminating the Patient Agreement Form because it "contains duplicative information already provided by each healthcare provider or clinic," "does not add to safe use conditions," and "is a burden for patients."[20] Nonetheless, in 2016 FDA retained the Patient Agreement Form, overruling the internal recommendation of its own staff for no apparent reason.[21]

---

[16] Letter from Soc'y of Fam. Plan. et al., to Stephen Ostroff, Acting Comm'r of Food & Drugs, Robert M. Califf, Deputy Comm'r for Med. Prods. & Tobacco & Janet Woodcock, Dir., Ctr. for Drug Evaluation & Rsch., U.S. Food & Drug Admin. 5 (Feb. 4, 2016) (hereinafter SFP Letter to FDA), Compl. Ex. K.

[17] Id. at 6.

[18] Id. at 3.

[19] Id. at 4.

[20] Compl. Ex. H (2016 Summary Review) at 25.

[21] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., No. 020687Orig1s020, Mifeprex Risk Assessment and Risk Mitigation Review(s): Letter from Janet Woodcock, Dir., Ctr. for Drug Evaluation & Rsch., U.S. Food & Drug Admin., Re: NDA 020687, Supp 20, at 1 (Mar. 28, 2016) (hereinafter "Woodcock Patient Agreement Memo"), Compl. Ex. L.

Considering FDA's repeated, and eminently correct, recognition of mifepristone's safety and efficacy, and the conclusion that it could be made more accessible without sacrificing safety or efficacy, FDA has relaxed *some* of the REMS over the years. In 2016, it expanded the types of healthcare providers who could be certified prescribers to include APCs, including nurse practitioners, nurse midwives, and physician assistants.[22] Restricting APCs from prescribing mifepristone limits access to abortion, especially in rural and underserved areas.[23] FDA concluded that extensive evidence and experience demonstrate that APCs provide medication and aspiration abortion with the same safety, efficacy, and patient satisfaction as their physician counterparts.[24]

In addition, FDA has removed the in-person dispensing requirement, paving the way for access to mifepristone via direct to patient telehealth and in brick-and-mortar pharmacies. In July 2020, a court ordered FDA to suspend the in-person dispensing requirement for mifepristone due to the constraints on in-person healthcare during the COVID-19 pandemic. *Am. Coll. of Obstetricians & Gynecologists v. FDA*, 472 F. Supp. 3d 183, 233 (D. Md. 2020), *stayed by FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578, 578 (2021) (mem.). In April 2021, FDA itself suspended the in-person dispensing requirement during the COVID-19 public health emergency because, during the six-month period in which the in-person dispensing requirement had been enjoined, the availability of direct to patient telehealth showed no increases in serious

---

[22] *See* U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., No. 020687Orig1s020, Mifeprex REMS (Mar. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf (hereinafter 2016 REMS).

[23] *See* National Academies Report, *supra* n.14, at 114–19.

[24] Compl. Ex. E (FDA 2016 Medical Review) at 78–80; *see also* National Academies Report, *supra* n.14, at 103–05; Tracy A. Weitz et al., *Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver*, 103 Am. J. Pub. Health 454 (Mar. 2013).

patient safety concerns.[25] In January 2023, FDA permanently removed the in-person dispensing requirement, enabling patients to access medication abortion by mail and opening the door for brick-and-mortar pharmacies to dispense mifepristone.[26] However, without basis, FDA imposed a new mandate that pharmacies, like prescribers, be "certified." FDA refused to remove the requirements mandating the unnecessary agreements.[27]

The imposition of the REMS has influenced and emboldened anti-abortion actors who leverage FDA's history of overregulation against providers and patients. For example, the Montana Legislature enacted a statute in 2021 that prohibited telehealth medication abortion, identifying the REMS as evidence of FDA's view that mifepristone is dangerous. The Legislature referred to FDA's use of the "only FDA approval process that allows for postmarketing restrictions" and the resulting restrictions to justify medically unnecessary barriers to accessing mifepristone. H.B. 171, 67th Leg., 1st Reg. Sess. (Mont. 2021). And, ongoing litigation continuously threatens to reinstate restrictions FDA removed; specifically, requiring in-person dispensing and restricting certified prescribers to physicians only. The Fifth Circuit's April 12 modified order would have done precisely that. Although widely reported as a compromise, that order was no such thing. It would have propelled providers and patients backward years and deprived them of significant service-delivery advancements—eliminating highly qualified and much needed providers as certified

---

[25] Letter from Janet Woodcock, Acting Comm'r, U.S. Food & Drug Admin., to Maureen G. Phipps, Chief Exec. Officer, Am. Coll. Of Obstetricians & Gynecologists, and William Grobman, President, Soc'y for Maternal-Fetal Med. (Apr. 12, 2021) (hereinafter Woodcock Letter), Compl. Ex. J.

[26] *See* U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., Risk Evaluation and Mitigation Strategy (REMS) Single Shared System for Mifepristone 200 MG (Jan. 2023), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2023_01_03_REMS_Full.pdf (hereinafter 2023 REMS).

[27] *See id.*

prescribers and upending direct to patient telehealth, which has dramatically improved access to mifepristone. *See All. for Hippocratic Med.*, 2023 WL 2913725, at *1–2.

In short, despite reimposing the REMS, FDA continuously and correctly concluded in 2016, 2019, 2021, and 2023 that mifepristone is one of the safest drugs available in the United States. And, when the safety of mifepristone was called into question by anti-abortion activists in the *Alliance* Case, FDA vigorously defended its approval of mifepristone by repeatedly emphasizing the proven safety record of mifepristone over the last 23 years, comparing its risk to that of ibuprofen. Emergency Mot. Under Cir. R. 27.3 for a Stay Pending Appeal at 1, 14–15, *All. for Hippocratic Med. v. FDA*, No. 23-10362 (5th Cir. Apr. 10, 2023).

### D.    The Dueling Lawsuits Over Mifepristone

Ensuring medically sound, protected access to mifepristone is more important now than ever, with abortion rapidly becoming criminalized across large swaths of the nation, and with anti-abortion zealots seeking to deprive people *in any state* of access to mifepristone. Such idealogues have been emboldened by years of overregulation of mifepristone, which has culminated in an unprecedented challenge to the decades-old 2000 approval of the drug.

In the *Alliance* Case, filed on November 18, 2022, plaintiffs sought to enjoin FDA's 2000 approval of mifepristone. Relying on long-discredited junk science and purported experts who have been rejected by numerous courts,[28] the district court ordered an unprecedented stay of FDA's longstanding approval of mifepristone. *See All. for Hippocratic Med.*, 2023 WL 2825871, at *32.

---

[28] *See* Mot. for Leave to File Br. of Over 100 Reprod. Health, Rts. & Just. Orgs. as Amici Curiae in Support of Defs.-Appellants and the Mots. for Stay Pending Appeal at 6–9, *All. for Hippocratic Med. v. FDA*, No. 23-10362 (5th Cir. Apr. 11, 2023); Unopposed Mot. for Leave to File Br. of Med. & Pub. Health Soc'ys as Amici Curiae in Support of Defs.-Appellants at 7, *All. for Hippocratic Med. v. FDA*, No. 23-10362 (5th Cir. Apr. 11, 2023) (identifying the rejection of plaintiffs' experts by courts and concluding that "[t]he so-called studies on which the District Court relied are not scientifically tested or sound; they are produced by anti-abortion advocacy groups or contain serious (and often well-documented) methodological flaws—or both.").

The court maintained that FDA's 2000 approval of mifepristone ignored "safety concerns," suggesting that the agency acquiesced to "political pressure to forego its proposed safety precautions." *Id.* at *27. Even though the challenged approval has been in effect for over twenty years, with no safety concerns, the court—citing nothing more than plaintiffs' assertions in their brief—declared that medication abortion causes "physical and emotional trauma," "mental and monetary costs," and death. *Id.* at *29.

Rather than stay this erroneous decision in its entirety, on April 12, the Fifth Circuit compounded the problem, staying the decision only in limited part, and reimposing an older version of the REMS from prior to 2016. *See All. for Hippocratic Med.*, 2023 WL 2913725, at *1. The Fifth Circuit stayed only the portion of the district court ruling that suspended FDA's 2000 approval of mifepristone, while declining to stay the district court's holdings essentially enjoining the 2016 and 2023 REMS. *Id.* at *21. On April 21, 2023, the Supreme Court stayed the *Alliance* Case injunction until it either (i) denied a petition for certiorari seeking review of the Fifth Circuit's decision on the merits of the *Alliance* Case injunction or, (ii) if certiorari were granted, issued its own ruling on the merits. *Danco Lab'ys*, 2023 WL 3033177, at *1.

Almost at the same time as the Texas court issued its injunction in the *Alliance* Case, the district court in the *Washington* Case enjoined FDA from deviating from the status quo—the 2023 REMS—concluding that Plaintiffs had a likelihood of success on their challenge to the REMS and faced irreparable injury. *Washington*, 2023 WL 2825861, at *8, *11. The court in the *Washington* Case emphasized that it is "precisely FDA's role" to make safety and efficacy determinations, however, based on the same record Plaintiffs present here, FDA "did not assess whether mifepristone qualifies for REMS and ETASU." *Id.* at *8. It noted FDA's repeated determinations that "[s]erious adverse events . . . are rare" and that mifepristone "is safe and effective through 70

15

days gestation." *Id.* Citing these factors, along with FDA's inexplicably inconsistent approval of mifepristone used for Cushing's syndrome without a REMS, the court found that FDA appears to have ignored an important aspect of the issue before it when it repeatedly imposed REMS requirements on mifepristone without scientific basis. *Id.*

Providers in states covered by the injunction in the *Washington* Case have the comfort of knowing that FDA cannot change the status quo during the pendency of that case, but Plaintiffs are left out, as are their patients.

**E.  The Irreparable Injury Caused by Rolling Back the Clock on Mifepristone**

Plaintiffs all provide mifepristone as part of the two-drug regimen for medication abortion, and all have done so under multiple burdensome iterations of the REMS. Hagstrom-Miller Decl. ¶¶ 10, 17, 21; Smith Decl. ¶ 12; Weems Decl. ¶ 7; Tong Decl. ¶ 6.

Access to medication abortion with mifepristone is essential for patients. Weems Decl. ¶ 8; Tong Decl. ¶ 23. Decades of research and experience have shown that mifepristone is safe and effective. Hagstrom-Miller Decl. ¶ 45; Smith Decl. ¶ 17; Weems Decl. ¶ 8; Tong Decl. ¶¶ 7, 13, 23. It is also preferable for many patients. Hagstrom-Miller Decl. ¶ 45; Smith Decl. ¶ 34; Weems Decl. ¶ 8; Tong Decl. ¶ 35. Medication abortion is less medicalized, complex, and expensive than procedural abortion. Hagstrom-Miller Decl. ¶ 45; Tong Decl. ¶ 23. It is also medically indicated for some patients with particular conditions like fibroids, obesity, and certain kinds of cervixes. Hagstrom-Miller Decl. ¶ 45. Medication abortion with mifepristone is also more convenient and more private—patients can have an abortion on their own schedule and experience their abortion like a miscarriage. Hagstrom-Miller Decl. ¶ 45; Tong Decl. ¶ 35. The added privacy can be particularly important for certain people, including, for example, individuals experiencing intimate partner violence. Hagstrom-Miller Decl. ¶ 45; Tong Decl. ¶ 35. And, the lack of instrumentation avoids retraumatizing survivors of sexual assault. Hagstrom-Miller Decl. ¶ 45; Tong Decl. ¶ 35.

Although there is another safe and effective method of medication abortion using misoprostol alone, patients and providers have come to rely on mifepristone as a significant innovation in medication abortion care. Tong Decl. ¶ 23. Further, the inability to use mifepristone or the reinstatement of restrictions that would prohibit the use of APCs as certified prescribers and prevent direct to patient telehealth would gravely reduce patient access to medication abortion and to abortion generally. Hagstrom-Miller Decl. ¶¶ 36–43; Smith Decl. ¶¶ 28–33; Weems Decl. ¶¶ 25–36. At a minimum, it is critical to Plaintiffs' patients that the 2023 REMS be maintained while this and other litigation proceeds. Hagstrom-Miller Decl. ¶ 47; Smith Decl. ¶ 34; Weems Decl. ¶ 36; Tong Decl. ¶ 36.

Plaintiffs serve patients from their own states and the many patients traveling from states that have banned abortion, and they rely on mifepristone to do so. Hagstrom-Miller Decl. ¶¶ 10, 12, 17, 19, 22, 42–43; Smith Decl. ¶¶ 7, 9–10, 12; Weems Decl. ¶ 2. Whole Woman's Health's clinics in Charlottesville and Alexandria, and its virtual clinic, collectively provide care to nearly 5,000 patients a year, and most of those patients obtained a medication abortion with mifepristone. Hagstrom-Miller Decl. ¶¶ 10, 12, 17, 19, 21–22. Whole Woman's Health is seeing huge numbers of Texans and other out-of-state residents traveling to Virginia for care. Hagstrom-Miller Decl. ¶¶ 12, 19, 22. Nearly half of the patients who receive direct to patient telehealth from Whole Woman's Health are people traveling from other states. Hagstrom-Miller Decl. ¶ 22. Trust Women Wichita saw 1,500 patients in 2021, half of whom received medication abortion; in 2022, they saw approximately 3,500 patients; and in 2023, they are on pace to care for 6,000 patients. Tong Decl. ¶¶ 19, 35. On some days, Trust Women Wichita receives tens of thousands of calls—a call volume so high they would not be able to meet patient demand even if they operated 24 hours a day, 7 days a week. Tong Decl. ¶ 21. The availability of direct to patient telehealth is an essential option in a

17

vast, rural state like Montana where many patients must travel long distances and navigate significant logistical burdens to reach an abortion provider. Smith Decl. ¶¶ 10, 28–30. So far, in 2023, the vast majority of abortion care All Families provided was medication abortion using mifepristone, and half of those medication abortions were provided through direct to patient telehealth. Weems Decl. ¶¶ 6–7, 31.

Additionally, Plaintiffs rely on APCs to provide abortion care. Hagstrom-Miller Decl. ¶ 36; Smith Decl. ¶ 31; Weems Decl. ¶ 25. Ms. Weems is the sole clinician, sole certified mifepristone prescriber at All Families, and the only abortion provider in Northwest Montana. Weems Decl. ¶¶ 1–2, 25. Rolling back the clock nearly a decade and requiring compliance with the outdated REMS would mean Ms. Weems could no longer dispense mifepristone as a certified prescriber. The entire region would once again be without a mifepristone provider, and All Families' patients throughout Montana would lose a trusted, qualified provider. Weems Decl. ¶ 25.

In short, to meet the needs of their patients, Plaintiffs rely on the availability of mifepristone, the ability of APCs to prescribe it, and the ability to dispense it by direct to patient telehealth.

The REMS has always harmed patients and providers and been out of line with the extensive evidence that FDA itself has repeatedly concluded shows the safety and efficacy of mifepristone. The retained Prescriber and Patient Agreement and Pharmacy Certification requirements create barriers to entry to providers and pharmacies, compromise patient and provider confidentiality and safety, and sow confusion, especially for people taking mifepristone to manage a miscarriage. Hagstrom-Miller Decl. ¶ 44; Smith Decl. ¶¶ 18–20; Weems Decl. ¶¶ 13–15; Tong Decl. ¶¶ 11–12. At the same time, they are medically unjustified, given mifepristone's documented safety record. Hagstrom-Miller Decl. ¶¶ 44–46; Smith Decl. ¶ 17; Weems Decl. ¶¶

18

14–15; Tong Decl. ¶¶ 11–13. Further, maintaining the REMS has and will continue to stigmatize medication abortion and be a tool leveraged by anti-abortion activists against providers and patients. Smith Decl. ¶ 17; Weems Decl. ¶¶ 11, 13; Tong Decl. ¶ 12. As one recent study of clinicians and administrators put it: although mifepristone is safe and effective, the REMS is the "linchpin of a cycle of stigmatization that continues to keep mifepristone" out of reach for many.[29]

That "cycle of stigmatization" has come to include a revolving door of legal threats to Plaintiffs' ability to prescribe mifepristone. Throughout the last weeks, to say nothing of the last year, Plaintiffs have faced constant upheaval around whether and how they can prescribe medication abortion—causing massive disruption to their practices with no end in sight. Hagstrom-Miller Decl. ¶¶ 23–35; Smith Decl. ¶¶ 24–25; Weems Decl. ¶¶ 19–22; Tong Decl. ¶¶ 22–36. As healthcare providers, Plaintiffs require clarity around their provision of care, practice, and protocols in order to continue to meet the needs of their patients. Hagstrom-Miller Decl. ¶ 47; Smith Decl. ¶ 27; Weems Decl. ¶ 23; Tong Decl. ¶¶ 10, 31–32.

## ARGUMENT

Plaintiffs meet all four requirements for a preliminary injunction because they can show: (1) "a likelihood of success on the merits," (2) "irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). Further, "[t]he traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment

---

[29] Danielle Calloway, Debra B. Stulberg & Elizabeth Janiak, *Mifepristone Restrictions and Primary Care: Breaking the Cycle of Stigma Through a Learning Collaborative Model in the United States*, 104 Contraception 24 (2021).

on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citation omitted).

Plaintiffs are facing an onslaught of threats to their provision of mifepristone around the country that are ongoing despite the Supreme Court's stay in the *Alliance* Case. Hagstrom-Miller Decl. ¶¶ 23, 28–33; Tong Decl. ¶¶ 22–32; Smith Decl. ¶¶ 23–25; Weems Decl. ¶¶ 19–21. These threats are part and parcel with FDA's continued imposition of the medically baseless and discriminatory REMS. *See supra* at **Error! Bookmark not defined.**19; Hagstrom-Miller Decl. ¶ 35; Tong Decl. ¶ 14; Smith Decl. ¶ 21. The REMS has always served to stigmatize and single out medication abortion, but now antiabortion activists and hostile enforcers are actively weaponizing the REMS against abortion providers around the country. *See supra* at **Error! Bookmark not defined.**–19; Weems Decl. ¶ 11; Tong Decl. ¶ 12; Smith Decl. ¶ 20. And, unlike abortion providers in the states that are party to the *Washington* Case, Plaintiffs expect day-to-day, week-to-week challenges to arise that will interfere with their prescription of essential medicine that allows them to best serve their patients. *See supra* at 19; Hagstrom-Miller Decl. ¶ 33; Tong Decl. ¶¶ 32, 36; Smith Decl. ¶ 27; Weems Decl. ¶ 21. Plaintiffs have met their burden in seeking a preliminary injunction that forestalls that chaos while this Court makes a determination on the merits of Plaintiffs' claims, by requiring FDA to maintain the status quo of the 2023 REMS in Plaintiffs' states. But, they have also demonstrated that an injunction blocking the imposition of the 2023 REMS is appropriate.

## I. Plaintiffs' Claims Are Likely to Succeed on the Merits

This Court should find, as the federal district court in the *Washington* Case has already held based on an identical record, that "FDA did not assess whether mifepristone qualifies for REMS and ETASU based on the criteria set forth in" the Food, Drug, and Cosmetic Act ("FDCA"). *Washington*, 2023 WL 2825861, at *8. The Court should also hold, as the *Washington* court did,

that "the record demonstrates potentially internally inconsistent FDA findings regarding mifepristone's safety profile." *Id*. Accordingly, like the *Washington* court, this Court should readily conclude that Plaintiffs have a "likelihood of success" on their claims to enjoin enforcement of the 2023 REMS. *Id*. at \*4.

### A.  FDA's Persistence in Imposing the 2023 REMS Violates the APA

Under Section 706 of the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), (C). As FDA has repeatedly acknowledged, most recently in its filings in the *Alliance* lawsuit, mifepristone is extremely safe, with a safety profile comparable to drugs that are sold without a prescription, such as ibuprofen. *See supra* at *14*. Because mifepristone does not meet the FDCA's statutory requirements for imposing a REMS, much less ETASU, the REMS is likely contrary to law and in excess of FDA's statutory authority. Similarly, because there is no medical or scientific basis for restricting access to mifepristone, FDA's decision to impose the REMS and make mifepristone more difficult to access is also likely arbitrary and capricious.

### 1.  The FDCA Does Not Authorize FDA to Impose the 2023 REMS for Mifepristone

Although FDA enjoys a significant degree of discretion in approving drugs, as a federal agency, its actions nonetheless "must be consistent with the statute under which they are promulgated." *United States v. Larionoff*, 431 U.S. 864, 873 (1977); *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 638 n.1 (1973) (Powell, J., concurring) (acknowledging FDA's authority "to adopt reasonable regulations consistent with the statute"). The 2023 REMS with ETASU is inconsistent with the FDCA, which permits a REMS with ETASU to be applied

21

only in certain, limited circumstances. First, a medication must be associated with a "serious adverse drug experience," defined as "death," "immediate risk of death," "inpatient hospitalization or prolongation of existing hospitalization," "persistent or significant incapacity or substantial disruption of the ability to conduct normal life functions," or "a congenital anomaly or birth defect," or where the medication "may jeopardize the patient and . . . require a medical or surgical intervention to prevent [such] an outcome." 21 U.S.C. §§ 355-1(f)(1)(A), (b)(4). Second, even where there is such an association with a "serious adverse drug experience," ETASU may be imposed only if the "specific serious risk listed in the labeling of the drug" is so great that FDA could not approve (or would have to withdraw approval of) the drug in the absence of an ETASU. *Id.* § 355-1(f)(1)(A). Third, ETASU must "not be unduly burdensome on patient access to the drug, considering in particular . . . patients in rural or medically underserved areas," and must, to the extent practicable, "minimize the burden on the health care delivery system." *Id.* §§ 355-1(f)(2)(C)–(D).

The 2023 REMS with ETASU for mifepristone bears no relationship to these statutory requirements. *First*, far from being "associated with a serious adverse drug experience," *see id.* § 355-1(f)(1)(A), FDA itself has concluded that serious adverse events following mifepristone use are "exceedingly rare." Compl. ¶ 130. Indeed, serious adverse events occur in fewer than 1% of mifepristone uses. *Id.* ¶ 51. Mifepristone's *associated* fatality rate is *0.000005%* for the entire time it has been available in the U.S.[30]—and none of those deaths can "be causally attributed to mifepristone." *Id.* ¶ 54. Indeed, FDA found that the "critical risk factor" for deaths due to infection

---

[30] Compl. Ex. I (Mifepristone U.S. Post-Marketing Adverse Events Summary) (noting 28 total reported deaths in adverse events summary out of approximately 5.6 million users of mifepristone, "regardless of causal attribution to mifepristone," as reported deaths included instances of homicide, drug overdose, ruptured ectopic pregnancy, and sepsis).

is not mifepristone but "pregnancy itself." *Id.* ¶ 55. For these reasons, mifepristone is among the safest drugs on the market—demonstrably far safer than many drugs that are not subject to a REMS, including Viagra, which has an exponentially higher rate of death.[31]

 *Second*, the restrictions imposed by the 2023 REMS with ETASU are not "required . . . to mitigate a specific serious risk" of a serious adverse drug experience. *Id.* §§ 355-1(b)(5), (f)(1)(A). FDA's own REMS review does not even pretend to assert that the required certifications are necessary to mitigate any specific risk.[32] To the contrary, the REMS with ETASU's burdensome administrative requirements—requiring patients to sign a form and providers and pharmacies to seek special certifications—are not related to any serious adverse drug experience, much less of any use in mitigating one. Weems Decl. ¶¶ 12–15; Tong Decl. ¶ 11; Smith Decl. ¶¶ 17–20; Hagstrom-Miller Decl. ¶ 44. Moreover, ETASU is appropriate only where the drug is so "inherent[ly] toxic[] or potential[ly] harmful[]" that—as a medical or scientific matter—FDA otherwise could not approve it. *See* 21 U.S.C. § 355-1(f)(1). FDA plainly does not consider mifepristone to be *inherently* toxic or harmful, as evidenced by its approval *without* any REMS of Korlym, a higher-dose form of mifepristone that is used for ongoing treatment of Cushing's syndrome, a chronic condition. Compl. ¶ 119.[33]

 *Finally*, even where a drug meets the medical or scientific requirements for imposing a REMS with ETASU, Congress specifically required FDA to refrain from imposing one if it would

---

[31] Mike Mitka, *Some Men Who Take Viagra Die—Why?*, 283 JAMA Network 590 (Feb. 2, 2000) (Viagra associated with 4.9 deaths per 100,000 prescriptions).

[32] *See* Compl. Ex. H (2016 Summary Review) at 26; Compl. Ex. E (FDA 2016 Medical Review).

[33] *See generally* U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., No. 202107Orig1s000, Korlym (mifepristone) Risk Assessment and Risk Mitigation Review(s) (Jan. 27, 2012), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/202107Orig1s000RiskR.pdf (hereinafter Korlym Review), Compl. Ex. M.

be "unduly burdensome on patient access to the drug, considering in particular . . . patients in rural or medically underserved areas." 21 U.S.C. § 355-1(f)(2)(C). Here, the ETASU creates a medically unnecessary burden, and that burden falls disproportionately on rural patients.[34]

Agency actions that are "inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement" are subject to vacatur under the APA. *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981). The REMS violates the FDCA's plain language and undermines the statute's goals of protecting public health without burdening patients' access to needed medications. By discouraging physicians and other healthcare professionals from prescribing mifepristone, the REMS makes abortion care harder to access for many patients without any discernible safety benefit. For these reasons, the 2023 REMS is likely invalid because it is squarely contrary to the FDCA.

## 2. The 2023 REMS is Arbitrary and Capricious

The 2023 REMS is also likely arbitrary and capricious. A regulation is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To comply with the APA, an agency must "pay[] attention to the advantages *and* the disadvantages of [its] decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015). "An agency, although entitled to deference, cannot simply state it 'believes' something to be true—against the weight of all the evidence before it—without further support." *Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020), *cert. dismissed* 141 S. Ct. 2170

---

[34] Compl. Ex. O (ACOG Citizen Petition) at 14–16; Compl. Ex. K (SFP Letter to FDA) at 2.

(2021). Rather, the agency must "offer an explanation why it made a certain decision, when 'every indication in the record points the other way.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 56–57).

The arbitrary and capricious nature of the 2023 REMS has at least three aspects: it is not grounded in science, it bears no demonstrated relationship to patient safety, and it reduces the availability of a safe and effective drug.

> a.  **The 2023 REMS restrictions are not supported by science as attested by all mainstream medical organizations to have addressed them.**

There has never been a scientific basis for subjecting mifepristone to additional burdens that are not applied to other, riskier medications, but this reality has only become more apparent with time. Since 2016, the preeminent, mainstream medical organizations in the United States, including the American College of Obstetricians and Gynecologists ("ACOG"), the American Public Health Association ("APHA"), the American Academy of Family Physicians ("AAFP"), and the American Medical Association ("AMA"), have *universally opposed* the imposition of the REMS in each of its iterations. Compl. ¶¶ 85–98, 120–27. And, in the face of this opposition, FDA has never been able to "satisfactorily explain its disagreement with the proliferation of negative comments from the medical community." *Mayor of Baltimore*, 973 F.3d at 281.

Most recently, the 2022 citizen petition submitted by the nation's leading healthcare professional organizations conclusively demonstrated that the 2023 REMS is not backed by science. Compl. ¶¶ 123–27. But, FDA continued to disregard these concerns with no explanation, and persisted in retaining certain REMS restrictions, even while it agreed that others were unnecessary. *See id.* ¶¶ 83, 128. FDA's decision to ignore the universal opinion of every mainstream medical organization and retain the REMS in 2023 matches the arbitrariness the Fourth Circuit found in the rule enjoined in *Mayor of Baltimore. See* 973 F.3d at 276. There, the

Fourth Circuit held that an agency "cannot easily brush off the swell of evidence in the record before the agency that the medical community finds [a] Rule to be repugnant." *Id.* at 278. Thus, by "merely" disagreeing with "every major medical organization in the country, without more," an agency fails to "examine the relevant data and articulate a satisfactory explanation for its action" and "offer[ ] an explanation for its decision that runs counter to the evidence before the agency." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Science belies any assumption by FDA that the REMS is in any way responsible for the safety and efficacy of mifepristone. Data from countries without REMS-like restrictions—data FDA considered in 2016—show similarly low rates of complications. For example, "[a]fter Canada removed all restrictions on prescribing mifepristone for abortion, thereby allowing it to be prescribed and dispensed like any other drug ('normal prescribing'), there was no increase in complications from mifepristone use."[35]

Even as mifepristone for pregnancy termination remains subject to the 2023 REMS, a higher-dose product of the same drug has been available to treat a chronic condition for over a decade without *any* comparable restrictions. In 2012, FDA approved Korlym (mifepristone) tablets, taken as one to four 300 mg pills daily, as treatment for Cushing's syndrome without a REMS. Compl. ¶ 119. FDA acknowledged that Korlym "is taken in higher doses, in a chronic, daily fashion unlike the single 200 mg dose of Mifeprex . . . [and] the rate of adverse events with Mifeprex is much lower."[36] FDA's decision to restrict 200 mg tablets of mifepristone more stringently than 300 mg tablets highlights the arbitrary and capricious nature of the REMS. *See,*

---

[35] Citizen Petition, Docket No. FDA-2022-P-2425, from Am. Coll. Of Obstetricians & Gynecologists et al. to Lauren Roth, Assoc. Comm'r for Pol'y, U.S. Food & Drug Admin., at 17 (Oct. 4, 2022) (hereinafter ACOG Citizen Petition), Compl. Ex. O.

[36] Compl. Ex. E (FDA 2016 Medical Review) at 10.

*e.g.*, *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015) ("[I]nternally inconsistent analysis is arbitrary and capricious.").

### b.    The 2023 REMS does not enhance patient safety.

The requirements of the 2023 REMS do not enhance patient safety. Indeed, as determined by FDA's *own* team of expert reviewers in 2016, the Patient Agreement should be eliminated because it duplicates informed consent laws and standards, "does not add to safe use conditions . . . and is a burden for patients."[37] Compl. ¶ 97; *see also id.* ¶ 125 (citing citizen petition stating that the Patient Agreement Form is "medically unnecessary and repetitive of informed consent," citing FDA's 2016 findings[38]). FDA's unexplained rejection of that recommendation is arbitrary and capricious. Since 2016, and especially in the last year of upheaval around the provision of abortion resulting from the reversal of *Roe v. Wade*, the burdens of the Patient Agreement Form and other unnecessary bureaucracy have only grown. Abortion is now illegal in 13 states, and patients and providers face a growing wave of criminalization, which raises the risks of exposure of information about abortion. FDA itself recognizes that Patient Agreement Forms undermine patients' interests in privacy and confidentiality, citing those concerns when concluding that Patient Agreement Forms were unnecessary for dispensing Korlym.[39]

Similarly, the prescriber certification requirement provides no additional safety benefit, and FDA has never explained why it remains necessary. Healthcare providers are already subject to numerous ethical and legal obligations to ensure that they practice only within their competency.[40]

---

[37] Compl. Ex. H (2016 Summary Review) at 25.

[38] Compl. Ex. O (ACOG Citizen Petition) at 12.

[39] *See* Compl. Ex. M. (Korlym Review) at 9.

[40] *See*, *e.g*., AMA Principles of Medical Ethics, Principle I, https://code-medical-ethics.ama-assn.org/principles (adopted June 1957, last revised June 2001) ("A physician shall be dedicated to providing competent medical care[.]");

Requiring providers to *say* that they are competent has no direct impact on patient care and simply poses barriers to entry, as medical experts informed FDA in 2016 and again in 2022. *See supra* at 11; *infra* at 30. And, providers dispensing the higher-dose form of mifepristone (Korlym) and providers who dispense other drugs that are far less safe than mifepristone are not subject to this requirement. Compl. ¶¶ 119–21.

Finally, the requirement that pharmacies be "specially certified" through the drug's manufacturer before they can dispense mifepristone is similarly unjustifiable. Like prescribers, pharmacies and pharmacists are subject to extensive regulation, and to discipline if they fail to adhere to established standards. *See, e.g.*, Va. Code Ann. §§ 54.1-3307, 54.1-3316; Mont. Code Ann. §§ 37-7-201, 37-7-323; K.S.A. §§ 65-1631, 65-1627. Instead, this requirement makes it more difficult for patients to access mifepristone.

### c.    The 2023 REMS harms patients.

As medical experts have informed FDA since at least 2016, evidence shows that the REMS worsens health outcomes by impeding access to abortion care. *See Michigan*, 576 U.S. at 753 (an agency must "pay[] attention to the advantages *and* the disadvantages of [its] decisions"). Multiple studies show the REMS acts as "a barrier to providing medication abortion," most notably by dissuading primary care providers from offering it.[41] Access to medication abortion is essential.

---

Va. Code Ann. § 54.1-2510 (Virginia Board of Health Professions "evaluate[s] all health care professions and occupations in the Commonwealth," determines the "degree of regulation to be imposed," and "promote[s] the development of standards to evaluate the competency of the professions and occupations represented on the Board"); Mont. Code Ann. § 37-3-202 (Montana Board of Medical Examiners maintains "reasonable and continuing supervision and surveillance over all licensees under this chapter to ensure that such licensees maintain standards of conduct and exercise the privileges granted hereunder in the greatest public interest"); K.S.A. §§ 65-2864–65 (Kansas Board of Healing Arts "shall enforce the provisions of all practice acts administered by the board" and accordingly shall "promulgate all necessary rules and regulations" and "make all necessary investigations").

[41] Na'amah Razon et al., *Exploring the Impact of Mifepristone's Risk Evaluation and Mitigation Strategy (REMS) on the Integration of Medication Abortion into US Family Medicine Primary Care Clinics*, 109 Contraception 19 (May 2022); *see also* Sara Neill, Alisa B. Goldberg & Elizabeth Janiak, *Medication Management of Early Pregnancy Loss:*

*See supra* at 16. Medication abortion has become an increasingly critical method on which patients and clinics rely in the face of an ongoing reproductive healthcare crisis; it makes up over half the abortion care provided in the country. Service-delivery advancements, like direct to patient telehealth, moderate the strain on the ever-shrinking number of clinics struggling to provide care for a dramatic increase in patients.[42]

For Plaintiffs and their patients, medication abortion is simpler, less expensive, and less resource-intensive, especially when provided by mail and prescribed by APCs. *See supra* at 16. Medication abortion is medically indicated for some patients. *See supra* at 16. And, for many of Plaintiffs' patients, medication abortion with mifepristone is preferable because it allows them to have more control over their experience, to guard the privacy of their decision, or to avoid instruments, which can be particularly important for survivors of sexual assault. *See supra* at 16. For those patients unable to access medication abortion, procedural abortion may be an option (depending on where they live and their resources), but it is an option that FDA itself acknowledges as slightly higher risk and more invasive.[43]

Given the dramatic reduction in abortion access, and particularly procedural abortion access caused by the overturning of *Roe*, restricting access to medication abortion means some patients will not be able to obtain an abortion at all. For them, the health risks are severe, given that carrying to term is far more dangerous than abortion by any method. A person who carries a pregnancy to term is at least fourteen times more likely to die than a person who uses mifepristone

---

*The Impact of the U.S. Food and Drug Administration Risk Evaluation and Mitigation Strategy* 139 Obstetrics & Gynecology 83S (May 2022).

[42] *See* Caitlin Myers et al., *Abortion Access Dashboard* (last updated Mar. 23, 2023), http://bit.ly/3KFOck7 (noting that there has been a 32% increase in women per abortion facility since March 1, 2022).

[43] *See* Compl. Ex. D (Citizen Petition Denial) at 5–6.

to end a pregnancy.[44] Forced pregnancy and childbearing also have long-term impacts on a person's educational and economic futures, and their ability to shape their lives. People who are denied a wanted abortion are more likely to experience economic insecurity and raise their existing children in poverty, and the financial impacts of being denied an abortion are as large as or larger than being evicted, losing health insurance, or being hospitalized.[45]

As ACOG explained in its 2022 citizen petition, the prescriber certification requirement disproportionately affects rural patients because REMS-certified providers "are almost always located in cities."[46] This requirement constrains the pool of clinicians that could be certified prescribers at Plaintiffs' and other clinics to those willing to take on the risks of becoming certified. *See* Compl. ¶ 100. "As with the certified provider requirement, the burdens associated with the certified pharmacy requirement will also fall disproportionately on poor and rural [patients], contrary to the REMS statute"[47]; as noted, under the statute, ETASU must "not be unduly burdensome on patient access to the drug, considering in particular . . . patients in rural or medically underserved areas," 21 U.S.C. § 355-1(f)(2)(C).

The likelihood of being denied abortion care has grown exponentially since the U.S. Supreme Court overruled *Roe* nearly one year ago and abortion has become illegal in many states. In the states where abortion remains legal, and even protected, it is subject to restrictions not imposed on equally safe or more dangerous interventions. The persistence of a unique set of federal

---

[44] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215 (Feb. 2012); Compl. Ex. D (Citizen Petition Denial) at 4 n.6.

[45] Diana G. Foster et. al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States*, 108 Am. J. Pub. Health 407 (Mar. 2018); Sarah Miller, Laura R. Wherry & Diana G. Foster, *The Economic Consequences of Being Denied an Abortion*, 15 Am. Econ. J.: Econ. Pol'y 394 (Feb. 2023).

[46] Compl. Ex. O (ACOG Citizen Petition) at 14.

[47] *Id.* at 16.

restrictions on mifepristone is part of the same set of efforts to put safe, effective options for pregnancy care out of reach.

Another district court in the Fourth Circuit has recognized that restrictions on accessing medication abortion harm patients. In 2020, during the height of the COVID-19 pandemic, ACOG sued to challenge FDA's in-person requirement for medication abortion that was then in effect (and would be resurrected if the Fifth Circuit's modified order had taken effect). The District of Maryland court ultimately entered an injunction blocking that requirement during the pandemic because it unduly burdened the then-existing federal right to abortion. But, even post-*Roe*, the court's analysis of the harms to patients caused by restrictions on medication abortion remains salient. The Court found that "delays in abortion care" can be burdensome "either because they increase the risk" associated with it, or because they can "cause the patient to miss the opportunity for a medication abortion such that they must seek a more invasive form of abortion." *Am. Coll. of Obstetricians & Gynecologists*, 472 F. Supp. 3d at 217. The impact of the pandemic—clinic closures, health risks, and other logistical barriers—is not unlike the current public health crisis caused by the overturning of *Roe*. The District of Maryland court concluded that restrictions on medication abortion can be particularly harmful when "medical offices that dispense mifepristone may be closed or operating with limited capacity, a disproportionate number of abortion patients are from demographic groups with heightened risk for serious illness from COVID-19, and such patients face particularized barriers posed by transportation, childcare, and the economic downturn during the pandemic . . . particularly where any delay in obtaining mifepristone that extends past the tenth week of pregnancy can force a woman to consider more complicated, invasive surgical abortions." *Id.* at 223. Further, the court found that a prohibition preventing the mailing of mifepristone did not serve a public health interest. *Id.* The Court should make a similar

determination here—that, considering the dramatic reduction in access to abortion around the country, and the legal uncertainty plaguing Plaintiffs' continued provision of medication abortion with mifepristone at least under the 2023 REMS, the harms to patients in Plaintiffs' states warrants a preliminary injunction to maintain the status quo.

Because FDA arbitrarily subjects mifepristone to more stringent restrictions than other, riskier medications—despite the mass opposition of every mainstream medical organization and despite FDA's own determination of mifepristone's thoroughly-proven safety—and because the REMS do not enhance patient safety but interfere with patients' access to an essential drug, leading to worse health outcomes, FDA's promulgation of the 2023 REMS is likely arbitrary and capricious.

### B.    Plaintiffs Are Excused from Filing a Citizen Petition with FDA

Ordinarily, plaintiffs challenging FDA actions under the APA are required to first file a citizen petition with FDA. *See* 21 C.F.R. §§ 10.25(a), 10.30, 10.45. In this case, however, Plaintiffs are excused from filing a citizen petition because the record demonstrates that any such filing would be futile. *See Wilson v. UnitedHealthcare Ins. Co.*, 27 F.4th 228, 241 (4th Cir. 2022). Historically, FDA refused similar relief to that sought here when it was requested in 2020 by 21 states,[48] and in 2022 by ACOG.[49] Earlier this year, when 17 states and the District of Columbia sought to roll back the 2023 REMS in the *Washington* Case, FDA opposed that relief, asserting in its brief that its decision to maintain the 2023 REMS restrictions on mifepristone was "reasonable."

---

[48] Letter from Xavier Becerra, Cal. Att'y Gen, et al., to Alex M. Azar, Sec'y, U.S. Dep't of Health & Hum. Servs. & Stephen Hahn, Comm'r, U.S. Food & Drug Admin. (Mar. 30, 2020), Compl. Ex. Q.

[49] Compl. Ex. O (ACOG Citizen Petition); U.S. Food & Drug Admin., FDA-2022-P-2425-0003, Letter from Patrizia A. Cavazzoni, Dir., Ctr. for Drug Evaluation & Rsch., U.S. Food & Drug Admin., to Maureen G. Phipps, Am. Coll. Obstetricians & Gynecologists, denying Citizen Petition, Docket. No. FDA-2022-P-2425 (Jan. 3, 2023) (hereinafter ACOG Citizen Petition Denial), Compl. Ex. P.

Defs.' Resp. Opp. Pl. States' Mot. Prelim. Inj. at 22, *Washington v. FDA*, No. 1:23-cv-03026-TOR (E.D. Wash. Mar. 17, 2023). There is no prospect that FDA would take a different view now if Plaintiffs were required to submit a citizen petition; there would only be harmful delay because the agency's own rule allows it 180 days to respond to citizen petitions, *see* 21 C.F.R. § 10.30(e)(2), and it often takes considerably longer to respond.

## II. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

For purposes of a preliminary injunction, the harm analysis focuses on irreparability, irrespective of the magnitude of the injury. *See, e.g.*, *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (recognizing irreparable harm when a movant makes a "clear showing" of "actual and imminent" harm that "cannot be fully rectified by the final judgment after trial"). Plaintiffs are irreparably harmed in at least three ways.

*First*, returning to an older regulatory scheme, as the Fifth Circuit's modified order would have required, would prevent Plaintiffs from providing direct to patient telehealth, which has had a tremendous impact on patients in rural areas or for whom in-clinic visits are difficult to access. For some patients, an in-person visit is simply impossible, and prohibiting access to direct to patient telehealth would greatly harm them. Smith Decl. ¶ 29. For others, the difficulty of arranging an in-person visit—requiring time off work or school, childcare, and adequate transportation— may delay their care, pushing them further into pregnancy when abortion care is more costly and potentially more complex. *Id.* Direct to patient telehealth mifepristone provides flexibility and discretion for patients whose privacy would be jeopardized by an in-person visit, including those in abusive relationships or who do not wish to disclose their abortion. Smith Decl. ¶ 28; Weems Decl. ¶ 32.

*Second*, resurrecting pre-2016 restrictions would confine certified mifepristone prescribers to physicians only. APCs can and do safely provide mifepristone: to hold otherwise limits access to mifepristone and undermines their licenses and expertise. Weems Decl. ¶¶ 27, 29; Smith Decl. ¶ 32; *see Richmond Med. Ctr. for Women v. Gilmore*, 11 F. Supp. 2d 795, 809 (E.D. Va. 1998) (finding irreparable harm where healthcare providers would be "constrained to alter their medical advice to, and their medical care of, their patients, contrary to their best professional medical judgments"). Reinstating this requirement would seriously threaten patient access to mifepristone, particularly in Montana: Plaintiff Helen Weems could no longer provide mifepristone at All Families Healthcare, and the next closest provider, Blue Mountain Clinic, is approximately a three-hour drive away. Weems Decl. ¶¶ 25, 28; Smith Decl. ¶ 33. Reinstating the physician-only certified prescriber requirement would also complicate Plaintiffs' staffing and operations, with no benefit to patient care. Hagstrom-Miller Decl. ¶¶ 37, 44. Delays in treatment—including those caused by a lack of "specially certified" providers under the reinstated requirements—may cause patients to miss their window for medication abortion altogether.

*Third*, the legal uncertainty surrounding mifepristone has unleashed chaos in Plaintiffs' states. Plaintiffs are unsure from one day to the next whether they will be able to maintain their protocols and procedures, or whether they will have to upend their practices to ensure that they are complying with various court orders. Weems Decl. ¶¶ 22–24; Tong Decl. ¶¶ 10, 31–32. Patients are unsure whether their appointments will be able to proceed as scheduled. Weems Decl. ¶ 22; Tong Decl. ¶¶ 24, 33. The constantly shifting law and policy landscape disrupts Plaintiffs' practices and places enormous strain on their clinicians, staff, and patients. Smith Decl. ¶ 27. Plaintiffs' energies should be focused on providing the highest-quality, evidence-based care to their patients—not parsing conflicting lawsuits to which they are not parties.

34

Because Plaintiffs will suffer irreparable harm in the absence of an injunction that cannot be remedied at the conclusion of litigation, temporary relief is warranted here. *See Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

### III. The Equities and Public Interest Weigh Strongly in Plaintiffs' Favor

The final preliminary injunction factors merge and are properly considered together when the government is a party to the litigation. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, both the equities and the public interest strongly favor injunctive relief.

"There is clearly a robust public interest in safeguarding prompt access to health care." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 61 (D.D.C. 2020). The ongoing legal chaos surrounding mifepristone threatens Plaintiffs' medical practices and their patients' access to timely and necessary medical care. Thus, "the public interest . . . favors a preliminary injunction" when agency action "will likely result in worse health outcomes." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 87 (2d Cir. 2020) (cleaned up); *see also Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 619 (D. Md. 2019) (finding it "in the public interest to continue the existing structure and network of healthcare that [Plaintiff] currently provides while this Court addresses legal challenges" to agency action).

Equity also favors the relief sought. Providers in 17 states and the District of Columbia currently enjoy legal protection from the havoc that might ensue from any orders affecting the availability of mifepristone as a result of the *Alliance* Case. And Defendants will not be harmed by maintaining the status quo for providers in Virginia, Montana, and Kansas when they are already required to do the same for providers in the 17 states and the District of Columbia that are parties to the *Washington* Case. Accordingly, the balance of equities and the public interest both weigh strongly in Plaintiffs' favor.

## IV. Maintaining the Status Quo on a Statewide Basis Is Necessary to Afford Plaintiffs Complete Relief

Plaintiffs seek a preliminary injunction preventing Defendants and any person in active concert or participation with them from altering the status quo as it relates to the availability of mifepristone under the 2023 REMS in Virginia, Montana, and Kansas, where Plaintiffs operate. "It is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992); *see also Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (per curiam) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."). The scope of relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

This temporary relief would put Plaintiffs and their patients in the same position as providers and patients in the 17 states and the District of Columbia that are party to the *Washington* Case. Granting this relief in this case does not impose any additional burden on Defendants, who are already obliged to maintain the status quo with respect to the state plaintiffs in the *Washington* Case. *See Washington*, 2023 WL 2825861, at *11; *Washington*, 2023 WL 2941567, at *2. The Fourth Circuit has "defined the status quo" for purposes of a preliminary injunction "to be the last uncontested status between the parties which preceded the controversy." *League of Women Voters of N.C.*, 769 F.3d at 236; *cf. Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) ("To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." (internal quotation marks and citation omitted)). And granting this relief is appropriate here because Plaintiffs' patients—who must bear the repercussions of any abortion care that is delayed

or denied—come from all across the states in which Plaintiffs' medical practices operate. Accordingly, statewide relief is necessary to ensure complete relief to Plaintiffs and their patients. *See Mayor of Baltimore*, 973 F.3d at 294 (affirming statewide scope of injunction against HHS final rule as "a permissible exercise of the district court's broad discretion" to secure healthcare needs of patients across the state).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order protecting access to mifepristone by issuing a preliminary injunction enjoining the Defendants from altering the status quo with respect to the 2023 REMS in the states of Virginia, Montana, and Kansas as it relates to the availability of mifepristone during the pendency of this litigation.

Dated:          May 8, 2023

Respectfully submitted,

/s/ Gail M. Deady_____
Gail M. Deady
Virginia Bar Number: 82035
Rabia Muqaddam*
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, New York 10038
Telephone: (917) 637-3600
Fax: (917) 637-3666
Email: gdeady@reprorights.org
Email: rmuqaddam@reprorights.org
*Counsel for Plaintiffs*

\*Pro hac vice application forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of May, 2023, I filed the foregoing document with the

Clerk of Court using the CM/ECF system, and I hereby certify that I will mail by United States

Postal Service Certified Mail the document to the following non-CM/ECF participants:

> United States Department of Health & Human Services
> c/o General Counsel
> 200 Independence Avenue, S.W.
> Washington, D.C. 20201
>
> Xavier Becerra, Secretary
> c/o General Counsel
> Department of Health and Human Services
> 200 Independence Avenue, S.W.
> Washington, D.C. 20201
>
> United States Food and Drug Administration
> Chief Counsel, Food and Drug Administration
> ATTENTION: LITIGATION
> White Oak Building 31, Room 4544
> 10903 New Hampshire Ave.
> Silver Spring, MD 20993-0002
>
> Robert M. Califf, Commissioner
> Chief Counsel, Food and Drug Administration
> ATTENTION: LITIGATION
> White Oak Building 31, Room 4544
> 10903 New Hampshire Ave.
> Silver Spring, MD 20993-0002
>
> Attorney General Merrick Garland
> Attorney General of the United States
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

I also hereby certify that on this 8th day of May, 2023, the foregoing document will be

hand served to:

> U.S. Attorney Christopher Kavanaugh
> United States Attorney's Office

Western District of Virginia
U.S. Courthouse and Federal Building
255 West Main Street, Room 130
Charlottesville, Virginia 22902


/s/ Gail M. Deady
Gail M. Deady
Virginia Bar Number: 82035
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, New York 10038
Telephone: (917) 637-3600
Fax: (917) 637-3666
Email: gdeady@reprorights.org
*Counsel for Plaintiffs*

39