Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1              UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF VIRGINIA
2                  CHARLOTTESVILLE DIVISION

3  ****************************************************************

4  WHOLE WOMAN'S HEALTH        CIVIL CASE NO.:  3:23CV19
   ALLIANCE, ET AL.,          JUNE 8, 2023, 11:02 A.M.
5                             CHARLOTTESVILLE, VIRGINIA
            Plaintiffs,       MOTIONS HEARING
6  vs.

7  UNITED STATES FOOD AND     Before:
   DRUG ADMINISTRATION,       HONORABLE ROBERT S. BALLOU
8  ET AL.,                    UNITED STATES DISTRICT JUDGE
            Defendants.       WESTERN DISTRICT OF VIRGINIA
9
   ****************************************************************
10
   APPEARANCES:
11

12 For the Plaintiffs:        RABIA MUQADDAM, ESQUIRE
                              GAIL MARIE DEADY, ESQUIRE
13                            Center for Reproductive Rights
                              199 Water Street Floor 22
14                            New York, NY 10038
                              917-715-4172
15

16 For the Defendants:        NOAH T. KATZEN, ESQUIRE
                              Department of Justice
17                            450 5th St., N.W.
                              Washington, DC  20530
18                            202-305-2428

19

20

21

22 Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                    255 West Main Street, Suite 304
23                  Charlottesville, Virginia  22902
                    434.296.9284
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25 TRANSCRIPT PRODUCED BY COMPUTER.

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  (Proceedings commenced, 11:02 a.m.)

2          THE COURT:  Good morning, everybody.

3          Let's call our case, please.

4          THE CLERK:  This is Civil Action Number 3:23cv19,

5  Whole Woman's Health Alliance, et al. versus the United States

6  Food and Drug Administration, et al.

7          THE COURT:  All right.  Let the record reflect the

8  parties are present by counsel.

9          I've got before me this morning the plaintiffs'

10  motion for a preliminary injunction and the defendants'

11  response.  There's also been a motion to stay.  As I indicated

12  back in chambers, I'm going to let you all speak to the motion

13  to stay as it relates to your particular positions.  At the

14  end, help me remember, please, we'll put together a briefing

15  schedule to be able to respond to those.

16          Otherwise, Ms. Muqaddam, on behalf of the plaintiffs,

17  I'll give you the first argument.

18          And first of all, thank you all, and welcome to

19  Charlottesville.

20          MS. MUQADDAM:  Thank you, Your Honor.

21          Good morning, Your Honor.  Rabia Muqaddam for the

22  plaintiffs.  Hello, again.  I have a brief introduction and

23  then I plan to address four issues:  Likelihood of success,

24  irreparable harm, exhaustion, and the balance of the equities.

25  Please let me know if you'd like me to prioritize a particular

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  issue.

2          THE COURT:  I'm going to let you go in order, and if

3  you want -- because Mr. Katzen is going to address standing as

4  well.  If you want to tackle that during your argument, that's

5  fine as well.  If you want to reserve, it's up to you.  It's

6  your argument.  So I'm going to let you put it together however

7  you like.

8          MS. MUQADDAM:  Okay.  Over the last few months,

9  plaintiffs and their patients have gone through hell due to the

10 uncertainty around access to mifepristone, which is a

11 medication that is absolutely essential for people's health and

12 dignity.  The government's brief does a pretty good job of

13 describing how access to this critical medication has been

14 volleying around the country back and forth between courts in

15 litigations to which the plaintiffs are not a party.  Because

16 mifepristone is under this grave threat, a federal court in the

17 Eastern District of Washington issued a preliminary injunction

18 identical to the one that plaintiffs seek here.

19 Preservation --

20         THE COURT:  But it wasn't the injunction the

21 plaintiffs sought there?

22         MS. MUQADDAM:  The injunction that the plaintiffs

23 sought was twofold.  First, it was to enjoin the 2023 REMS.

24 Plaintiffs have not sought that here.  They also asked to

25 preserve the availability of mifepristone at the time.  I think

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  there's a disagreement between plaintiffs and defendants about

2  how far away that relief is from the court's ultimate order.

3  Our position is the plaintiffs asked for that second piece of

4  relief at a minimum preservation of the status quo, and that's

5  what the court granted, and that's what plaintiffs are seeking

6  here.

7         And the government has not appealed that order.  So

8  that case is going to continue in the trial court.

9         THE COURT:  Well, I thought the Washington case was

10 in the Ninth Circuit now.

11        MS. MUQADDAM:  There is an appeal by a group of

12 states that sought to intervene, including the Montana attorney

13 general and a variety of other states.  They sought

14 intervention that was denied by the district court, and they

15 have appealed that.  But the government has not appealed the

16 preliminary injunction order, so that is going to stay through

17 trial court proceedings.

18        THE COURT:  And all that that order -- the

19 preliminary injunction order does is it preserves the status

20 quo the way things were the day after the 2023 REMS were

21 issued.

22        MS. MUQADDAM:  Exactly right.  And that's what

23 plaintiffs are seeking here.

24        THE COURT:  And that's where you are right now in

25 Virginia, Kansas, and Montana?

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          MS. MUQADDAM:  That's correct.  And under that status

2    quo, plaintiffs are able to provide mifepristone via direct

3    patient telehealth, using mail order pharmacies.  Plaintiff

4    Helen Weems, for example, is an advanced practice clinician.

5    She is not a physician.  And so rollbacks of restrictions on

6    mifepristone, such as the requirement that a physician only

7    provide the medication that's a certified prescriber, all of

8    these earlier requirements that would have been reimposed

9    should the Fifth Circuit order have taken effect, or should

10   other future orders take effect, would have effectively

11   eliminated mifepristone for half of Montana.  It would have

12   destroyed plaintiff Whole Woman's Health's direct patient

13   telehealth, the same with Blue Mountain and Trust Women's plan

14   to start that practice.

15         THE COURT:  But the Fifth Circuit stay is not going

16   to take effect -- or the Fifth Circuit order isn't going to

17   take effect until the Supreme Court stay is lifted.  And that

18   occurs either after the time period expires for a cert petition

19   to be filed or after the Supreme Court handles whatever makes

20   its way up there.

21         MS. MUQADDAM:  It is true that there is a temporary

22   stay in place from the Supreme Court, but it is too late for

23   plaintiffs to have to come back to court if people are already

24   being denied mifepristone.  And that's what was going on over

25   the last few months.  Every day, every week, there was a new

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   development that would have prevented plaintiffs from providing

2   this medication entirely, that would have prevented them from

3   providing it as they do now.

4           THE COURT:  But is that because of these defendants

5   or is that because of events that have taken place in other

6   courts?

7           MS. MUQADDAM:  Well, it is partly due to the response

8   of the FDA and the way that the REMS have been defended in

9   those cases.  I can give a few examples of how the FDA has

10  compounded the situation in their response, if that would be

11  helpful.

12          I think one of the biggest issues was even before the

13  Supreme Court, the FDA took the position that mifepristone was

14  misbranded.  Effectively they took the position that would have

15  meant that mifepristone was entirely banned for a few months.

16  That was really a surprise to plaintiffs.  And the Fifth

17  Circuit order clearly intended for mifepristone to remain

18  available, but the FDA in response took that action, and that

19  would have prevented all of the clients from being able to use

20  it.

21          THE COURT:  Isn't that a clarification that should

22  come through the courts that issued those orders, and not

23  through a new action filed in this Court?

24          MS. MUQADDAM:  Well, plaintiffs have brought an

25  action here because this is a forum where we believe plaintiff

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  is resident, and this is a forum where they can talk about the

2  harms that they are experiencing right here in Virginia.  But

3  even aside from the developments that have gone on in the

4  *Alliance* case, the *Alliance* case is just one manifestation of a

5  climate of extreme uncertainty surrounding mifepristone.  And

6  plaintiffs do not dispute this is an incredibly unusual

7  situation.  This is an unprecedented situation.  But plaintiffs

8  see the request here as really a matter of equity.  These 17

9  states and the District of Columbia are insulated from future

10  uncertainty from the *Alliance* case or other developments.

11       THE COURT:  So one of the questions that I had penned

12  for the FDA, and I'll get your flip side response to it, is:

13  Because of the Washington injunction, can the FDA change its

14  REMS at all?

15       MS. MUQADDAM:  Well, I think -- I don't think it's

16  entirely clear.  In theory, perhaps there are things the FDA

17  could do that wouldn't change the availability of the

18  medication as it's prescribed under the 2023 REMS, but I think

19  not.  I mean, the FDA has complained that this would lock in

20  place the 2023 REMS.  But if a court was unable to hold an

21  agency to its present policy, then courts would be erring all

22  around the country all the time.  So what we're asking for here

23  is simply an extension of the relief that these 17 states and

24  the District of Columbia are enjoying.  And what that means is

25  that when this uncertainty continues to arise, those states and

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   the providers in those states are going to be insulated.  These

2   plaintiffs, who are not party to that case -- that case is

3   brought by states, it's not brought by providers -- they are

4   going to be left out.  So the insane chaos that they have been

5   experiencing over the last few months will happen again, and

6   it's not going to happen to providers across the majority of

7   the states where abortion remains legal.  So we see the request

8   here as an extremely narrow one simply to ensure that

9   plaintiffs can enjoy the same security that the providers that

10  they know well across the other parts of the country enjoy

11  under that injunction.  So even if Your Honor is not convinced

12  about the merits of the Washington order, I think it is

13  important, at least, that these plaintiffs feel the same

14  security that their fellows across the country enjoy.

15          These plaintiffs are unique in that they are on a new

16  frontier of abortion access in the United States.  They provide

17  services, including using mail order pharmacies, to thousands

18  of people who are traveling from states where abortion is

19  illegal.  And if they can't provide mifepristone, thousands of

20  people will be unable to get medication abortion or abortion at

21  all.

22          THE COURT:  So let me have you address what I know is

23  going to be Mr. Katzen's -- well, I don't know, he'll tell me

24  what his argument is going to be, but what I anticipate his

25  argument to be.  That is this:  As long as the Supreme Court

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  stay remains in effect -- and we know that's going to be at

2  least until 90 days after the Fifth Circuit rules, and maybe

3  until this time next year, assuming that the Fifth Circuit

4  rules -- there's a cert petition that's granted and it falls

5  into the next term, that would come to an end June 30th of '24,

6  and it would remain in effect until then.  And if it gets to

7  the Supreme Court or even the Fifth Circuit, if they find that

8  the Texas court was wrong, then mifepristone remains in effect

9  the way it was before the Texas court ruled.  If they find that

10 the Texas court was correct, then the FDA has to follow the

11 order of the Fifth Circuit before it follows the order of a

12 district court; does it not?

13          MS. MUQADDAM:  Not necessarily, Your Honor.  I think

14 there is arguments to be made that whatever the Fifth Circuit

15 does should be limited to that circuit.  I think the problem

16 that plaintiffs have experienced is the tremendous uncertainty

17 around what is going to happen from one day to the next, and

18 that is the reason why plaintiffs have sought this extension of

19 the Washington relief to them, because it is possible that that

20 stay could be in effect for a long time.  It is also possible

21 it could be in effect for a matter of a few months.  And if

22 that's the case --

23          THE COURT:  Well, what's the circumstance that would

24 bring it into effect for just a few months?

25          MS. MUQADDAM:  I think if the Fifth Circuit order

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    comes out -- and we expect it to come out pretty expediently --

2    the government could take 90 days to file its cert petition.

3    It could take less time to file a cert petition.  And if they

4    -- even if they file a cert petition on the 90th day --

5              THE COURT:  They don't have to take it up, right.

6              MS. MUQADDAM:  Right, they don't have to take it up.

7              And again, what the reality has been for these

8    plaintiffs is they call me one night and say, Can we use

9    mifepristone tomorrow?  And I say, I don't think so.

10             Next week:  Can we use mifepristone?  Maybe, but you

11   can use it this way.

12             THE COURT:  But I have to take it as of today, June

13   8th, right?  And the answer you would give those clients today

14   is what?

15             MS. MUQADDAM:  The answer I would give them is:

16   Don't buy that much mifepristone.

17             We're talking about really small healthcare

18   providers.  Healthcare doesn't have an on/off switch.  The

19   possibility and the uncertainty that they are facing right now

20   is impacting them irreparably right now.  And it certainly will

21   be too late when people are already being denied mifepristone,

22   because as another fellow court in this circuit has held,

23   mifepristone is really, really important.  It is essential for

24   people.  And when they're not able to get it, they get delayed

25   furthering pregnancy, they're outright denied abortion care,

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  they have to get procedural abortions when they could have

2  gotten the abortion pill, which is less -- less involved.  They

3  can do it in the privacy of their own home.  And again, I would

4  emphasize that mifepristone, since the Supreme Court has

5  overturned *Roe*, is a lifeline for people.

6          THE COURT:  So what happens to my order if I agree

7  with you and I issue a preliminary injunction, and the Fifth

8  Circuit affirms the Texas court -- which is a nationwide

9  injunction that says mifepristone was not properly

10 authorized -- what happens to my order at that point in time?

11         MS. MUQADDAM:  Well, we think the FDA would have to

12 observe this Court's order in the jurisdictions covered by the

13 preliminary injunction, as they must respect the Washington

14 order in the 17 states and the District of Columbia.  We do not

15 claim to understand how the FDA is going to reconcile that.

16 Frankly, this is so unusual --

17         THE COURT:  Nor would I.

18         MS. MUQADDAM:  This is so unusual; plaintiffs do not

19 dispute that.  This is an unprecedented situation, and we are

20 here with an unusual request.  That is the case.  But given

21 that the Washington injunction exists, and given that they have

22 not appealed it, we don't understand how the government can

23 credibly claim that it is appropriate to treat these providers

24 differently than the providers in all of those other states,

25 especially given that these providers are on the front line of

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  seeing those thousands of people traveling.  And without

2  mifepristone, those people are not going to get abortions.

3       THE COURT:  Well, the government resisted the action

4  of the Washington court.  The fact that it may have chosen not

5  to appeal doesn't mean that it's chosen to treat the different

6  provides differently.  You still have to meet the *Winter*

7  factors here in the Fourth Circuit for that purpose.

8       MS. MUQADDAM:  Absolutely.  And we are not asserting

9  that the government is simpatico with the Washington order.

10  They very likely are not, and they may have chosen not to

11  appeal for a variety of reasons.  But regardless of that, the

12  order is going to remain, and it is going to insulate providers

13  in those states from this uncertainty that providers are

14  experiencing.

15       And I'll just emphasize again, these clinics are

16  really small, and they are providing the vast majority of

17  abortion care to people traveling.  If they are to continue to

18  experience this uncertainty, it will be operationally

19  impossible for them to continue to adjust.  And so we are here

20  asking for what we think is a relatively narrow -- we have not

21  come here asking the Court to disrupt the status quo.  We have

22  come to ask for an extension of this relief to be afforded for

23  these providers who are in this unique circumstance.

24       THE COURT:  Is the -- the operational concern, is the

25  issue:  We don't know how much of this drug to have in stock

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  because we don't know whether, six weeks from now, if we have a

2  six-week supply, we'll be able to use it, because four weeks

3  from now there may be an order that comes from another court

4  that says we can't do such and such?

5          MS. MUQADDAM:  That's exactly right, Your Honor.

6  I'll give you an example of what happened in the last few

7  months.

8          So right after the Fifth Circuit's order we told our

9  clients -- including the plaintiffs here -- we think you can

10  move forward with mifepristone.  We're going to have to do a

11  lot of operational things to make that happen because these old

12  restrictions are coming back into effect, and you can't use the

13  generic.  That was another thing that came out of the Fifth

14  Circuit order.  So some of our providers used the generic.

15  Some of them used the name brand.

16          So for example, Trust Women, I call them.  I say,

17  Hey, we think you can go forward with mifepristone, but we're

18  going to have to use old paperwork.  I don't exactly know how

19  we're going to figure it out, but we're going to figure it out

20  as fast as we can.  But we need you to get name brand Mife.  We

21  need you to get Mifeprex, because you can't use the generic

22  under this decision.  So Trust Women spend $20,000 acquiring as

23  much Mifeprex as they could, not even knowing if they would be

24  able to use it.  And then a few days later the government told

25  the Supreme Court that all mifepristone was misbranded, and

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  effectively would have meant a ban nationwide on mifepristone,

2  despite the fact that the Fifth Circuit order didn't go that

3  far.

4          So that's the kind of chaos that they've been

5  experiencing.  And Trust Women does not have another $20,000.

6  None of these plaintiffs do.  And they need to be able to know

7  that they can provide mifepristone to their patients with some

8  security.  And maybe we would be here in a different place if

9  the Washington order didn't exist.

10         THE COURT:  But this wouldn't -- if I grant the

11 preliminary injunction, it wouldn't impact if the state

12 legislature for any of these states -- and I recognize that

13 Virginia is not going to meet again until January, but I don't

14 know about Kansas and Montana.  If they elect to enact a

15 complete abortion ban or one that is much shorter, my order

16 would have no effect, right?

17         MS. MUQADDAM:  It would have the effect of meaning

18 that mifepristone would be available under federal regulations

19 under the 2023 REMS, but a state law would have prohibited

20 abortion entirely.

21         THE COURT:  Use of it, of that drug.

22         MS. MUQADDAM:  Right.  So barring state law right

23 now, if you grant this injunction, the providers can move

24 forward with providing mifepristone in security like their

25 fellows across the country.

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1        There is no doubt that there is a push to ban and

2   eliminate abortion nationwide as much as possible.  That is why

3   the *Alliance for Hippocratic Medicine* case exists, because the

4   goal of the anti-abortion movement is to eliminate abortion

5   nationwide, especially providers like the plaintiffs who are

6   struggling valiantly to provide abortions to Texans,

7   Louisianans, and all the other people who are traveling.  And

8   mifepristone is the only way they can do that.  And it is

9   extraordinarily safe.  It is extraordinarily effective.  But

10  without knowing that they can go forward acquiring it, using

11  it, prescribing it, that is the definition of irreparable harm

12  for them, but particularly for the patients that they see.

13        So I know you have some questions also about our

14  likelihood of success on the merits.

15        THE COURT:  Yeah, I've taken you off your arguments.

16        MS. MUQADDAM:  Oh, no, no, not at all.  Not at all.

17  You have very kindly given us a lot of freedom to address a

18  number of issues.  So if you have more questions about those

19  issues, I'm happy --

20        THE COURT:  We could be here for a while just talking

21  about the issues, but you go where you like.

22        MS. MUQADDAM:  This is a tough nut to crack.  That is

23  unequivocally so.

24        So the government does criticize the Washington

25  decision quite a bit, but I'd like to point to a particular

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  reason about this circuit that plaintiffs have a particularly

2  strong argument that they have a likelihood of success on the

3  merits.  So in the Fourth Circuit decision, *Mayor of Baltimore*

4  *versus Azar,* the Fourth Circuit looked at a restriction on --

5  or a modification of the regulations applying to the family

6  planning program.  HHS had issued a rule that really overhauled

7  the program.  And they did that in spite of widespread and

8  universal opposition by the medical community.  And the Fourth

9  Circuit said an agency cannot easily brush off the swell of

10 evidence in the record before the agency that the medical

11 community finds a rule to be repugnant.  And then thus, by,

12 quote, "merely disagreeing with," quote, "every major medical

13 organization in the country, without more, an agency fails to

14 examine the relevant data."

15        So that is the identical situation to here with the

16 REMS.  The medical community has, since 2015, but also as

17 recently as 2022, told the FDA the REMS are medically baseless.

18 They make them less accessible, particularly for rural

19 patients, particularly in light of the aftereffects of the

20 *Dobbs* decision and in light of new data.  So the government

21 suggests that this data and the effect of *Dobbs* and the impact

22 on rural patients was not before the agency.  That's not the

23 case because the medical community --

24        THE COURT:  But wouldn't -- and maybe this morphs

25 back into the irreparable harm issue.  And I think you know the

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    question I'm getting ready to ask.  Wouldn't the continuation

2    of the REMS continue to cause the harm that is, in some

3    respects, what the plaintiffs are claiming is the irreparable

4    injury?

5              MS. MUQADDAM:  It's true, plaintiffs do feel that

6    they have demonstrated all of the necessary elements in order

7    to -- in order for the Court to issue a preliminary injunction

8    that blocks the REMS entirely.  Plaintiffs do feel that they

9    need that, particularly in light of this precedent.  But that

10   would disrupt the status quo, and plaintiffs are not here to

11   ask the Court to do something extreme.  And we recognize that

12   that would be quite an extreme remedy.  So we have sought --

13             THE COURT:  And I guess this goes -- sorry, I'm

14   taking you off your point again.

15             Can the FDA have one set of rules for -- and maybe

16   this is your point -- for Washington that says everything is in

17   place, another set of rules for this group of plaintiffs in

18   these three states that, if my injunction -- if I grant one --

19   does not mirror what Washington does, can it have different

20   rules, or can it then take a separate action itself for the

21   other I guess then 30 states that may apply?  And I don't know

22   how many of those abortion is restricted or otherwise --

23             MS. MUQADDAM:  It's 13 states and counting.

24             THE COURT:  Okay.  Can it then maybe change the REMS,

25   if it believed that to be appropriate, that applies in those

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  other states that aren't then governed by Washington or in this

2  Court?

3          MS. MUQADDAM:  To plaintiff's knowledge, this has

4  never happened before.  It has never been true that FDA has had

5  different regulations for different parts of the country, but

6  unfortunately this is the reality of post-*Dobbs* America, that

7  we are going to have different rules applying to abortion

8  nationwide.  And what is particularly perverse about this

9  situation -- and the FDA is in a horrible position in this,

10  just like the plaintiffs in many ways, we are all in a very

11  difficult position -- but in Montana, in Kansas, those states

12  have fundamental rights to abortion.  In Texas where the

13  *Alliance* case comes out of, abortion is already banned.  None

14  of those plaintiffs are providing abortion.  And so it is

15  particularly bizarre that an order out of Amarillo, Texas is

16  going to reach out to medication abortion nationwide.

17          And so it is unprecedented for the FDA to have

18  different rules for different parts of the country, but we

19  think that is what has effectively happened with the interplay

20  of the Washington order and the Texas case.  The FDA is held to

21  ensure the availability of mifepristone in those 17 states and

22  DC.  And we think that they should be at least held to that for

23  these plaintiffs who, to be frank, don't have support of state

24  governments.  In Montana and Kansas, there is a fundamental

25  right to abortion under the state constitution, but the AG of

19

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  Montana tried to intervene against the plaintiffs in

2  Washington.  So not only are they in this position seeing all

3  of these banned state patients, they don't have a state

4  government like California or Washington or Oregon that is

5  going to protect them and is going to ensure that mifepristone

6  remains available.  They are incentivized.  And so it is going

7  to be a huge relief and huge security and prevention of the

8  uncertainty they are now experiencing operationally and for

9  their patients emotionally and physically.  That would be the

10 redressability of this injunction.  And we do not say -- there

11 is no precedent for the FDA doing this.  That is simply a fact.

12 None of this has any precedent, but right now --

13         THE COURT:  That's what courts like.

14         MS. MUQADDAM:  I know.  It's really the worst.  It's

15 the worst.  This is all terrible.  And the FDA is in an awful

16 position.  The plaintiffs are in an awful position.  But what I

17 would bring it back to is that there are thousands of people

18 who the plaintiffs provide mifepristone to.  They cannot

19 continue living under this uncertainty and provide mifepristone

20 at the same time.

21         And so, in order to protect the rights of Virginians,

22 Montanans, Kansans, and the other people who are traveling to

23 the plaintiffs' clinics and receiving direct patient

24 telehealth, this injunction is essential.  And so that's why

25 we're here.  We do think we easily meet the likelihood of

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   success factor because of *Mayor of Baltimore.* We also think

2   the bases for the Washington order for finding likelihood of

3   success on the merits are equally true here. That is because

4   the REMS is really only appropriate for extremely dangerous

5   medications.

6           I can provide just a little bit of color about the

7   REMS programs.

8           THE COURT: Please do.

9           MS. MUQADDAM: So of the 20,000 medications that FDA

10  regulates, there are 63 REMS programs. Of the 62 that are not

11  mifepristone, 15 programs involve cancer drugs, which are

12  universally and extraordinarily high risk; 30 involve risks of

13  permanent physical impairment or death, such as heart failure,

14  liver damage, arterial tearing, penile fractures,

15  life-threatening infections, cancer; and three can result in

16  lethal anaphylaxis; and the remainder associated with dramatic

17  psychiatric affects like addiction with opiates, dissociation,

18  delirium, suicidal ideation. Mifepristone is a drug the FDA

19  concedes is as safe as Advil. It doesn't belong anywhere near

20  these other drugs.

21          And there's a few comparators that may be

22  particularly helpful here, and these are comparators that the

23  Washington judge looked at as well. One is that there's

24  Korlym. Korlym is a higher-dose mifepristone that is used for

25  Cushing's disease. That medication is a daily 300-milligram

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    dose of mifepristone.  Again, extraordinarily safe treatment

2    for Cushing's, for termination of pregnancy.  It's used to

3    dilate cervixes and other types of abortion care.  It's used

4    for lots of things.  Mifepristone for pregnancy termination is

5    a one-dose, 200-milligram pill.

6            THE COURT:  But not beyond 14 weeks; is that correct?

7            MS. MUQADDAM:  It's typically used actually under 11

8    weeks.

9            THE COURT:  11 weeks, okay.

10           MS. MUQADDAM:  So it's early pregnancy.  It is used

11   actually around the world to a greater degree, but that's the

12   most common protocol in the United States.

13           THE COURT:  And it seems to be that the government's

14   response in some respects is that the reason for the

15   certifications of the provider, as well as the pharmacy, is to

16   assure that there is knowledge as to when the pregnancy began

17   so that it is prescribed and used within that same -- within

18   that window.  What is the impact?  No one really speaks to

19   this.  Maybe I have to read everything closely again.  What is

20   the impact of administration or use of the drug beyond the

21   prescribed window?

22           MS. MUQADDAM:  So, in fact, actually around the

23   world -- and we can put this in our reply -- mifepristone is

24   used much later in pregnancy.  The current protocol in the

25   United States is 11 because when mifepristone was first

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   started, it has kind of expanded in its gestational limit as

2   more and more science has developed.  But I point you to

3   Plaintiffs' Complaint Exhibit N, which is the American College

4   of Obstetricians and Gynecologists, the chief expert on OB/GYN

5   care in the United States.  They filed a 2022 citizen's

6   petition with the FDA talking about the post-*Dobbs* effect,

7   talking about the REMS, talking about this latest Canadian

8   data, talking about the burdens on patients.  And in that

9   petition the ACOG talks about why mifepristone does not meet

10  any of these requirements.  And it's because there are hundreds

11  of studies demonstrating that mifepristone is one of the safest

12  drugs out there, and it does not need special certifications.

13  It does not need providers to self-certify.  And, in fact, that

14  limits providers.

15          THE COURT:  Is there an increased risk to the mother

16  or the patient after 11 weeks, 14 weeks, 20 weeks; in other

17  words, if it's prescribed too late into the pregnancy, is there

18  some increased risk --

19          MS. MUQADDAM:  No.

20          THE COURT:  -- to the patient?

21          MS. MUQADDAM:  There is no increased risk.  And also,

22  I would emphasize that what ACOG talks about -- and what many,

23  many other scientific experts have delved into extensively --

24  is that there are very common, easily used methods of

25  determining gestational age even when the patient is not --

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1        THE COURT:  Ultrasounds and measurements.

2        MS. MUQADDAM:  Ultrasounds is one way, but there are

3   questionnaires and protocols that doctors use and clinicians

4   use to determine whether, for example, the patient has risk

5   factors for ectopic pregnancy, or whether the patient is

6   further along in pregnancy than the clinician would prescribe

7   mifepristone.  And so it is not the case that any of these

8   things ensure that those things are true.  And, in fact, for

9   patients who are having a miscarriage, nobody needs to be --

10  that they need to be certified to prescribe this drug even for

11  a patient who is having a miscarriage.  And that patient who is

12  having a miscarriage has to sign a form that says, I am

13  terminating my pregnancy, even when it's a very wanted

14  pregnancy, and it's deeply upsetting.

15        So the reality is, as ACOG and the entire universal

16  mainstream medical community has told the FDA since 2015, these

17  are not necessary.  They are not necessary to ensure ectopics

18  are appropriately treated.  They are not necessary to ensure

19  gestational age is appropriate.  They are not necessary to

20  ensure that mifepristone is safe.  They are not necessary to

21  ensure that providers know how to deal with pregnancy

22  complications.  That is the case with childbirth.  Childbirth

23  is 14 times more likely to result in death than any method of

24  abortion.  And doctors and clinicians and midwives provide

25  childbirthing care.  They don't have to certify that they know

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   how to do things.  They're just licensed as clinicians, and

2   they know what to do, and they provide medicine the way that

3   they can within the scope of their practice.  The same should

4   be true for medication like this, especially when it is a

5   medication that ensures health and dignity, and especially in

6   this post-*Dobbs* reality as the ACOG demonstrated in that

7   petition.  We are not living in a world where abortion is

8   easily accessible, even in states where it is protected.  And

9   for those patients who are traveling, this is a lifeline.  And

10  without that, thousands of people will be carrying unwanted

11  pregnancies to term.  And as copious amounts of data shows us,

12  those people suffer extreme harms.  They are less able to care

13  for their existing children.  They die in childbirth,

14  especially given our dismal maternal mortality rate.  And so

15  mifepristone for those patients is the difference perhaps for

16  many, many, many of them between getting an abortion and not

17  getting an abortion.  And so that is one of the reasons why

18  this has become so significant and why the uncertainty is so

19  intolerable for the plaintiffs.

20          THE COURT:  Let me take you to exhaustion quickly,

21  and I'll let you circle back around where you need to.

22          So there are three parts to the REMS now, and the

23  2023 added the pharmacy certification.

24          MS. MUQADDAM:  Uh-huh.

25          THE COURT:  I understand your futility argument with

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  respect to the first two because I think, as I understand the

2  argument, the FDA has addressed those in other citizens'

3  petitions and it's futile to go back and do that again.  And

4  the 2022 petition by ACOG -- I'll use your acronym --

5  challenged the 2023 including the pharmacy certification, I

6  presume; is that right?

7          MS. MUQADDAM:  That's correct.

8          THE COURT:  What happened to that citizen's petition?

9  Is it still pending?

10         MS. MUQADDAM:  No.  It was denied.

11         THE COURT:  It was denied?  When was it denied; do

12 you recall?

13         MS. MUQADDAM:  I think it was denied right before the

14 2023 REMS modification was made.

15         THE COURT:  While it was under consideration?

16         MS. MUQADDAM:  Correct.

17         THE COURT:  They were challenging that?

18         MS. MUQADDAM:  Correct.

19         THE COURT:  All right.  Thank you.

20         MS. MUQADDAM:  And just to get at exhaustion a little

21 bit more fully, the FDA has made a lot about the fact that the

22 ACOG petition asks for miscarriage to be added as an

23 indication.  They did that because we know that post *Dobbs*,

24 lots of miscarriage care in banned states has been disrupted,

25 and so people are not even getting miscarriages managed

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    appropriately.

2         THE COURT:  There is uncertainty as to what doctors

3    can and can't do.

4         MS. MUQADDAM:  Right.  But in addition to that, they

5    do remind FDA:  Just in case you forgot, we and the entire

6    medical community -- the American Medical Association, the

7    maternal-fetal medicine specialist organization, ACOG, and so

8    on -- did get into why the REMS in total, including the

9    pharmacy certification requirement, was medically unnecessary

10   and burdensome.  And they have just denied that.  And so, as

11   the Washington court held, the FDA cannot credibly say that

12   were we to provide the exact same information, they would come

13   to a different conclusion today.

14        THE COURT:  All right.

15        MS. MUQADDAM:  So I would like to just address the

16   government's position on their rationale for the 2023 REMS.  So

17   the government does quote a lot of the text from their Exhibit

18   C and Exhibit D, which describes their rationale for the 2023

19   REMS.  And I'd like to particularly point the Court to look at

20   the difference between the analysis for the three restrictions

21   that were imposed and the removal of the in-person prescribing

22   requirement.

23        So the in-person prescribing requirement is -- the

24   analysis there is multiple pages long.  It looks at lots of

25   studies, and it comes to the eminently correct conclusion that

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    in-person dispensing is not required.  If you take a look at

2    the rationale for the other three requirements, it's

3    effectively *ipse dixit*.  The agency has looked at the evidence

4    and concluded that we think that these things are still

5    necessary.  There is no evidence whatsoever why that's the

6    case.  And that's important in the Fourth Circuit because the

7    Fourth Circuit has said that an agency cannot just disagree

8    with the entire medical community without more.  They have to

9    say:  We looked at the study and we think this shows X.  We

10   have to say:  Okay, we've heard ACOG, we've heard the AMA come

11   to us with this point of view.  This is why we disagree.  And

12   that case, *Mayor of Baltimore,* is extraordinarily clear on that

13   point.  And the FDA simply has not remotely met that standard.

14   And as a result, I think it is extremely likely that plaintiffs

15   will succeed on the merits of their claims that the REMS

16   violate the APA, because the Fourth Circuit has been very,

17   very, very on point there.  But I really would advise the Court

18   to take a look at the difference between those two pieces,

19   because the FDA in its response quotes some of the pieces of

20   that rationale memo, but when you look at that in light of

21   *Mayor of Baltimore* and in light of the extensive analysis that

22   they performed about the other pieces that they eliminated, I

23   think it's extremely clear that the agency has not made a

24   sufficient explanation.  And that's in addition to the fact

25   that, as the Washington court delved into, REMS and REMS with

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    these special elements ETASU are extremely unusual, and they

2    have to be demonstrated to be necessary, and the agency has to

3    make a determination as to why they are necessary.  They have

4    actually never done that, but they certainly haven't done it in

5    the 2023 REMS modification.  And in addition to determining

6    whether they're necessary, they have to look at whether they

7    unduly burden access to healthcare.  And that is one of the

8    pieces that ACOG has gotten into since 2015 and in the latest

9    citizen's petition, that the effect of the REMS, in addition to

10   not making Mife any safer and not improving mifepristone

11   outcomes or making it any more effective, that it really

12   prevents people from getting mifepristone.  It limits the

13   people who can prescribe it, who the plaintiffs can use to

14   prescribe it.  It limits the kinds of places where it can be

15   accessible, even if in-person dispensing is no longer required,

16   because they have to use special pharmacies and it requires

17   them to use this incredibly upsetting and irrational patient

18   agreement form which is extremely confusing, especially for the

19   thousands of people who seek miscarriage care, for example, for

20   whom this is particularly upsetting because they are not

21   terminating a pregnancy.  They are losing a very much wanted

22   pregnancy.  So those are sort of three reasons that the REMS

23   here -- I think plaintiffs have certainly met their burden to

24   show they have a likelihood of success on the merits.

25           Coming back to irreparable harm -- I think, as we've

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  discussed, this is a very unusual situation, but the Court does

2  have equitable authority to fashion preliminary relief in a way

3  that both prevents irreparable harm, but also ensures the

4  ability of the Court to make a determination of that ultimate

5  issue of whether the REMS are burdensome, whether they are

6  stigmatizing, whether in plaintiff's view they have actually

7  created this entire situation, because, as I think one of the

8  quotes that we cite in our complaint, FDA has attempted to both

9  sort of have its cake and eat it too.  Mifepristone,

10 extraordinarily safe, very effective, but we're going to saddle

11 it with these requirements that suggest it's unsafe and

12 dangerous.  We're going to saddle it with requirements that

13 opiates are subject to or chemotherapy drugs.  And the result

14 has been that anti-abortion extremists, including the

15 plaintiffs in Texas and including governments around the

16 country -- state governments -- have pointed to the REMS as a

17 reason why mifepristone is unsafe.  And so I think it's really

18 important to look at what the plaintiffs have said in *Alliance*,

19 for example, and what the Fifth Circuit held, for example,

20 about the same arguments.  Look, FDA has looked at this

21 medication.  It thinks it's unsafe.  It thinks it's dangerous.

22 It should be off the market.  And they point to pieces of the

23 REMS and they point to pieces of the FDA's consideration of

24 this drug that make no sense and say --

25            THE COURT:  But the challenge in those cases -- and I

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   may be over my skis, and Mr. Katzen will correct me because I

2   know he was counsel in that case -- but the challenge in that

3   case wasn't:  This is a dangerous drug; therefore, get it off

4   the market.  It was:  The FDA has not adequately considered

5   whatever the risks may be -- whether they be small or great or

6   whatever they may be, they haven't adequately considered that

7   and taken it all into consideration as required under the APA

8   not just because it's a dangerous drug, get it off the market.

9   There are plenty of dangerous drugs that are on the market.

10  You've mentioned plenty of them.

11        MS. MUQADDAM:  Absolutely.  We're not here to say

12  that the FDA has made a mistake in its expert judgment.  It's

13  actually the fact that FDA has made this extremely correct

14  judgment based on decades of experience and hundreds of studies

15  that mifepristone is extremely safe.  The problem is that their

16  regulation of the drug is totally inconsistent.

17        THE COURT:  It's inconsistent with what the results

18  show.

19        MS. MUQADDAM:  Exactly.  And the plaintiffs in the

20  *Alliance* case have -- there is a movement in the United States

21  to eliminate abortion nationwide.  That is not FDA's fault, but

22  the REMS are not divorced from the situation on the uncertainty

23  that providers are living under right now.  It is not

24  unrelated.  And I think the examples that we point to in our

25  complaint and in our motion about how the REMS have been used

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  to justify restrictions on abortion from states to use to

2  justify the Fifth Circuit's decision, for example, to use as to

3  justify political action against mifepristone.  So I think it

4  is not entirely credible for the government to sort of wash its

5  hands of the situation that is happening right now.  Not to say

6  that they manufactured it, but to say that the REMS are this

7  linchpin of stigma that has driven a lot of the efforts to

8  restrict mifepristone.

9        But to your point, Your Honor, we have not the

10  injunction of the REMS at this stage, nor do we think it's

11  appropriate.  That would be a major disruption to the status

12  quo; however, were the Court to enter the same relief that the

13  Washington court entered, it would afford these additional

14  three states, and the government would be in no different

15  position.  They would be in identical position to the one

16  they're in now.  They'd have some states where they are

17  required to abide by this injunction.  And if an order takes

18  effect from the Texas case or from another development, they

19  will have to reconcile that.

20        But right now I'll just bring it back to the fact

21  that 17 states and the District of Columbia and all of their

22  providers are living in certainty that whatever happens in

23  Texas, whatever happens in the Supreme Court, their provision

24  of mifepristone is going to be protected.  And these plaintiffs

25  who are on the front lines are left out.  And so that's really

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  why we're here.  We don't envy the Court's task and we

2  certainly don't envy the position of the FDA.

3          THE COURT:  Let me -- as you're putting a bow on it,

4  let me see if I can sum up what I'm struggling with as well and

5  trying to figure it out; and that is that a court, in

6  fashioning a preliminary injunction, typically is tasked with

7  seeking to assure that a plaintiff who is claiming irreparable

8  ham is not continued to be harmed by the actions of a

9  defendant.  If someone has violated a noncompete agreement, for

10 example, you can't compete while this case is pending.  In this

11 particular case, I'm being asked to fashion an injunction that

12 will perpetuate the very harm that the plaintiff seeks to avoid

13 at the end of the case.

14         MS. MUQADDAM:  Well, I think plaintiffs are making

15 two forms of harm argument.  One is that they are living under

16 a cloud of uncertainty, and that the REMS are part of that, and

17 that the FDA's actions are a part of that.  I think a perfect

18 example is when the FDA said the drug was misbranded, shocking

19 all the providers in the country into thinking that

20 mifepristone was going to be entirely banned.

21         THE COURT:  But that issue is not in front of the

22 Court, is it, about how the FDA has branded or not branded the

23 drug?  The only issue before the Court -- I say the only issue,

24 but the main issue before the Court is whether these REMS are

25 proper under the APA or whether some constitutional claim is

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  associated with them.

2       MS. MUQADDAM:  Well, I don't think the Court is

3  limited from looking at the totality of the circumstances.  The

4  Court can look at what's going on in the world, and that can

5  inform what the Court thinks is equitable or appropriate in the

6  scope of the relief.

7       THE COURT:  Can I do that, or am I restricted to the

8  record?

9       MS. MUQADDAM:  I think in terms of determining

10  whether plaintiffs are experiencing irreparable harm, the

11  Court -- the Court is not limited from looking at how these

12  things will interact in real life.  And that is part of the

13  challenge with this case, and frankly the challenge that the

14  FDA is in and the plaintiffs are in, is that there is a level

15  of uncertainty caused around mifepristone that is attributable

16  to the FDA, but is also magnified because we are in a

17  post-*Dobbs* world.  I don't think the Court has to close its

18  eyes to that reality when fashioning preliminary relief.  And

19  that's because preliminary relief is absolutely dependent on

20  likelihood of success on the merits, but it is an exercise of

21  the equitable discretion of the Court.  And the Court can

22  fashion relief in order to avoid irreparable harm.  That's the

23  fundamental purpose of a preliminary injunction is to avoid

24  irreparable harm.  And there is actually precedent around the

25  country.  For example, there is a notable Fifth Circuit case

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  about this, actually, that an injunction is typically

2  preserving the status quo, right?  That's typically what it

3  does; however, the ultimate purpose of a preliminary injunction

4  is to avoid irreparable harm and to preserve the positions of

5  the parties as they move to the -- a determination on the

6  merits.  It is certainly going to avoid irreparable harm that

7  the plaintiffs are experiencing right now, and it also will

8  ensure that when a determination is made on the merits of the

9  REMS that the plaintiffs and the defendants are in the same

10 position they're in now.  And the defendants are -- will be in

11 an identical position as to these three states as they already

12 are in 17 other states and the District of Columbia.

13        THE COURT:  If Mr. Katzen gets up and says, either as

14 a matter of fact or as a practical matter, the FDA can't change

15 these REMS on -- willy-nilly isn't the right word, but

16 promptly; in other words, it has to go through the notice and

17 that whole process -- which is, if I'm looking at the statutes

18 correctly, 60 to 180 days' notice -- nothing will change,

19 whether I issue an injunction or not, without the plaintiffs

20 having plenty of prior notice if something is getting ready to

21 change with respect to the REMS.  In fact, they may even -- my

22 injunction would prevent the FDA from reconsidering the REMS

23 and removing them.

24        MS. MUQADDAM:  I am certainly -- if circumstances

25 change, the Court's injunction may no longer be appropriate,

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  and --

2          THE COURT:  But they couldn't even remove the REMS if

3  I issue an injunction of the type sought by the plaintiffs.

4          MS. MUQADDAM:  Well, that's true, but that's not

5  terribly uncommon --

6          THE COURT:  It's not likely.

7          MS. MUQADDAM:  But it's not terribly uncommon in APA

8  cases.  It does happen that courts issue relief ensuring that

9  FDA cannot deviate from the present regulation.  That is not

10 uncommon at all.  I think what is different about this case is

11 the fact that we have this geographical divide, and that makes

12 any outcome somewhat perverse and out of -- totally out of the

13 norm.  And it is true that we are in this situation for a

14 variety of environmental circumstantial factors, as well as the

15 REMS.  And so -- but we would ask that the Court exercise its

16 equitable discretion to fashion a remedy here that will at

17 least ensure equity between these plaintiffs and the other

18 providers that are in those other states.  We think that is

19 what will preserve the ability of the Court to make a

20 determination about whether the REMS are appropriate.  We think

21 it will avoid irreparable harm the plaintiffs are experiencing

22 that I've talked extensively about.  And the Court is not -- is

23 not required to shut its eyes to the circumstances, especially

24 when determining whether plaintiffs are experiencing

25 irreparable harm.  It can be true at the same time that

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   plaintiffs are experiencing irreparable harm from another -- a

2   number of factors, including the FDA, as long as there is harm

3   that is partly perpetuated and caused by the defendant, a court

4   can enter an injunction to avoid that irreparable harm, even if

5   the irreparable harm doesn't just come from the defendant's

6   actions.

7       THE COURT:  I can't promise this is my last question,

8   but I think it will be.  Are the plaintiffs in the 17 states

9   that were before the Washington court able to make the same

10  business decisions with respect to how much mifepristone they

11  wish to stock as the plaintiffs in your case; in other words,

12  it is available on the market in the State of Washington the

13  same way it's available on the market in a state that's not

14  part of that case, whether it be one of the three states before

15  us or another state that -- where it could be administered?

16      MS. MUQADDAM:  For now, yes.  I think the difference

17  is the clinics in those states are making business decisions

18  feeling very confident that their provision of mifepristone is

19  not going to be disrupted in a few months or in the next year,

20  and that is not where plaintiffs are right now.  And plaintiffs

21  are particularly harmed by this reality because they don't have

22  supportive state governments.  They don't have a lot of

23  resources.  They have very limited resources.

24      THE COURT:  This injunction really is to try to

25  prevent other courts from getting ahead of the FDA?

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          MS. MUQADDAM:  I don't think that's entirely the

2   case.  It would be one effect of the injunction.  I think the

3   other thing that is happening here is that there isn't a

4   difference of experience between these plaintiffs and most of

5   the other abortion providers in the country.  And the

6   irreparable harm is exacerbated by that fact, because there are

7   clinics all across the country behaving as if there is nothing

8   wrong, because they are protected.  But that's just not the

9   reality for these plaintiffs, and that's why we're here.  And

10  so, in addition to experiencing irreparable harm generated by

11  the FDA, generated by this situation, they are also uniquely

12  disadvantaged because many of their fellows across the

13  country -- most of them -- are proceeding as normal, are

14  acquiring mifepristone as they normally do, are spending the

15  amount of money they normally spend on mifepristone, are

16  stocking it the way they normally do.  That is not what the

17  plaintiffs are doing, and that is not how they are experiencing

18  this moment.

19          So even if the Court is not convinced about the

20  merits of the Washington order, even if the FDA didn't appeal

21  it for the reason -- for any other reason, these plaintiffs are

22  experiencing pretty severe irreparable harm.  And we think it

23  is still appropriate for the Court to fashion relief that, at a

24  minimum, recognizes that these plaintiffs should not be treated

25  differently from the clinics in all of those other states.

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    THE COURT:  So if there was a challenge to

2  mifepristone in one of the 17 states other than Washington -- I

3  know the District of Columbia is in there.  So let's say there

4  was a challenge in the District of Columbia.  A district court

5  judge is not -- well, let me ask you this question, do it this

6  way.  I'm going to take you back to your fed courts class in

7  law school.

8    MS. MUQADDAM:  My favorite.

9    THE COURT:  And that's this:  Is a district court

10 judge in another -- in one of the 17 states bound by what the

11 State of Washington -- the district judge did in Washington, or

12 is that -- because it's a parallel court, is it not bound by

13 that, and can make an independent decision that may be

14 contrary?

15   MS. MUQADDAM:  It can make a determination, I think,

16 on a legal question that is different.  But an Article III

17 court has the power to issue an injunction that extends beyond

18 the geographic --

19   THE COURT:  Right.  I get that.

20   MS. MUQADDAM:  Well, yeah.  But I think with the

21 Washington injunction, it covers these states.  That would --

22 when a judge is looking at a question or a challenge to

23 mifepristone in those courts, I don't think that that judge

24 could undo the Washington injunction.

25   THE COURT:  But for example, if I make a decision in

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  a case on a question of law, and that same question of law

2  comes up with one of my fellow judges, they're not bound by my

3  decision in the same district.  And so really my question is:

4  Is a district judge in a different district that may be covered

5  by one of the 17 states bound to follow the injunction?  In

6  other words, can that judge issue a different ruling that

7  may -- it creates a quagmire.  And part of this may be a

8  horrible law school exam question, because I'm not sure that

9  something like that would happen.

10          What I'm trying to ferret out is the extent to which

11  the uncertainty that you say that the 17 -- the providers in

12  the 17 states don't have really could still exist, because

13  there could be a separate lawsuit filed in one of those states

14  that could challenge the underlying availability of

15  mifepristone.

16          MS. MUQADDAM:  So I think two things.  One, I think

17  there's a difference between a legal conclusion or a different

18  legal decision and one court being able to violate an

19  injunction issued by another district court.  And to my

20  knowledge, that has never --

21          THE COURT:  I've never seen it.

22          MS. MUQADDAM:  -- happened because a district court

23  would not issue an injunction that undermines an injunction

24  issued by another district court.

25          I think the second point is that's partly why

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  plaintiffs are here now, because whatever decision comes out of

2  the *Alliance* case, it will be in light of the fact that the

3  Washington order exists and potentially an injunction here.  So

4  I think an important piece is when the government moved for

5  clarification in the Washington court, it was partly because

6  the Texas order was not in effect that the court felt that it

7  could enter this kind of relief, because it is not intruding

8  upon injunctive relief that is in effect other places.  But if

9  there is an injunction here, that will make a difference to

10 what relief ultimately could come out of the Texas case.

11         THE COURT:  All right.

12         MS. MUQADDAM:  So I think I've covered all my points.

13 If you have any other questions --

14         THE COURT:  Do you want to address the stay or hold

15 that until you hear from Mr. Katzen?

16         MS. MUQADDAM:  I will hold to address it later, but I

17 think I can say that we feel that it's largely tied to the

18 government's position that we're not experiencing irreparable

19 harm.  So I think I've discussed that extensively in my opening

20 presentation.  And so our position is that the stay should be

21 denied for the same reason that an injunction should issue.

22 But I'll address --

23         THE COURT:  The one thing I'll have you think

24 about -- and you can address it afterwards while we listen to

25 Mr. Katzen -- and that is the order in which I address the

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    questions.  Do they go together or are they in serial fashion,

2    that I address the injunction issue and then the stay issue?

3    Because if I issue the injunction, maybe your position is

4    different with respect to the stay, maybe it's not.  I don't

5    know.

6             MS. MUQADDAM:  I think that's right.  I will point

7    out one thing about the government's stay motion, is there is a

8    degree to which I understand them to be saying that if the

9    Court, for example, declines to enter injunctive relief, it

10   sounds like a stay of the determination of the motion -- a stay

11   of the determination of the motion might be acceptable to the

12   government.  I don't know if that's the case.  But if the Court

13   is not convinced that the providers are experiencing the

14   extreme irreparable harm, then perhaps there is a remedy where

15   an injunction could be put on hold, but we do think the case

16   should move forward for all the reasons that we've talked

17   about, about how the REMS are -- not only are they not

18   unconnected to the uncertainty that they're experiencing; they

19   are themselves causing additional irreparable harm in addition

20   to what the plaintiffs are experiencing now.  So we do think

21   the case should move forward under any circumstances.  And I

22   think the next stage perhaps would be the production of the

23   administrative record as the case moves forward, which is what

24   the government is now engaged in, in the Washington case, I

25   believe.  But we do feel that given what the providers are

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  experiencing, given that the Washington order exists -- and

2  will exist for some time, since the government has not

3  appealed, regardless of what their decision-making was -- that

4  it really isn't appropriate for these providers to be

5  experiencing what they are experiencing now operationally, and

6  for their patients psychologically and physically, that all of

7  these other providers in these other states are not.  And that

8  is why we have sought what we grant is unusual, but we hope

9  that the Court will exercise its equitable discretion to enter

10 that narrow remedy.  And that's even the case if you are not

11 convinced by the rationale of the Washington decision.  I think

12 that is in some ways besides the point because it does exist.

13 It hasn't been appealed.  It's going to be in effect probably

14 through what we see happen in the *Alliance* case.  And because

15 whatever relief is ultimately issued in that case is not in

16 effect, that means that whatever the district court does there

17 or the Fifth Circuit, this injunction would protect them from

18 whatever relief goes into effect there.  And in light of what

19 they are presently experiencing, we think that that's an

20 appropriate remedy.

21          THE COURT:  Okay.  Thank you very much.

22          Mr. Katzen?

23          MR. KATZEN:  Good morning again, Your Honor.

24          THE COURT:  Good morning.

25          MR. KATZEN:  As a threshold --

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1        THE COURT:  Excuse me, afternoon now.

2        MR. KATZEN:  Oh, it is?  Well, good afternoon.

3        As a threshold factor for obtaining a preliminary

4   injunction, it's plaintiff's burden to make a clear showing

5   that they will suffer imminent irreparable harm that could be

6   prevented by the injunction they seek.  In their motion for

7   preliminary injunction, plaintiffs target harm from another

8   district court order, the *Alliance* order.  But as Your Honor

9   noted, the Supreme Court has stayed that order pending

10  resolution of appellate proceedings in *Alliance*, including

11  disposition of any timely filed cert petition.

12       THE COURT:  And I get that.  And in their motion they

13  indicate that because of that stay -- I forget exactly how it's

14  written -- but because of that stay, nothing is going to change

15  as long as that stay is in effect.  But the argument, as I

16  understand, is a little bit more nuanced; and that is that

17  because of the uncertainty that surrounds the availability of

18  the drug that doesn't exist where the FDA is enjoined from

19  doing anything that would affect the availability of the drug

20  in the other 17 states, it impacts the way in which these

21  providers can either stock the drug or otherwise make it

22  available to their patients.

23       MR. KATZEN:  If that uncertainty were enough, then

24  any time someone can posit hypothetical speculative future

25  harm, the irreparable harm factor would be satisfied, because

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  they could say we don't know what the future holds.  We don't

2  know what's going to happen.  We have to act as if it's a risky

3  scenario.  We have to take all these steps.  And that's our

4  irreparable harm.  Speculative, far-off, contingent harm that's

5  conditioned on future events coming into effect isn't converted

6  into imminent irreparable harm because the plaintiff is

7  planning ahead for the future.  And if it were otherwise, as I

8  said, that would effectively eviscerate the imminent harm

9  factor.

10        THE COURT:  I know you objected to a number of

11  states -- when I say "you," the FDA; it may have been you as

12  well, since you are counsel of record in the case -- but in the

13  Washington case intervening.  And I didn't read all the

14  intervening to know exactly the reason why, but is there any

15  reason that providers in one state should be treated any

16  differently -- as long as abortion is legal from state A to

17  state B, that the providers in state A should be treated the

18  same as it relates to state B with respect to the availability

19  of the drug and with respect to what the FDA can and can't do

20  with respect to the drug from one state to the next?  That's

21  their argument, is that the providers in these 17 states have a

22  measure of protection -- whether it be great or small is

23  subject to part of our debate -- that these other states don't

24  have.  And the government is to be fair to all, right?

25        MR. KATZEN:  Right.  If anything, though, that begs

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    the question of why they didn't seek to intervene in Washington

2    where they could have --

3           THE COURT:  Because those are states.  These are

4    individual providers.

5           MR. KATZEN:  That doesn't necessarily -- I'm not sure

6    that would mean that under Rule 24 they couldn't seek

7    permissive intervention.  But be that as it may, we oppose the

8    relief in Washington.  Our position is that the relief that was

9    entered by the Court was not proper and the relief --

10          THE COURT:  Would you agree they can intervene in

11   Washington?

12          MR. KATZEN:  What was that?

13          THE COURT:  Can I move this case to Washington?

14   Would you agree they could intervene in Washington?

15          MR. KATZEN:  We're happy to have supplemental

16   briefing on that.

17          One key difference, I think, Your Honor, between this

18   case and Washington is the procedural posture in which

19   Washington was decided versus here.  When Washington was

20   decided, the *Alliance* order was scheduled to go into effect in

21   seven days.  So if nothing happened but the passage of time for

22   seven days, then the *Alliance* order would have been in effect.

23          THE COURT:  I thought the two decisions came down

24   almost simultaneously, and then there was a clarification

25   during that intervening seven days.

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1           MR. KATZEN:  That's correct.  The *Alliance* order came

2   down first, and then about 20 minutes later the Washington

3   order was issued.  But at the time, after that 20 minutes, the

4   *Alliance* order was -- the district court in *Alliance* had stayed

5   its own order for seven days to give FDA time to seek emergency

6   relief from the Fifth Circuit.  So the order was scheduled to

7   go into effect in seven days at the time that the Washington

8   court issued its order.

9           Here, by contrast, the *Alliance* order is stayed

10  effectively indefinitely, pending resolution of the appellate

11  proceedings in *Alliance*.  So if nothing happens but the passage

12  of time, the stay will continue.  So again, we don't think the

13  relief that the Washington court entered was correct either,

14  but the imminence factor is far more lacking here than it was

15  in Washington.  And that's -- that threshold factor, the

16  failure to show imminent irreparable harm, precludes granting a

17  motion for preliminary injunction here before the Court gets to

18  factors like hardship to the government and public -- public

19  interest.

20          THE COURT:  So if the FDA decided it wanted to change

21  its REMS, that either the requested -- or the manufacturer to

22  change its -- submit a petition or the FDA wanted to reconsider

23  2023, what does that process look like?  What is that time

24  period?

25          MR. KATZEN:  So --

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1        THE COURT:  Maybe that's an administrative law class

2   that can't be done here in 20 minutes.

3        MR. KATZEN:  Yeah, no, I think typically FDA would

4   make a determination that the REMS need to be modified in some

5   way, and then it would ask the sponsors of mifepristone to

6   submit a supplemental application proposing modified REMS.  And

7   I think this statute gives 180 days.  I can check that.  It's

8   cited in our brief, but --

9        THE COURT:  I think that's right.

10       MR. KATZEN:  So that's the process for modifying the

11  REMS.

12       THE COURT:  Under the Washington order, what can the

13  FDA do or not do with respect to the regulation of

14  mifepristone?

15       MR. KATZEN:  This may be a frustrating answer, but

16  I'm not going to interpret the Washington order to a

17  hypothetical set of facts.  In this case we'd like to --

18       THE COURT:  What we're trying to figure out --

19  because I'm asked to enter essentially the same injunction, and

20  so I'm trying to understand what the limits of that are.  And

21  so I'm not trying to put you in a position where you're

22  answering a hypothetical question, but what does the FDA

23  understand it can do or not do under that order?

24       MR. KATZEN:  FDA will want to address that in a

25  specific circumstance with specific facts rather than kind of

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    in the abstract in this circumstance.  So I apologize for not

2    being able to provide more guidance on that question.

3              THE COURT:  It certainly can't change the REMS,

4    right?

5              They certainly cannot change the REMS?

6              MR. KATZEN:  Again, I think I don't want to get ahead

7    of the agency on that question.  I think it's -- we haven't had

8    an opportunity to consider that.  So it hasn't come up yet and

9    hasn't been fully considered.

10             THE COURT:  Well, because I'm asked to enter an

11   injunction.  And I'm trying to figure out what the scope of

12   that injunction would be if the injunction is to be consistent

13   with what the Washington court said.

14             MR. KATZEN:  I think, as we said in our brief, the

15   relief that's being requested here, which is the same relief as

16   requested in Washington, it locks the current REMs in place.

17   It requires FDA to maintain the agency action that plaintiffs

18   have chosen to challenge in this case.

19             THE COURT:  Can it treat one state differently than

20   another state?

21             MR. KATZEN:  Your Honor, again, I'm unable to provide

22   you a satisfactory answer to that question because it hasn't

23   been something the FDA has had to consider.

24             THE COURT:  Because that's part of -- it's part of

25   the plaintiffs' argument.  Your reticence is opening the door

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  for Ms. Muqaddam to say:  Here's exactly what our problem is,

2  is that these 17 states have a federal judge that can step in

3  right away and say, FDA, you can't do such and such.  And those

4  that are the plaintiffs here -- we'll just deal with them,

5  because they're the only ones before us -- don't have that

6  protection.  And so, please give us the same protection as

7  well.

8        MR. KATZEN:  I understand.  What I would say to that,

9  though, is it kind of shifts the burden onto us to show what we

10 are planning to do and what we're not planning on doing, when

11 the burden is on plaintiffs to --

12       THE COURT:  But it helps me understand their

13 irreparable harm.  If -- for example, if the FDA stands up

14 today and says:  We can't change our REMS.  Nothing that we can

15 do with respect to how we regulate this drug can be any

16 different in those 17 states than these states certainly

17 between now and when the Supreme Court or the Fifth Circuit --

18 whatever the court of last jurisdiction is on the *Alliance*

19 case -- makes its decision.  That's one thing with respect to

20 irreparable harm.  If the FDA can't say that that can't happen,

21 that's another thing potentially with respect to irreparable

22 harm.

23       MR. KATZEN:  It's their burden to show what is going

24 to happen and what's not going to happen.  It's their burden to

25 say what they think is going to happen, what FDA is going to do

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   after the preliminary injunction, and show that there's an

2   imminent threat of that happening, not our burden to describe

3   what it is we think we can and can't do for questions --

4           THE COURT:  How do they know that, other than me

5   letting them start conducting a lot of discovery inside the

6   FDA, which I'm sure you don't want?

7           MR. KATZEN:  No, that would not be called for, Your

8   Honor.  But they're also not entitled to go on a fishing

9   expedition just to find irreparable harm.  What they have to do

10  is they have to have some reason for thinking that if they

11  don't get this injunction, FDA is going to take some action

12  that imminently harms them.  And all they point to in their

13  brief, Your Honor, is harm from the *Alliance* order, from

14  another court order.

15          And I would -- you know, that brings up another point

16  besides just the failure to show irreparable harm, is standing.

17  They have to show for each form of relief that they seek that

18  there is not only an imminent injury, but an injury that is

19  fairly traceable to FDA's allegedly unlawful conduct and that

20  is likely to be redressed by the judicial relief sought.  Well,

21  the only challenged conduct here is the January 2023 REMS

22  modification.  And any injuries that would be fairly traceable

23  to that by definition would not be redressed by an order

24  requiring FDA to maintain the January 2023 REMS modification.

25          THE COURT:  That's the unique position that

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    Ms. Muqaddam tells us that we're in here.  That's the question

2    that I was asking.

3              MR. KATZEN:  Right.  But this is the irreducible

4    constitutional minimum of standing.  And I appreciate the

5    position she's in, but there is no exception for the unique

6    situation.

7              To the extent that they are alleging that their

8    injuries come from the *Alliance* order or from actions of other

9    third parties, that fills the second prong of standing because

10   that's not a failure traceable to FDA.  So even assuming that

11   they have established some imminent injury relating to the

12   REMS, they have not shown that that injury is both fairly

13   traceable to the allegedly unlawful conduct in this case and

14   could be redressed by the judicial relief that they have

15   sought.

16             And thirdly, under the APA and principles of remedial

17   law, remedies are intended to address the specific wrong that

18   the plaintiff establishes.  So this is related to the point I'm

19   saying, but it's a little bit distinct.  In the context of the

20   APA, the relief that a plaintiff is entitled to, even in the

21   preliminary injunction context, is relief that runs against the

22   final agency action that they're challenging.  They are

23   challenging again the January 2023 REMS modification.  But the

24   relief they seek isn't really relief from that action at all.

25   It just requires FDA to maintain that action.

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          Now, they've said that it's not unusual for there to

2    be injunctions requiring FDA to maintain the current status quo

3    pending litigation, but those are cases in which they -- the

4    plaintiff has come forward and pointed to something that FDA is

5    imminently going to do that would upset the status quo.  And

6    they haven't met that burden here.

7          THE COURT:  So -- but what -- and this is where I

8    have to reconcile the Washington court with what the FDA is

9    requesting here.  Isn't the same circumstance in existence --

10   weren't the same circumstances existent, if you will, in

11   Washington; and that is, that judge found that because of the

12   existence of the REMS and the uncertainty that existed in the

13   climate that in determining -- in answering the questions

14   before him in that case, he was going to lock the parties in

15   place, if you will?  In other words, the 2023 REMS remain in

16   place and now he's going to conduct -- allow discovery to go

17   forward and resolve the case, and you're going to know better

18   about what's going on in the procedural posture of that case

19   certainly than I.

20         Isn't this the same situation, and doesn't that

21   opinion then become persuasive authority for me?

22         MR. KATZEN:  So it's a different situation for a

23   couple of reasons.

24         First, as I think Your Honor noted, the relief that

25   the Washington court entered was never asked for by the

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  parties.  So it was never briefed.  The Washington court, as I

2  recall, didn't say what it thought FDA was imminently going to

3  happen to change the REMS.  So it didn't really address the

4  issue I've been discussing.  But, you know, I think it's worth

5  noting just the difference in procedural posture that I

6  mentioned before; namely that at the time the Washington court

7  issued that order, the *Alliance* order was scheduled to go into

8  effect in seven days.  And here, it's not scheduled to go into

9  effect at all.  That is I think -- even if Your Honor finds the

10 Washington court's reasoning persuasive -- is a key difference

11 that separates this case from that case on that threshold

12 factor of irreparable harm.

13       THE COURT:  And what that court said is that -- and I

14 recognize the Ninth Circuit and the Fourth Circuit have

15 different standards as it relates to preliminary injunctions.

16 It said that one of the reasons that it did not -- and what was

17 sought by those plaintiffs, those states, is that to remove the

18 2023 REMS -- and that's still the goal, is to remove all the

19 REMS, but that would take you -- would eliminate the ability of

20 pharmacies to provide the drug, and it would reduce the

21 availability.  And then the Court said that from an equitable

22 standpoint, it was appropriate for the FDA not to act with

23 respect to the REMS program until a determination is made.

24 That's essentially what's being sought here, and the government

25 hasn't sought to seek relief from that order.

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1        Why shouldn't the government be treated similarly in

2   this Court?  In other words, then the courts of equal

3   jurisdiction are treating the government the same way.

4        MR. KATZEN:  As Your Honor noted before, there's

5   multiple reasons why the government may decide not to appeal a

6   particular case.  One can't infer from the fact that we didn't

7   appeal in Washington, that we agree that the order there was

8   appropriate.

9        THE COURT:  I know it's not an agreement.  Right.  I

10  recognize that.

11       MR. KATZEN:  What I would say to you is I think that,

12  for the various reasons I have stated, there is no imminent

13  harm; that harm isn't traceable to FDA conduct; and to the

14  extent that there is harm from the REMS, that that wouldn't be

15  redressed by relief that requires FDA to maintain the REMS.

16  If, nonetheless, the Court finds the Washington order

17  persuasive, I still think that one key difference is that

18  there, the order was scheduled to go into effect in seven days,

19  and here it's not scheduled to go into effect at all, which

20  goes certainly to the imminence factor that's plaintiffs'

21  threshold burden to show under the Fourth Circuit's decision.

22       THE COURT:  And certainly the FDA could go into the

23  Washington court now and say that your injunction is moot, or

24  the need for the injunction is moot because of the stay in the

25  *Alliance* case; is that correct?

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          MR. KATZEN:  We haven't -- we haven't --

2          THE COURT:  You haven't done that.

3          MR. KATZEN:  We haven't briefed mootness there in

4   that case.

5          THE COURT:  And whether "moot" as a legal term is the

6   right term, I'm not exactly sure.  The point is that your

7   argument in some respects is:  We don't need even the

8   Washington injunction because of the stay in the *Alliance* case?

9          MR. KATZEN:  Yeah.  I think to the extent the

10  Washington injunction is intended to prevent harm from the

11  *Alliance* order, it's certainly not necessary, because the

12  *Alliance* order isn't in effect and may never go into effect.

13         THE COURT:  All right.  I understand.

14         MR. KATZEN:  To the extent -- to Your Honor's concern

15  about how -- what -- how FDA interprets the Washington order,

16  and we could submit supplemental briefing on that issue, but

17  I'm just not prepared today to interpret that order absent a

18  specific factual context that the agency has considered.

19         THE COURT:  I understand.

20         Talk -- I'll leave it to you as to where you want to

21  go next, whether it be exhaustion or likelihood of success.

22         MR. KATZEN:  Sure.  Let me begin with the exhaustion

23  point.  So the sides are in agreement, I think, that there is a

24  mandatory exhaustion requirement imposed by FDA's regulations.

25         THE COURT:  And futility is the exception.

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          MR. KATZEN:  Plaintiffs argue that they qualify for

2    the Fourth Circuit's narrow futility exception.

3          THE COURT:  Certainly as to the first two; and that

4    is the provider certification and as to the patient contract,

5    those have been dealt with on numerous occasions by the FDA,

6    and the FDA has affirmed those on each occasion; is that right?

7          MR. KATZEN:  That's true; however, FDA has also --

8    and what the history shows is the FDA reconsiders requirements

9    and modifies them as necessary when it's presented with new

10   evidence and new arguments.  And part of the problem here is

11   that plaintiffs in their complaint, in their motion for

12   preliminary injunction, rely on stuff that wasn't before the

13   agency when it reconsidered these requirements back in its 2021

14   review which resulted in the REMS modification that was

15   approved in January.

16          For instance, they make -- they talk at length about

17   how the REMS restrictions are extra burdensome because of how

18   they interact with state legislation enacted in the wake of

19   Dobbs.  I think that's in the first paragraph of their

20   complaint.  It's a major argument of plaintiffs.  That wasn't

21   before the agency back in 2021 when it was considering all

22   these issues, because Dobbs hadn't been decided at that time.

23   That issue has never -- that question and its relevance to the

24   burdens analysis has never been put to the agency.

25          THE COURT:  So right now the two courts that I'm

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   aware of -- and there may be additional; Ms. Muqaddam will tell

2   me -- is both the Texas court and the Washington court agree on

3   something, and that is that exhaustion is futile.

4           Are there any other courts that have addressed that

5   issue with respect to these REMS, mifepristone and --

6           MR. KATZEN:  I don't believe there is any other

7   courts that have addressed it with respect to these REMS, Your

8   Honor.

9           THE COURT:  All right.  And the pharmacy

10  certification was challenged in the 2022 citizen's position by

11  ACOG, right?

12          MR. KATZEN:  Right.  But it's important to realize

13  what ACOG said the petition was about.  It contained -- as

14  relevant here -- two different requests.  The first request was

15  for FDA to ask the sponsors for mifepristone -- or the sponsor

16  for Mifeprex to submit a supplemental application that proposed

17  miscarriage management as an approved indication for the drug.

18  Miscarriage management is currently not an approved indication.

19  And the second request was to modify the REMS so as to not

20  unduly burden that new proposed use of miscarriage management.

21  Those were the -- if you look at the actions requested in the

22  ACOG citizen's petition, which I believe is Exhibit O to

23  plaintiffs' complaint, those are the actions requested.

24          As to the first request, FDA denied it because it's

25  up to the sponsor to decide what new indications to seek

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    approval for.  By denying that first request, that meant that

2    the second request about modifying the REMS was premature

3    because miscarriage management not being an approved indication

4    for mifepristone, it would be premature to request that the

5    REMS be modified so as not to unduly burden that approved use.

6    So the FDA didn't consider these issues in the 2022 ACOG

7    citizen petition.

8         THE COURT:  Over the course of the last 23 years -- I

9    think that's right, maybe 22 and-a-half years -- how many

10   citizens' petitions have been filed challenging the REMS for

11   mifepristone?

12        MR. KATZEN:  I don't know the answer to how many

13   citizen petitions have been filed, Your Honor.  I can try to

14   find that out.

15        THE COURT:  Have any of them resulted in a

16   reconsideration of the REMS?

17        MR. KATZEN:  I don't know if any citizen petition

18   has.  FDA has modified the REMS before -- before 2021 and

19   modified it before --

20        THE COURT:  I think 2016 and 2007.

21        MR. KATZEN:  That's correct, in response to new

22   information.  Now, I don't know if that new information comes

23   to it from the sponsor, or from outside, or from a citizen

24   petition.  But the point is that FDA has shown a willingness to

25   reconsider its -- the requirements imposed by the REMS when new

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   evidence is put before the agency in some fashion that

2   justifies the modification.

3        THE COURT:  Part of the response to it is that -- I

4   don't want to use the word "futility," because that has a legal

5   connotation here -- is that if these plaintiffs have to file a

6   citizen's petition that takes some period of time to address --

7   and certainly the *Alliance* court -- whether right, wrong, or

8   indifferent, I don't know -- took some issue with respect to

9   the time it took to respond to certain citizen petitions.  If

10  there is some measure of irreparable harm -- and I recognize

11  you disagree with that -- then that simply delays the ability

12  of the courts to be able to address that harm.  If they have to

13  go back and file a citizen's petition, it may result in this

14  case being put off for six, nine, 12, 18 months, whatever it

15  may be.  I think that's going to be what I'm going to hear from

16  the plaintiffs.

17        Can you address that?

18        MR. KATZEN:  I mean, first of all, we don't think

19  there is irreparable harm.

20        THE COURT:  I know you don't think there is

21  irreparable harm.

22        MR. KATZEN:  We certainly don't think there is

23  significant enough irreparable harm to justify departing from

24  the normal requirement that a party must exhaust its

25  administrative remedies.  And I emphasize the importance of the

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  exhaustion requirement in this context because it's crucial to

2  the development of an administrative record on which the

3  agency's action can be appropriately reviewed in light of all

4  plaintiffs' arguments.  To the extent they're relying on new

5  arguments, those won't be reflected in the administrative

6  record unless they've put that before the agency somehow.  And

7  it will not facilitate judicial review to proceed straight to

8  judicial review without first filing a citizen petition and

9  creating the record before the agency that they need to create.

10         THE COURT:  And it may at the end of the day be more

11  fundamental than that, and that is that there is no basis in

12  fact -- because of all the reviews that the FDA has done of

13  this drug because of all of the conclusions that have been

14  reached about the safety of the drug, and that having REMS,

15  period, with respect to the administration of this drug is

16  inappropriate, because the FDA has certainly considered that on

17  numerous occasions because they have to make that determination

18  as to whether this drug crosses some threshold, as I understand

19  it, with respect to safety in its use and administration and

20  prescription before it can assign certain REMS to it, correct?

21         MR. KATZEN:  Right.  With the caveat that the

22  restrictions that FDA imposed at the time of approval were

23  before there was a REMS statute.  It was under FDA's subpart H

24  regulations --

25         THE COURT:  Right.  And in --

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1           MR. KATZEN:  -- which those restrictions were deemed

2    to be a REMS in 2007 when Congress enacted the REMS statute for

3    the first time.  But yeah, FDA has said that --

4           THE COURT:  But -- and I apologize for interrupting.

5    But does the FDA have an ongoing obligation to consider whether

6    REMS remain necessary on drugs; in other words, what's put in,

7    in 1975 may not be still applicable in 2022?

8           MR. KATZEN:  Yes.

9           THE COURT:  And if it hasn't been challenged, does

10   the FDA still have an obligation to review those 75 -- whatever

11   they were called before the REMS statute, before --

12          MR. KATZEN:  Right.

13          THE COURT:  You see where I'm going?

14          MR. KATZEN:  I see where you're going.

15          The statute provides for FDA to make -- do periodic

16   evaluations to determine whether specific REMS requirements,

17   safe use should be --

18          THE COURT:  Medical science advances, right?

19          MR. KATZEN:  Exactly.  And FDA has done that,

20   including the 2021 review that prompted the January 2023 REMS

21   modification.

22          So, I mean, I guess the final point being on

23   exhaustion that FDA has shown itself willing to modify various

24   requirements of the REMs, or even eliminate them, as in the

25   case of the in-person dispensing requirement when new evidence

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   is put before it.  Plaintiffs are relying on evidence and

2   argument that were not put before the agency during its 2021

3   review.  They should be required to put it before the agency

4   for the first time for -- before getting a decision on the

5   merits of their claims.

6           And just to turn briefly, if I can, to the merits,

7   you know, I don't think *Mayor of Baltimore* holds that if the

8   medical -- if medical organizations say something, the FDA has

9   to then do it.  What it at most would hold is that FDA has to

10  provide a reasoned explanation for its decision.  And perhaps

11  that has some force when there's -- when there's, you know,

12  evidence that organizations in the medical community oppose it.

13  But FDA did provide a reasoned explanation here provided in

14  Exhibit C to our motion where it went through each of the

15  requirements at issue --

16          THE COURT:  That goes to the issue -- whether there's

17  a reasoned explanation goes to the issue of whether the

18  decision to impose the REMS was arbitrary and capricious,

19  right?

20          MR. KATZEN:  Correct.

21          THE COURT:  If there's a reasoned explanation, then

22  you get the benefit of the doubt.

23          MR. KATZEN:  Correct.  Exactly, Your Honor.

24          And I want to make a point about what was said about

25  Korlym, which is another drug whose active ingredient is

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  mifepristone that doesn't have a REMS.  When FDA is determining

2  whether a drug requires a REMS, it does more than just look at

3  whether two drugs are the same active ingredient to determine

4  whether safety issues require a REMS for one and not the other.

5  It looks also to things -- such things as conditions of use and

6  how those conditions of use interact with the specific risks of

7  the drug at issue.

8          Korlym is for patients with Cushing's syndrome or

9  Cushing's disease.

10          THE COURT:  Male and female, right?

11          MR. KATZEN:  Right.  And people with Cushing's are

12  unlikely to be pregnant; and, in fact, the drug is

13  contraindicated for people who are pregnant.  And, you know,

14  since the risks of mifepristone in large measure relate to

15  pregnancy, such as ectopic pregnancy, there is just a different

16  risk profile for the two drugs, despite the fact that they have

17  the same active ingredient.  So one cannot infer from the fact

18  that Korlym doesn't have a REMS that Mifeprex doesn't need a

19  REMS either.

20          THE COURT:  But as I'm understanding the argument --

21  and I've got to go back and look at all the exhibits -- the

22  importance of the REMS is to make sure that the drug is

23  administered within the time frame for which it's authorized up

24  to 11 weeks, I think.

25          MR. KATZEN:  Through ten weeks.

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          THE COURT:  Yeah, 70 days, I think.

2          MR. KATZEN:  That's part of it, Your Honor.  So the

3   prescriber certification requirement requires prescribers to

4   certify that they can -- one of the things they have to certify

5   to is that they can accurately date pregnancies to comply with

6   that condition of use.  But they also have to certify that

7   they're able to diagnose ectopic pregnancies, since those pose

8   a risk for people who take mifepristone.

9          THE COURT:  But doesn't every -- but doesn't every

10  good OB/GYN have to be able to do that, because separate and

11  apart whether this drug is used, an ectopic pregnancy is

12  potentially very, very dangerous to the woman, right?

13         MR. KATZEN:  An ectopic pregnancy is potentially

14  dangerous to women.  The dangers can be exacerbated when the

15  patient uses Mifeprex.  We understand that many doctors who

16  prescribe this drug will already -- will have this

17  qualification, which will make it very easy for them to

18  certify --

19         THE COURT:  I would think the patient standard of

20  care anywhere in the country for an OB/GYN has to be able to

21  identify ectopic pregnancies because women who have no intent

22  upon aborting a child will show up in a doctor's office maybe

23  with signs of pregnancy, but then begin to develop problems

24  that become endemic to an ectopic pregnancy and require

25  immediate action.  And so regardless of whether you're

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    certified to administer mifepristone, that OB/GYN has to be

2    able to address the medical needs of the -- of their patient,

3    regardless of whether they're going to use that as a way to be

4    able to deal with it.

5         MR. KATZEN:  I take the point, though, without this

6    requirement there would be no guarantee that the drug would, in

7    fact, be prescribed by only qualified physicians, but --

8         (Overlapping speakers)

9         THE COURT:  -- without REMS that are said don't use

10   if such and such, right?  I mean, there are all kinds of drugs

11   that are saying don't administer -- for example, the use of

12   mifepristone to treat Cushing's has certain contraindications.

13   Don't administer this drug if you're pregnant.  But it doesn't

14   come with REMS.

15        MR. KATZEN:  Just to back up for a second, these

16   questions I think go back to FDA's original decision back in

17   2000 when it was approved to require the prescriber

18   certification requirement to begin with.  What was on the table

19   in 2021 when FDA undertook its review was whether to modify

20   that existing requirement.  The way the agency approached that

21   is it didn't reconsider its initial decision to impose these

22   requirements de novo.  It asked whether there is any evidence,

23   since the last substantive REMS modification in 2016, that

24   justified departing from its earlier conclusion and in some way

25   modify it.  So it was -- the inquiry was focused on whether --

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  on evidence that had arisen since 2016, and whether that

2  justified departing from the conclusion the agency had

3  previously reached.  And the agency reviewed the literature and

4  wasn't able to find anything in the literature that showed that

5  the requirement did not contribute to safety.  And so it

6  determined that there was no evidence justifying, modifying, or

7  omitting this requirement.

8          THE COURT:  If the plaintiffs are ultimately

9  successful in this case -- and not just at the preliminary

10 injunction stage, but they achieve the relief that they seek,

11 and that is to have the 2023 REMS set aside -- does that take

12 them back to the 2016 or do you understand the relief they seek

13 is to get rid of any REMS as it relates to mifepristone?

14         MR. KATZEN:  Well, I think the most they get is

15 relief against the most recent -- the January 2023 REMS

16 modification.

17         THE COURT:  That would take them back to 2016 if they

18 achieve that?

19         MR. KATZEN:  Well, I think -- we're happy to brief

20 this issue at the appropriate time, or brief it on what we

21 think the ultimate remedy here should be.  But I think we would

22 say that the REMS should remain in place while FDA -- on

23 remand.  The drug -- it would not be appropriate for the Court

24 to order that the drug be, you know, in essence, approved under

25 conditions that FDA has never determined were safe and

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  effective for the drug.  There is no status quo ante in which

2  the drug wasn't subject to some kind of restrictions.  So we

3  haven't yet gotten to the stage where we've briefed the

4  ultimate relief here, but I think our argument is that --

5          THE COURT:  It's beyond the medical purview of the

6  Court to say to get rid of all the REMS is what you're saying?

7          MR. KATZEN:  Right.

8          THE COURT:  It would go back for a determination from

9  the get-go.

10          MR. KATZEN:  Right.  And again, it's not pertinent to

11  this motion for preliminary injunction for the simple reason

12  plaintiffs have disclaimed any intent or any preliminary

13  injunction that would act against the agency action they're

14  challenging.  As they say, they're seeking a preliminary

15  injunction that would essentially lock in the January 2023 REMS

16  despite, in our view, not having identified any imminent harm

17  that they are about to suffer as a result of FDA's actions that

18  would be prevented.

19          And I guess just the point about the scope of relief

20  here.  You know, in our view, any relief should be -- we think

21  relief is inappropriate for all the reasons I've articulated.

22  But if the Court were to enter any relief, it should not be

23  statewide relief.

24          THE COURT:  Limited to these particular plaintiffs?

25          MR. KATZEN:  It should be limited to these particular

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  plaintiffs.  The plaintiffs in the Washington case --

2          THE COURT:  How do I do that for a plaintiff that

3  sits here in Charlottesville and an abortion provider that may

4  be in Roanoke or some other part of the Western District, or an

5  abortion provider that may be in Richmond?  How do I do that to

6  where the FDA may be able to take some action that impacts

7  someone differently who may be in a sister county?

8          MR. KATZEN:  Yeah, it's an interesting question which

9  goes to the unusual nature of the relief that's being requested

10  here.  And I think we would have to figure out how to comply

11  with an order -- I don't know how to interpret that in the

12  abstract.  But in any event, whatever the order would prohibit,

13  it should prohibit that with acting with respect to these

14  plaintiffs and not throughout the entire state where these

15  plaintiffs live, since they allege no injuries that require

16  statewide redress in order to address their own personal

17  injuries.

18          THE COURT:  Do you want to address the stay?

19          MR. KATZEN:  I can briefly address the stay.  It's

20  wrapped up with our arguments about irreparable harm.

21          THE COURT:  I am interested in your thoughts as to

22  help me analytically as to how you think I should address it.

23  Should I address the preliminary injunction first and determine

24  whether I think that type of relief is appropriate and then

25  address the stay; and that is, if I enter an injunction and

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  then stay what goes forward in the case until the *Alliance* case

2  is resolved, or do they go hand in hand?

3          MR. KATZEN:  I think it would be appropriate for Your

4  Honor to deny the motion for preliminary injunction now on the

5  grounds that plaintiffs haven't shown imminent irreparable

6  harm.

7          But an alternative to that would be if Your Honor

8  thinks that maybe imminent irreparable could arise, is to

9  simply stay the matter, including the motion for preliminary

10 injunction, and defer any decision on that until, you know, in

11 Your Honor's view a more -- there is more of a case for

12 imminent harm.  Now, we think there would still be problems

13 with the request for preliminary injunction even later, even

14 if, for instance, the *Alliance* case were decided.

15         With that said, Your Honor really could do either,

16 but I think given plaintiffs' failure to identify any imminent

17 irreparable harm, it would be most reasonable to deny the

18 motion for preliminary injunction and then grant a stay of

19 proceedings pending *Alliance* so that --

20         THE COURT:  So in a case of this nature, I'm limited

21 to the administrative record, correct?

22         I mean, is there any discovery that goes beyond the

23 administrative record?

24         MR. KATZEN:  No, Your Honor.

25         THE COURT:  And what's involved in production of the

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  administrative record in this case?

2          MR. KATZEN:  So FDA is currently on a schedule to

3  produce the administrative record in the Washington case.

4          THE COURT:  Is it going to be the same record as in

5  this case?

6          MR. KATZEN:  We have not yet had a --

7          THE COURT:  A rule --

8          MR. KATZEN:  Come to that discussion yet, but --

9          THE COURT:  Substantially similar.

10          MR. KATZEN:  It should be similar, I think that's

11  fair to say.

12          The reason we're requesting the stay is principally

13  because of merits briefing that would follow production of the

14  administrative record, which we believe should not proceed

15  until resolution of appellate proceedings in *Alliance*, given

16  the potential of any decision in *Alliance* to offer important

17  guidance to this Court on how it should decide some of those

18  issues.

19          THE COURT:  Is there -- and I understand that point.

20          Is there any reason that I shouldn't require

21  production of the administrative record but then stay

22  everything with respect to briefing, because I may agree with

23  you that until -- and Ms. Muqaddam is going to tell me I'm

24  making her irreparable harm argument -- until the uncertainty

25  regarding *Alliance* is resolved either by the Fifth Circuit or

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  the Supreme Court, and if the Texas court is reversed or

2  mifepristone exists in its present form with the 2023 REMS, is

3  there any reason why the record shouldn't be produced and then

4  we're immediately able to go straight into merits briefing

5  after the stay the Supreme Court has issued is lifted, assuming

6  the case isn't otherwise resolved during a different posture?

7       MR. KATZEN:  I think I understand the question.

8  Yeah, I think if Your Honor wanted to order us to produce the

9  administrative record, we could go ahead and do that and stay

10  the rest to have proceedings.

11       THE COURT:  I think you're going to be 95 percent, if

12  not 100 percent, already there, having done it in the

13  Washington case.

14       MR. KATZEN:  Yeah, I'd have to confer with agency

15  counsel, but there is some overlap there, Your Honor.

16       THE COURT:  Okay.  Anything further?

17       MR. KATZEN:  That's it, Your Honor.  Thank you.

18       THE COURT:  Thank you very much.

19       MS. MUQADDAM:  I think we have extensively covered

20  why plaintiffs believe they are experiencing extreme

21  irreparable harm right now, but I wanted to address six points.

22       THE COURT:  Yes, ma'am.

23       MS. MUQADDAM:  So I think the first one is, as Your

24  Honor pointed out, the government cannot articulate why these

25  three states should be treated so differently from these 17

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   others and the District of Columbia.  They just can't say.  And

2   the interest, as you pointed out, in the government --

3           THE COURT:  Should I get separate briefing on that

4   issue; in other words, whether -- and I know Mr. Katzen was

5   reticent to answer the question -- but as to whether the FDA

6   can take any action that would impact these particular

7   plaintiffs that it couldn't take in the Washington case?

8           MS. MUQADDAM:  Well, I think we know the answer to

9   that question already.

10          THE COURT:  Okay.

11          MS. MUQADDAM:  And that's because the Washington

12  court issued its order.  And then, for example, the government

13  took the position that Mifeprex was misbranded due to the Fifth

14  Circuit decision.  Providers in the states covered by the

15  Washington injunction were moving forward with providing

16  mifepristone -- Mifeprex -- as normal.  The providers who

17  brought suit here were thrown into absolute chaos.  So that has

18  already happened that the government has taken action that has

19  disproportionally affected these plaintiffs in ways that were

20  not experienced by the providers in the 17 states.

21          THE COURT:  Maybe you can answer the question that

22  Mr. -- and I know why he was reluctant to answer it.

23          What is the scope of the Washington injunction as you

24  understand it?

25          You're not counsel in that case; is that correct?

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          MS. MUQADDAM:  No.  There are no providers in that

2    case.

3          THE COURT:  What is the scope?  What can the FDA do

4    or not do in that case that it can do outside of those 17

5    states?

6          MS. MUQADDAM:  I think our position is, for example,

7    the government cannot -- if for whatever reason, whether it's

8    an order -- and I think if an order comes out of the *Alliance*

9    case, we would extremely be in the position that that order

10   should not extend beyond the Fifth Circuit, for example, but

11   assuming that the order doesn't specify --

12         THE COURT:  I presume if something comes from the

13   Supreme Court, horse of a different color, right?

14         MS. MUQADDAM:  And that would be a different

15   situation.  Then we would have guidance from the Supreme Court

16   about the merits of this case, perhaps.  But the government,

17   our understanding, cannot reinstate restrictions that were

18   imposed under the pre-2016 REMS, for example.  So the Fifth

19   Circuit order purported to reinstate some of those

20   restrictions.  Our position is that under the Washington

21   decision, that's simply not the case.  They can't do that with

22   respect to those 17 states and the District of Columbia.  And

23   as a result, even before the Supreme Court issued a stay,

24   providers were moving forward providing mifepristone as normal.

25   And that was assuming that the Fifth Circuit decision was going

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  to take effect.  So without the stay even, when we have the

2  prospect of the Fifth Circuit order taking effect wherever it

3  was going to take effect, those 17 states and the District of

4  Columbia were planning on moving forward providing mifepristone

5  as they have been; but not the plaintiffs, because they were

6  grappling with the fact that, for example, Plaintiff Helen

7  Weems would have been absolutely unable to provide mifepristone

8  at all.  The direct patient telehealth that serves thousands of

9  people from the plaintiffs would have been eliminated.

10        So that is the irreparable harm, and that gets to the

11  uncertainty that they're experiencing, because if it happens

12  again -- and I think the government is asking all of us, I

13  think, to put blinders on a little bit.  What has happened is

14  that mifepristone is under attack in lots of different ways all

15  around the country.  And new citizens' petitions, the *Alliance*

16  case is an example, the governments that tried to intervene,

17  for example, to oppose the Washington case --

18        THE COURT:  But I've only got what I've got, right,

19  from the standpoint of who is before me, what jurisdiction I

20  have, and I've only got a certain set of defendants.  And I

21  guess this is the fundamental question that I'm going to have

22  to wrestle with; and that is, can I use -- the plaintiffs seem

23  to be attempting to use this set of defendants to get an

24  injunction to prevent other courts from being able to take

25  action that would be inconsistent with what they seek.

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          MS. MUQADDAM:  I think it's true that the *Alliance*

2   case has injected and perpetuated this uncertainty, but FDA has

3   to take action in response to whatever comes out of that case

4   and other things that are before them like citizens' petitions.

5   They have to make a decision.  They have to make choices about

6   how they implement that.  And in the 17 states and the District

7   of Columbia, our understanding is they cannot make any of those

8   decisions in a way that alters the availability of

9   mifepristone.  And that would be true here if Your Honor enters

10  an order affording that same relief to these plaintiffs.

11          And I can touch on the statewide relief issue

12  question, which is sort of related, I think.  So it would be

13  extremely inequitable, I think, to enter this relief just as to

14  the plaintiff for the very reason that you identified, Your

15  Honor.  There are more clinics in Virginia than just Whole

16  Woman's Health Alliance.  And there are more clinics in Montana

17  and Kansas than just Trust Women and the Montana plaintiffs.

18  But they are standing in the shoes of their patients also,

19  people who seek abortion services.  And so, for the very same

20  reason that -- take, for example, in the *Jackson Women's Health*

21  *versus Dobbs* case, not all the plaintiffs in Mississippi were

22  plaintiffs in that case.  They were representing Mississippians

23  who are seeking abortion.  The same is true here.  The

24  plaintiffs here are bringing their own Article III injury, as

25  they must, but they are also exercising the third-party

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1    standing of their patients.  And those patients are not just

2    patients who are seeking abortions at their clinics.  They are

3    Virginians, they are Montanans, and they're Kansans who are

4    seeking abortion.  And so it has never been the case that when

5    abortion providers exercise third-party standing that one --

6    that every single clinic in a state had to be plaintiffs in the

7    case in order to vindicate the rights of the state citizens in

8    toto.

9         And it's not actually unusual for this kind of

10   statewide relief to be entered.  This is a slightly different

11   circumstance, but there is another case in the District of

12   Maryland that was brought by the City of Baltimore.  That case

13   was against another administrative role, but the same thing

14   happened in the Title X case which ultimately went up and

15   became *Mayor of Baltimore versus Azar.*  But that relief was

16   limited to the State of Maryland.  And the relief that was

17   entered -- and the court basically said it would be practically

18   bizarre for the relief to just be the City of Baltimore and not

19   extended to the state.

20        And so I think for the reasons of practicality, and

21   also the reasons of the fact that the plaintiffs are exercising

22   the interest of people --

23        THE COURT:  Now, of course, Maryland is a single

24   district.  I'm only the Western District.  But you do have --

25   if memory serves me, I think you have a plaintiff in the

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  Eastern District; do you not?

2           MS. MUQADDAM:  In Virginia?

3           THE COURT:  Yeah, in this case?

4           MS. MUQADDAM:  Yes.

5           THE COURT:  I believe so.  Right.

6           MS. MUQADDAM:  Yeah.  But just typically when

7  abortion providers work, anyone exercising third-party

8  standing, they're representing a population of people.  The

9  population of people here may seek care at Whole Woman's Health

10 Alliance.  They may seek care at clinics in Richmond or other

11 places.

12          THE COURT:  You seek the geographic scope to be

13 limited to the edges of the districts where the different

14 plaintiffs reside?

15          MS. MUQADDAM:  To the limits of the states.

16          THE COURT:  Well, you have an Eastern District of

17 Virginia, the District of Kansas and the District of Montana.

18          MS. MUQADDAM:  Correct.  The districts that are

19 encompassed within a state's borders.

20          THE COURT:  Right.  Okay.

21          MS. MUQADDAM:  So I'll turn to the government's

22 arguments about injury being speculative or hypothetical.  So I

23 think one of the strange things about the government's argument

24 is when the Washington case -- when the Washington judge issued

25 the injunction, the *Alliance* order didn't exist.  It existed

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  for about 20 minutes before that.  So if anything, the

2  irreparable harm here is much greater and much more certain

3  because we've seen it already happened, and there is every

4  likelihood that it will reoccur.

5       So what happened in the Washington case is that this

6  judge issued an injunction.  He later clarified that the order

7  stood regardless of the orders in the *Alliance* case, but the

8  order was issued before probably even the government had

9  finished reading the Texas decision.  So the argument that the

10 Washington order was targeting irreparable harm because the

11 Texas order would go into effect within seven days is a little

12 strange because the order was issued basically before anyone

13 even had finished reading the order.  So I think if anything

14 here, the procedural posture is greater emphasis on irreparable

15 harm because we've seen what happened.  The plaintiffs have

16 experienced it.  They are continuing to experience it; whereas

17 in the Washington case, that order was issued before anyone

18 knew the level of uncertainty that was going to occur.  Here,

19 we know.  We've seen it and it's continuing to happen.

20      So I'll touch on the intervention point.  I think the

21 plaintiffs have not intervened in the Washington case for two

22 reasons at least.  One is, as you pointed out, it's brought by

23 states, and they're raising injuries that are typically

24 sovereign injuries.  They're also exercising --

25      THE COURT:  Large section of the opinion that dealt

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   with the state standing separate and apart from you as a

2   private party.

3          MS. MUQADDAM:  Exactly.  So I think plaintiffs have

4   brought suit here partly because of the lead plaintiff's

5   connection to the forum and a desire to represent the facts of

6   Virginians, in addition to their fellows in Kansas and Montana,

7   but also because they are raising quite different arguments and

8   they're raising quite different facts about patients.  The

9   states have raised all sorts of important concerns about the

10  operation of their public health systems and their hospitals

11  and extremely important facts, but unrelated in some ways to

12  what the plaintiffs are raising here.  So the relief might be

13  ultimately similar, but I think the cases have quite a number

14  of factual differences, which is why plaintiffs didn't seek to

15  intervene in Washington.

16         I'll just close with the point about likelihood of

17  success on the merits.  The government has talked extensively

18  about how issues weren't before the agency that plaintiffs have

19  raised.  And I think the standard for futility is about whether

20  the agency would make a different determination based on

21  information that we would provide them.  And they parse and

22  sort of split fine hairs, I think, about the ACOG 2022

23  citizen's petition.  And I realize I was referring to the wrong

24  exhibit letter.  It's Exhibit O, as Mr. Katzen pointed out.

25  But I'd just like to read a little bit of that.  And it is true

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   that the relief they sought there was partly about miscarriage

2   management, partly about elimination of the REMS.  But the

3   information that was before the agency included the

4   mifepristone REMS must be eliminated because it is not

5   necessary for the drug's benefits to outweigh its risks and is

6   unduly burdensome for this use.  But this is again information

7   that has been provided to the agency and was before the 2023

8   REMS were finalized.  And it included the impact of the *Dobbs*

9   decision, the impact on poor and rural patients, that the

10  patient agreement forum was not necessary, that the

11  self-certification process is not necessary.  They extensively

12  got into the pharmacy certification requirement.  They talked

13  about the Canadian data.  And in particular, they highlighted

14  that existing data demonstrate that a removal of all REMS

15  requirements will not harm patient safety.

16          So the question isn't necessarily:  Has somebody

17  provided a citizen's petition with exactly the terms of what

18  the plaintiffs might be seeking here.  The question is:  Was

19  the information before the agency when it was making its

20  decision?  And it absolutely was, and so that is very clear.

21          THE COURT:  And Exhibit O is the -- is FDA's

22  response, or is that the petition itself?

23          MS. MUQADDAM:  This is the petition itself.

24          THE COURT:  Is the agency's response --

25          MS. MUQADDAM:  I believe it is --

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          THE COURT:  I'm going to have to read all the

2    exhibits again anyway.

3          MS. MUQADDAM:  We have a handy-dandy --

4          MR. KATZEN:  Exhibit P, I believe.

5          MS. MUQADDAM:  Oh, Exhibit T?

6          MR. KATZEN:  P, I believe.

7          MS. MUQADDAM:  Exactly right, Exhibit P, plaintiffs'

8    complaint, Exhibit P.  Thank you.

9          THE COURT:  Okay.  Thank you.

10         MS. MUQADDAM:  So the evidence was before them, even

11   if the specific identical request was not.  And so the question

12   is not:  Has someone asked them the exact question?  The

13   question is:  Does he have the information that plaintiffs

14   would provide?  And they absolutely did.

15         I will close again by just emphasizing that

16   plaintiffs have sought the relief that they think is the most

17   narrow and tailored to addressing the harm that they are

18   experiencing.  We've talked extensively about that harm and how

19   it's not just experienced by patients -- plaintiffs.  It's

20   experienced by the thousands of people that need mifepristone.

21   And so we hope that the Court will enter this narrow relief.

22         THE COURT:  All right.  Do you want to speak any more

23   to the motion to stay?  It was Mr. Katzen's motion, and I'll

24   give you an opportunity to respond.

25         MS. MUQADDAM:  Yeah, we will respond.  I think --

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          THE COURT:  You can have plenty of opportunity to

2    respond in writing as well.

3          MS. MUQADDAM:  Right.  We generally -- we generally I

4    think agree with the government that it's tied up together.  So

5    I think Mr. Katzen is correct that you could do either in terms

6    of order of operations.  But I think that the request for a

7    stay is intimately related to whether or not Your Honor thinks

8    that we have demonstrated sufficient imminent harm.  And so I

9    think we think that the Court should grant the preliminary

10   injunction.  We would perhaps not be opposed to staying the

11   proceedings if an injunction was granted.  But certainly if an

12   injunction is not granted, we certainly oppose a stay.  And I

13   think the government has been a little bit mushy about staying

14   the case versus staying the motion.  And I think if the motion

15   determination is stayed, that's one thing.  I don't think we

16   think that the proceedings should be stayed precisely because

17   we think we have demonstrated a very strong likelihood of

18   success on the merits, especially particular to this circuit.

19          THE COURT:  But should -- I asked Mr. Katzen the same

20   question.  If I require production of the administrative

21   record, which is going to be -- it's already going to be put

22   together -- maybe there are a few things that are different as

23   it relates to this particular set of plaintiffs; I can't

24   imagine that there really are -- but then not address the

25   merits until after the *Alliance* case is otherwise resolved,

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  because the outcome of that case may answer some of the

2  questions that we're dealing with in this particular case.

3          MS. MUQADDAM:  I think that's right on the merits.

4  We would just continue to draw the distinction about the

5  outcome of the motion and the stay of the proceedings.  I think

6  if the Court grants a preliminary injunction ordering the

7  administrative record and then seeing what guidance comes from

8  the Supreme Court might be sensible.  But if an injunction is

9  not granted, we're going to want to move as quickly as possible

10  in the trial court so that we can ultimately get some relief,

11  because for all the reasons we've talked about for what ACOG

12  said in their citizen's petition, what the entire medical

13  community has said since 2015, is that these are extremely

14  burdensome, serve no interest; and, if anything, that has

15  become exceptionally more true in the post-*Dobbs* world, which

16  ACOG gets into in their 2022 citizen's petition.  So I think if

17  the Court is not inclined to grant the preliminary relief, then

18  we would want to move quickly.  But I think if relief is

19  granted and plaintiffs feel like they have some security, and

20  the security that these other states enjoy, that would be a

21  very different matter.

22          THE COURT:  Last question -- and it's not going to be

23  dependent upon how I make my decision -- but the grant or

24  denial of the preliminary injunction is an appealable issue.

25  The grant or denial of a stay is not, however, is it?

84

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          MS. MUQADDAM:  I think it depends on whether the stay

2    order has some effect on the interests of the parties.

3          THE COURT:  And I don't know.  The reason --

4          MS. MUQADDAM:  Generally not.

5          THE COURT:  You know, I recognize that ultimately

6    someone -- a court or two above me may ultimately be involved

7    in this case.  And I don't want to do anything that negatively

8    impacts the parties' rights to be able to have appropriate

9    review.

10          MS. MUQADDAM:  Right.  And I think, you know, in

11   addition to the irreparable harm we've demonstrated, it's also

12   the equity point about how the uncertainty operationally and

13   the patient health and dignity uncertainty that is presently

14   experienced by them and basically no other abortion providers

15   in any of those other states is really dramatic.  And we do

16   think that that would preserve the interest of the parties as

17   this moves to a decision on the merits, whether the proceedings

18   are lengthy or shorter.

19          So I think -- you know, I do think that our position

20   is that the injunction should be granted.  As to the

21   lengthiness of the merits determination, I think if the

22   injunction is granted, we would not be terribly opposed to

23   production of the administrative record.  It is long and it

24   takes time.  We know that.  So even if they are doing it as

25   quickly as they can in Washington, it's not a small feat.  It's

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  quite a big deal.  So I know that that takes time.  And, you

2  know, we would not be opposed to that, but we do think we have

3  interests that really need to be protected in the interim.

4          THE COURT:  Thank you very much.

5          Mr. Katzen, anything further as it relates to the

6  stay, which I think gives everyone an opportunity to have the

7  last word on their particular motion.

8          MR. KATZEN:  Nothing as it relates to the stay, Your

9  Honor.

10          THE COURT:  All right.  So let's talk about a

11  briefing schedule.  Ms. Muqaddam, I know you requested until

12  next Thursday.

13          MS. MUQADDAM:  Yes, Your Honor.

14          THE COURT:  I guess you don't want me to require

15  something to be done the following week.

16          MS. MUQADDAM:  I think if the deadline --

17          THE COURT:  I'll make it Friday, as you are wrapping

18  up.  So that will be the 16th.

19          MS. MUQADDAM:  Okay.

20          THE COURT:  And then I believe, Mr. Katzen, you

21  requested two weeks after that.  That will take you to the

22  30th, if I'm doing my math correctly.

23          MR. KATZEN:  That's correct.

24          MS. MUQADDAM:  Your Honor, just a point of

25  clarification.  The government's reply will be exclusive to the

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1  motion to stay?  There will not be an opportunity to surreply?

2       THE COURT:  So I'm going to talk in just a second

3  about one particular issue that we've talked about; and that

4  is, you know, what is the scope, whether the FDA can have

5  different -- I don't know whether to say have different REMS,

6  but whether the FDA can effectively administer mifepristone

7  differently in those states not covered by the Washington

8  decision.  It's not formulating the question presented terribly

9  well.

10      MS. MUQADDAM:  I would emphasize that most of the

11 states not covered by the injunction are states where abortion

12 is banned.

13      THE COURT:  Do you agree with that, Mr. Katzen?

14      MR. KATZEN:  I didn't hear that.

15      THE COURT:  That would leave 33 states -- well, 30

16 states because we have the three states that are here.

17      MS. MUQADDAM:  There's 13 states where abortion is

18 entirely prohibited, but then there's another large group of

19 states where abortion is extremely limited.

20      THE COURT:  Extremely limited.  Less than the ten

21 weeks that mifepristone addresses?

22      MS. MUQADDAM:  Yes.  I don't know the exact number

23 off the top of my head.

24      THE COURT:  Okay.  All right.  So let's do this:

25 June 16 to respond to the government's -- or for your reply to

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1   the motion to stay, opposition to the motion to stay, as well

2   as the reply to the government's opposition to the

3   injunction -- preliminary injunction request -- and addressing

4   as well options the Court may have under the stay, including

5   production of the administrative record and merits briefing, as

6   well, and then reply in that regard.  I don't think I need

7   anything further with respect to opposition to the injunction,

8   but then on the 30th any further reply to the opposition of the

9   motion to stay.

10          MR. KATZEN:  Understood, Your Honor.

11          I think when we had the status conference a few weeks

12  ago my understanding was that because plaintiffs' reply was

13  being pushed till after oral argument, that we would get a

14  chance to respond to points they make in their reply with

15  regard to the preliminary injunction motion.

16          THE COURT:  All right.

17          MR. KATZEN:  Normally we would have had the

18  opportunity to respond to those at the hearing, but since that

19  reply will be coming in after the hearing --

20          THE COURT:  Ultimately I'm going to give -- because

21  the plaintiff has the burden on their motion and you have the

22  burden on your motion -- I'm going to give them the last word.

23  So I will let you respond to anything new that they raise, and

24  then I'll give you seven days thereafter, Ms. Muqaddam, to

25  respond to that.

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1          MS. MUQADDAM:  All right.

2          THE COURT:  Does that make sense?  You get the last

3  word as it relates to the preliminary injunction, and the

4  government gets the last word as it relates to the stay.

5          MS. MUQADDAM:  Understood.

6          THE COURT:  I think that would work.  I'll put out a

7  short briefing order to that effect, I hope tomorrow, as well.

8          Otherwise, is there anything on behalf of the

9  plaintiffs?

10          MS. MUQADDAM:  No, Your Honor.

11          THE COURT:  Anything else on behalf of the government

12  or the defendants?

13          MR. KATZEN:  Nothing on behalf of the government.

14          THE COURT:  Let me just say this:  I know these are

15  very, very important issues to the parties.  First of all, I

16  want to thank counsel for the great professionalism they've

17  shown to each other, and being able to get these issues before

18  the Court to present them in an orderly fashion, to present

19  them in a cogent fashion; and to be willing to stand up and

20  help to educate me, not just answer my questions, but help to

21  educate me about the issues that are before it.  You've done a

22  great job and I very much appreciate it.

23          So with that, we'll stand in recess.

24  (Proceedings adjourned, 1:12 p.m.)

25

Whole Woman's Health Alliance, et al. v. United States Food
and Drug Administration, et al., 3:23cv19, 6/8/2023

1                    C E R T I F I C A T E

2       I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3    the United States District Court for the Western District of

4    Virginia, appointed pursuant to the provisions of Title 28,

5    United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction

8    with computer-aided transcription, and that same is a

9    true and correct transcript to the best of my ability and

10   understanding.

11      I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14      /s/ Lisa M. Blair              Date: June 21, 2023

15

16

17

18

19

20

21

22

23

24

25